Save Our Children Truth Commission
Pro Se Litigants
201 W Bayshore Blvd
Jacksonville, NC 28540
704-771-3238
MEL@saveourchildren.org

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

### SOUTHERN DIVISION

CASE NO. 7:22-CV-178-FL

| | |
|---|---|
| SAVE OUR CHILDREN TRUTH COMMISSION; MELODY RODGERS; MALACHI CHAPMAN; LAURIE REYNOLDS; TIJANA VIDANOVIC; TERESA GOIN; DESIREE PETERSON; MOHOGANY HUNTER; NATASHA LOACH; RENESHA TOMLIN; SHANEQUA AUSTIN; DMITRI & LISA CASH; RAYMOND SIPULT; GLENDA & RUSS CODY; KESHIA HOLLIMAN; KENYA CLOUD; KEONA BRADLEY; KRISTEN CLARK-HASSEL; ELIZABETH ANDREWS; WILLIAM & EMILY O'DELL; KRISTINA SINGLETON; SALLY BORGHESE; ALAN MEDDOWS; CHRISTINA ANDERSON; DEANNA ROBINSON; LATASHA WOOLRIDGE; JESSICA KIRBY; CONNIE FORD; WILNIESA TURNER; JOY TYLER & ROBERT LISBY JR.;GERRI HOOD; BRANDEE RITSEMA; STEVEN BRADLEY; RONISHA PETERS, HEIDI DAVIS; KATHERINE THOMAS; AND MORE<br>*Plaintiffs*<br><br>v.<br>THE UNITED STATES OF AMERICA; JOE BIDEN, KAMALA HARRIS; XAVIER BECERRA; MERRICK B. GARLAND; ET. AL.<br><br>*Defendants* | COMPLAINT FOR DAMAGES FOR:<br><br>1. **42 U.S.C. § 1983** & VIOLATION OF CIVIL RIGHTS - BY DECEPTION IN THE PRESENTATION OF EVIDENCE, INTERFERENCE WITH FAMILIAL ASSOCIATION, RETALIATION, COERCION, /ANTI-SLAPP, 1ST, 4TH, 5TH 8TH, & 14TH<br><br>**42 U.S.C. § 1988** - PROCEEDINGS IN VINDICATION OF CIVIL RIGHTS<br><br>2. **42 U.S.C.§ 1985** - CONSPIRACY AGAINST RIGHTS<br>3. **42 U.S.C.§ 1986**- NEGLECT TO PREVENT<br>4. MONELL-RELATED CLAIMS - LAW ENFORCEMENT MISCONDUCT & EXCESSIVE FORCE- FALSE ARREST & IMPRISONMENT - ABUSE OF PROCESS - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS - SEXUAL ABUSE- WRONGFUL DEATH; MALICIOUS PROSECUTION;<br><br>5. RICO CONSPIRACY TO COMMIT FRAUD BY INTENTIONAL MISREPRESENTATION, FRAUD UPON THE COURT, HONEST SERVICE, FRAUD, MAIL & WIRE FRAUD, PEONAGE, SLAVERY, HUMAN TRAFFICKING – FEDERAL TORT CLAIMS OF FRAUD<br><br>6. LEGAL MALPRACTICE, MEDICAL MALPRACTICE, BREACH OF FIDUCIARY<br><br>7. BREACH OF IMPLIED AND EXPRESS WARRANTIES; UNCONSCIONABLE CONTRACTS;<br><br>8. **28 U.S.C. § 1361** – ACTION TO COMPEL<br>9. BIVENS CLAIMS<br>10. DECLARATORY AND INJUNCTIVE RELIEF<br><br>JURY TRIAL DEMANDED |

1. Plaintiffs, representing themselves in pro-persona, hereby bring this action against Defendants UNITED STATES GOVERNMENT, JOE BIDEN, XAVIER BECERRA, MERRICK B. GARLAND, and others, and allege as follows:

**A. PARTIES**

PLAINTIFFS

2. Plaintiff **MELODY RODGERS** a female adult of sound mind and a resident of [201 W. Bayshore Blvd. Jacksonville, NC 28540].

3. Plaintiff **MALACHI CHAPMAN** is a male adult of sound mind and a resident of [470 Dekalb Ave Apt #8C Brooklyn, New York 11205].

4. Plaintiff **LAURIE REYNOLDS** is a female adult of sound mind and a resident of [600 Victoria's Cir St. Mary's, Georgia, 31558 United States]

5. Plaintiff **TIJANA VIDANOVIC** is a female adult of sound mind and a resident of [13066 Gridley St. Sylmar, California 91342].

6. Plaintiff **TERESA GOIN** is a female adult of sound mind and a resident of [841 West Alpha Parkway Waterford, Michigan, 48328].

7. Plaintiff ~~DESIREE PETERSON~~ me is a female adult of sound mind and a resident of [1632 Ontario St. Fairfield, CA 94533].

8. Plaintiff **MOHOGANY HUNTER** is a female adult of sound mind and a resident of [8236 Troost Ave. Apt 3R, Kansas City, Missouri 64131]

9. Plaintiff ~~CECELIA EVERTEZ~~ me is a female adult of sound mind and a resident of [47 Poverty Hollow Road Newtown, Connecticut 06470].

10. Plaintiff **NATASHA LOACH** is a female of adult and sound mind and a resident of [400 Liberty St. At. 105 Killeen, Texas 76543].

11. Plaintiff **RENESHA TOMLIN** is a female adult of sound mind and a resident of [1501 Edith Blvd SE, Apartment 3 Albuquerque, New Mexico, 87102].

12. Plaintiff **SHANEQUA B. AUSTIN** is a female adult of sound mind and a resident of [34 N. Clinton Ave. Rochester New York 14605].

13. Plaintiff ~~DMITRI CASH~~ me is male adult of sound mind and a resident of [ 30 S. PLYMOUTH AVE. ROCHESTER, NY 14614].

14. Plaintiff ~~LISA CASH~~ me is a female of sound mind and a resident of [130 S. PLYMOUTH AVE. Rochester, New York 14614].

15. Plaintiff **RAYMOND SIPULT** is a male adult of sound mind and a resident of [1323 N. Pershing Wichita Kansas 67208].

16. Plaintiff **GLENDA CODY and RUSS CODY** are adults of sound mind and a resident of [1012 Denver St. El Dorado, Kansas, 67042].

17. Plaintiff **KESHIA HOLLIMAN aka KESHIA HORTON** is a female adult of sound mind and a resident of [103 Gatlin Dr. 206A3 Dublin, Georgia 31027].

18. Plaintiff **KENYA CLOUD** is a female adult of sound mind and a resident of [1036 Madeira Dr. SE Apt 4 Albuquerque New Mexico 87108].

19. Plaintiff **KEONA BRADLEY** is a female adult of sound mind and a resident of [6429 E. Cottonwood Lane Wichita, Kansas 67207].

20. Plaintiff **KRISTEN CLARK-HASSEL** is a female adult of sound mind and a resident of [108 Plantation Court St. Mary's, Georgia 31558].

21. Plaintiff **ELIZABETH ANDREWS** is a female adult of sound mind and a resident of [5182 NW Miller Rd., Altha Florida 32421].

22. Plaintiffs **WILLIAM and EMILY O'DELL** are adults of sound mind and residents of [670 Elmwood Dr. Woodway, Texas 76712].

23. Plaintiff **KRISTINA SINGLETON** is a female adult of sound mind and a resident of [2023 Dallas St. Apt 6 Fort Smith, Arkansas 72901].

24. Plaintiff **SALLY BORGHESE** is a female adult of sound mind and a resident of [510 Marsh Ridge Drive, NW Apartment 103 Grand Rapids, Michigan 49504].

25. Plaintiff **ALAN MEDDOWS** is a male adult of sound mind and a resident of [5997 Smith Rd., Pleasant Plaint, Illinois 62677].

26. Plaintiff **CHRISTINA ANDERSON** is a female adult of sound mind and a resident of [2550 Ironwood Way, Apt E, Lexington Park, Maryland 20653].

27. Plaintiff **DEANNA ROBNINSON** is a female adult of sound mind and a resident of [2650 Moss Run Rd. Marietta, Ohio 45750].

28. Plaintiff **LATASHA WOOLRIDGE** is a female adult of sound mind and a resident of [529 Texas St. SE, Albuquerque, New Mexico 87108].

29. Plaintiff **JESSICA KIRBY** is a female of adult of sound mind and a resident of [240 Hazelwood Ave., #4 Pittsburg, Pennsylvania 15207].

30. Plaintiff ~~DAVID MINES~~ is a male of adult of sound mind and a resident of [Grand Rapids, Michigan].

31. Plaintiff ~~JOE STEINKE~~ is a male adult of sound mind and a resident of [439 SW Blake St. Melvern, Kansas 66510].

32. Plaintiff **CONNIE FORD** is a female adult of sound mind and a resident of [700 Hollywood Rd, Knoxville, Tennessee 37919].

33. Plaintiff ~~WILNIESA TURNER~~ is a female adult of sound mind and a resident of [3257 Market St. Unit 1 Riverside, California 92501].

34. Plaintiff ~~GAIL TURNER~~ is a female of adult and sound mind and a resident of [1400 West Washington St. Apt 1002 Paris Texas, 75460].

35. Plaintiff ~~ELANI WELLS~~ is a female of adult and sound mind and a resident of [153 Scotland Dr, NC 27921].

36. Plaintiff **QUEENA HACKNEY** is a female adult and sound mind and a resident of [2616 Charleston Gate Ave SW, Wyoming Michigan 49509].

37. Plaintiffs **JOY TYLER and ROBERT LISBY JR** are adults of sound mind and are residents of [ Florida Jail: PREVIOUS ADDRESS 1708 N 12TH St., UNIT A, Fort Pierce, Florida 34950].

38. Plaintiff **BARBARA MAST** is a female adult of sound mind and a resident of [5075 Saint Andrews Rd Apt 24 Mariposa, California 95338].

39. Plaintiff **GERRI HOOD** is a female adult of sound mind and a resident of [985 Acord St. Rockford, Illinois 61101].

40. Plaintiff **DESTINY FEATHERS** is a female adult of sound mind and a resident of [405 Bobby Adams Lane, Poteet, Texas 78065].

41. Plaintiff **JON EIFER** is a male adult of sound mind and a resident of [14050 East Avenue Q Palmdale California 93591].

42. Plaintiff ~~AMANDA HUNT~~ is a female adult of sound mind and a resident of [631 SE LeLand Street Topeka, Kansas 66607].

Moose

43. Plaintiff **STEVEN BRADLEY** is a male of sound mind and a resident of [22036 N. Black Canyon Highway, Lot 28, Phoenix Arizona 85027].

MR

44. Plaintiff ~~EMILEE LAWSON~~ is a female of sound mind and a resident of [61 County Rd, 2313, Salem, Missouri 65560].

45. Plaintiff **RONISHA PETERS** is a female of sound mind and a resident of [1641 BUNKER HILL WAY, Salinas, California 93906].

46. Plaintiff **TINA BRANDON** is a female of sound mind and a resident of [510 E. Loop 281, Suite B448, Longview, Texas, 78016].

47. Plaintiff **HEIDI DAVIS** is a female of sound mind and a resident of [241 N. 4th St., Grand Junction, Colorado 81501].

48. Plaintiff **KATHRINE THOMAS** is a female of sound mind and a resident of [1641 Bunker Hill Way, Salina California 93906].

49. Plaintiff **STEPHANIE HUMPHRIES** is a female of sound mind and a resident of [13083 Huntington Woods Ave., Spring Hill, Florida 34609].

50. Plaintiff ~~BRENDA and DANIEL BLUE~~ are adults of sound mind and are residents of [481 Cloverleaf Dr., Lancaster Texas 75146].

MR

51. Plaintiff ~~LORIBETH AARON~~ is a female of adult and sound mind and a resident of [1501 S. Park Ln. Apt 902 Altus, Oklahoma 73521].

MRs

52. Plaintiff ~~BRANDEE RITSEMA~~ is a female of adult and sound mind and a resident of [5500 Osborne Ave. SE, Kentwood, Michigan 49548-5867].

53. ~~ADDITIONAL PLAINTIFFS' NAMES ATTACHED. MORE THAN 100 PLAINTIFFS~~ MR
SAVE OUR CHILDREN TRUTH COMMISSION [201 W. Bayshore Blvd. Jacksonville NC
DEFENDANTS    28540]

**54.** Defendant **UNITED STATES GOVERNMENT**, upon the Plaintiff's information and belief is the sovereign independent government of the UNITES STATES OF AMERICA. Plaintiffs sue the said Defendant in its official capacity for damage and injunction from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Their address is: **[U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001]**

**55.** Defendant **JOE BIDEN**, upon Plaintiff's information and belief is the **President of the United States Department**. Plaintiffs sue the said Defendant in his individual capacity for damages, and his

official capacity for an injunction from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001]**

**56.** Defendant **KAMALA HARRIS**, upon the Plaintiff's information and belief is the Vice President of the UNITES STATES OF AMERICA and former Attorney General of California. Plaintiffs sue the said Defendant in her official capacity for damage and injunction from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001]**

**57.** Defendant **XAVIER BECERRA**, upon Plaintiff's information and belief is the **head of the United States Department of Health and Human Services**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is**: [200 Independence Avenue, SW Washington, DC 20530-0001]**

**58.** Defendant, **MERRICK B. GARLAND**, upon Plaintiff's information and belief, is the **Attorney General of the United States**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief for negligent supervision, neglect to prevent abuse, corruption, and fraud rampant in its subordinate courts, and for continuing to fund the human trafficking conspiracy despite being informed of the crisis. His address is: **[U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001]**

**59.** Defendant **JERRY MILNER ("MILNER")**, upon Plaintiff's information and belief is the **DIRECTOR OF THE CHILDREN'S BUREAU FOR THE ADMINISTRATION FOR CHILDREN AND FAMILIES**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. **[ 330 C. St. SW Washington, DC 20201]**

**60.** Defendant **DOES**, upon Plaintiff's information and belief, DOES are the **UNITED STATES ASSISTANT SECRETARIES FOR ADMINISTRATION FOR CHILDREN AND FAMILY SERVICES** from (2019-Present) and are sued in their individual and official capacities for injunctive relief for negligent supervision, neglect to prevent abuse, corruption, and fraud rampant in its subordinate courts, and for continuing to fund the human trafficking conspiracy despite being informed of the crisis. Their address is

**[ 330 C. St. SW Washington, DC 20001]**

61. Defendant **GAVIN NEWSOM ("NEWSOM")**, upon Plaintiff's information and belief is the **Governor of CALIFORNIA**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[1021 O Street, Suite 9000 Sacramento, California 95814].**

62. Defendant **JERRY BROWN ("BROWN")**, upon Plaintiff's information and belief is the **former Governor of CALIFORNIA.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His most recently known address is: **[1021 O Street, Suite 9000 Sacramento, California 95814].**

63. Defendant **ELENI KOUNALAKIS ("KOUNALAKIS"),** upon Plaintiff's information and belief is the **Lieutenant Governor of CALIFORNIA**. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is **[1021 O St., Suite 8730, Sacramento, California 95814].**

64. Defendant **GREG ABOTT ("ABOTT"),** upon Plaintiff's information and belief is the **Governor of TEXAS.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[1100 San Jacinto Blvd., Austin, Texas, 78701]**

65. **Defendant DAN PATRICK ("PATRICK")**, upon Plaintiff's information and belief is the **Lieutenant Governor of TEXAS.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite report of the atrocities. His address is: **[1100 San Jacinto Blvd., Austin, Texas, 78701]**

66. Defendant **SUSANA MARTINEZ ("MARTINEZ")**, upon Plaintiff's information and belief is the former Governor of NEW MEXICO. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the

abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[8301 Jefferson St NE Ste A Albuquerque, New Mexico 87113]**

**67.** Defendant **MICHELLE LUJAN-GRISHAW ("LUJAN-GRISHAW")**, upon Plaintiff's information and belief is the **Governor of NEW MEXICO.** Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[490 Old Santa Fe, Trail Room, Santa Fe, New Mexico 87501]**

**68.** Defendant **DOUG DUCEY ("DUCEY"),** upon Plaintiff's information and belief is the **Governor of ARIZONA.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[1700 W. Washington St., Phoenix, Arizona 85007]**

**69.** Defendant **RON DESANTIS ("DESANTIS"),** upon Plaintiff's information and belief is the **Governor of FLORIDA.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[400 S. Monroe St. Tallahassee, Florida 32399]**

70. Defendant **TOM WOLF ("WOLF"),** upon Plaintiff's information and belief is the **Governor of PENNSYLVANIA**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[508 Main Capital Building, Harrisburg, Pennsylvania, 17120]**

71. Defendant **BRIAN KEMP ("KEMP"),** upon Plaintiff's information and belief is the **Governor of GEORGIA.** Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite report of the atrocities. His address is: **[206 Washington St., 111 State Capitol, Suite 203, Atlanta, Georgia 30334]**

72. Defendant **BILL LEE ("LEE"),** upon Plaintiff's information and belief is the **Governor of TENNESSEE**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and

fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[State Capitol, First Floor, Suite 600 Dr. Martin Luther King Jr. Blvd Nashville, Tennessee 37243]**

73. Defendant **MICHEAL DUNLEAVY ("DUNLEAVY"),** upon Plaintiff's information and belief is the **Governor of ALASKA**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[P.O. BOX 110001 Juneau, Alaska, 99811-0001]**

74. Defendant **KATHLEEN LAURA KELLY ("KELLY"),** upon Plaintiff's information and belief is the **Governor of KANSAS**. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[State House 300 South West 10th Ave, #241s, Topeka, Kansas 66612]**

75. Defendant **KATHY HOCHUL ("HOCHUL"),** upon Plaintiff's information and belief is the **Governor of NEW YORK**. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[NYS State Capitol Building, Albany, New York 12224]**

76. Defendant **GRETCHEN WHITMER ("WHITMER"),** upon Plaintiff's information and belief is the **Governor of MICHIGAN**. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in subordinate agencies, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[111 S. Capitol Ave., Lansing, Michigan 48933]**

77. Defendant **JACKEY LACEY ("LACEY"),** upon Plaintiff's information and belief is the former **Attorney General of LOS ANGELES COUNTY**. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in the Los Angeles County Courts, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her most recently know address is **[300 S. Spring St. Los Angeles CA 90013]**

78. Defendant **ROB BONTA ("BONTA")** upon Plaintiff's information and belief is the present **Attorney General of LOS ANGELES County**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in the Los Angeles County Courts, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is **[300 S. Spring St. Los Angeles CA 90013-1230].**

79. Defendant **KEN PAXTON ("PAXTON")** upon Plaintiff's information and belief is the present **Attorney General of Texas**. Plaintiffs sue the said Defendant in his individual capacity for damages and his official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in the state Texas, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[ P.O. Box 12548 Austin, Texas 78711-2548].**

80. Defendant **JAIMIE MASTERS ("MASTERS")**, upon Plaintiff's information and belief is the present Commissioner of the Department of Family and Child Protective Services. Plaintiffs sue the said Defendant in her individual capacity for damages and her official capacity for injunctive relief from negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in the state of Texas, and for continuing to fund the human trafficking scheme despite reports of the atrocities. Her address is: **[ P.O. Box 149030 Austin, Texas 78714-9030].**

81. Defendant **WILLIAM CLARK ("CLARK")**, upon Plaintiff's information and belief is the PRESIDENT OF SAINT FRANCIS MINISTRIES. Plaintiffs sue the said Defendant in his individual capacity for damages for negligent supervision, neglect to prevent the abuse, corruption, and fraud rampant in the state of Texas, and for continuing to fund the human trafficking scheme despite reports of the atrocities. His address is: **[509 E. Elm St., Salima, Kansas, 67401].**

82. Defendant St. Francis Ministries **[4155 E. Harry St., Wichita, Kansas, 67218].**

83. Defendant Kids Central Inc Aka The Centers Inc. **[901 Industrial Dr., Suite 200, Wildwood, Florida 34785].**

84. The following Municipalities are sued in their official capacities:

85. Defendant MARICOPA COUNTY ARIZONA **[301 W. Jefferson St., Phoenix, Arizona 85003].**

86. Defendant SEBASTIAN COUNTY ARKANSAS **[901 B. St. S, Suite 209, Fort Smith, Arizona 72901].**

87. Defendant SCOTT COUNTY ARKANSAS **[100 W. 1st St. Waldron, Arkansas 72958].**

88. Defendant LOS ANGELES COUNTY CALIFORNIA **[300 S. Spring St. Los Angeles California 90013].**

89. Defendant RIVERSIDE COUNTY CALIFORNIA **[3960 Orange St., Riverside, California 92501]**

90. Defendant MONTEREY COUNTY CALIFORNIA **[142 W. Alisal St., Suite A, Salinas, California 93901].**

91. Defendant MARION COUNTY FLORIDA **[601 SE 25th Ave., Ocala, Florida 34471].**

92. Defendant MIAMI-DADE COUNTY FLORIDA **[1350 NW 12TH Ave., Miami, Florida 33136].**

93. Defendant ST. LUCIE COUNTY FLORIDA **[411 S. 2ND St., Fort Pierce Florida, 34509].**

94. Defendant CAMDEN COUNTY GEORGIA **[210 E. 4th St., Woodbine, Georgia, 31569].**

95. Defendant LAURENS COUNTY GEORGIA **[101 N. Jefferson St., Dublin, Georgia, 31021].**

96. Defendant HUTCHINSON COUNTY KANSAS **[120 SW 10th Ave, Topeka Kansas].**

97. Defendant SEDGWICK COUNTY KANSAS **[18th Judicial District of Kansas, 1900 E. Morris Wichita, Kansas 67211].**

98. Defendant ST. MARY'S COUNTY MARYLAND **[23110 Leonard Hall Dr., Leonardtown, Maryland, 20650].**

**99.** Defendant KENT COUNTY MICHIGAN **[8201 Ionia Ave NW, Grand Rapids, Michigan, 49503].**

**100.** Defendant OAKLAND COUNTY MICHIGAN **[1200 N. Telegraph Rd., West Wing-Building 14E Pontiac, Michigan, 48341].**

**101.** Defendant BERNALILLO COUNTY NEW MEXICO **[Steve Schiff District Attorney Building, 520 Lomas NW, Fourth Floor Albuquerque, New Mexico 87102].**

102. Defendant KINGS COUNTY NEW YORK **[350 Jay St. 16th Floor, Brooklyn, New York 11201].**

103. Defendants MONROE COUNTY NEW YORK **[47 S. Fitzhugh St. Rochester, New York 14614].**

**104.** Defendant WASHINGTON COUNTY OHIO **[205 Putnam St., Marietta, Ohio, 45750].**

**105.** Defendant ALLEGHANY COUNTY PENNSYLVANIA **[300 Fort Pitt Commons Building,**

**445 Fort Pitt Blvd., Pittsburg, Pennsylvania 15219].**

106. Defendant MCLENNAN COUNTY TEXAS **[219 N. 6th St. #200 Waco, Texas 76701].**

107. Defendant BELL COUNTY TEXAS **[1201 Huey Dr., Belton, Texas, 76513].**

**108.** Defendant WICHITA COUNTY TEXAS **[900 7th St. Wichita Falls, Texas, 76301].**

**109.** Defendant BLOUNT COUNTY TENNESSEE **[942 E. Lamar Alexander Pkwy., Blount County Justice Center, Maryville, Tennessee, 37804]**

## B. PRELIMINARY STATEMENT

110. This action is brought pursuant to **42 U.S.C.§ 1988** and **42 U.S.C.§ 1983; proceedings in vindication of civil rights** to redress the **deprivation of rights** of families and children, as secured by the United States Constitution, under color of law by Defendants (Municipal, State, and Federal agents, Non-profit Community Organizations agents and private individuals).

111. It is also brought pursuant to **42 U.S.C. §1985** to address the c**onspiracy against Plaintiffs' rights under color of law**, between the Defendants, and **42 U.S.C. 1986** the **negligence of Defendants** to prevent the harm or disclose the conspiracy.

112. This action is also brought pursuant to **28 U.S.C. § 1361** to Compel an officer to perform his or her duties.

113. This action is also brought pursuant to **18 U.S.C.§1346, 1347** to redress the deprivation of rights to honest services and health care by means of fraud by the Defendants.

114. In this action, Plaintiffs also seeks to disclose the **18 U.S.C.§ 4 Misprision of Felony** which states "Whoever (owing allegiance to the United States), having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title."

115. This Complaint is brought because the juvenile dependency scheme between the United States Federal Government, its agencies, the 50 states, their municipalities, their contractors, and private citizens has been fundamentally corrupted by malicious actors who have breached their fiduciary duty to the people and have broken their sworn oath to protect and uphold the Constitution.

116. Instead of an being an honest service scheme to keep families together, strengthen communities, keep children safe and stop human trafficking, the Children's Bureau, the Department of Justice, and its contractors (here forth referred to as 'Defendants') have created an "artifice or scheme to

defraud" families to deprive them of their intangible right of honest services.

117. The Defendants have simultaneously created an "artifice or scheme" to defraud the United States' health care benefits programs of trillions of tax-payer dollars, while using false and fraudulent pretenses, representations, and promises to gain custody and control over minor children who will then be trafficked under the guise of their welfare.

118. The Defendants have demonstrated a *"pattern and practice of enacting and enforcing arbitrary and capricious policies and procedures that are contrary to what the state and federal laws indicate*."

119. The Defendants "*maliciously defy bright line laws"* because of the lack of accountability and the fact that law breakers are promoted to higher positions when they knowingly defy the law.

120. Defendants have knowingly and willfully **abused the processes** associated with laws and frustrated the intended purpose and spirit of the laws by those who created it. They have corrupted the fundamental integrity of court systems all over the nation with so many bribes and kickbacks that an average citizen has little faith in receiving an impartial and fair hearing.

121. These bad actors who include judges, lawyers, police officers, social workers, health care professionals and sometimes average citizens have exploited the system and redesigned it into an instrument of coercion, retaliation and weaponry against victims who seek redress from abuse with these agencies.

122. The court officials work together to create a fraudulent court record whereby each participant in the conspiracy ratifies the other agents' bad actions by accepting false information that they know are untrue and disregarding the errors in the document.

123. The proceedings begin when, DEFENDANT Social workers or (municipal against) file a child abuse and neglect lawsuit against a parent in a juvenile court. The social workers have a pattern and practice of filing neglect and abuse claims against parents that contain intentionally misleading reports that are filled with factual errors, and omissions of exculpatory evidence.

124. The next step in the conspiracy to commit fraud upon the court is the county prosecutor ratifying the social workers actions, by making no effort to verify the validity of the statements and not making interrogation or investigations into important information and relevant facts.

125. Taking the untrue statements act face value and often without any proof of abuse or neglect as required by statute, the Prosecutors then proceed to vigorously litigate against Plaintiffs beyond what is required for public interest instead imploring cut thorough litigation practices and acting with an illegal amount of adversariness.

126. Juvenile court judges take steps in furtherance of the conspiracy to deny rights by taking jurisdiction where the court lacks jurisdiction, being biased toward the Plaintiffs, on all occasions and not allowing the Plaintiffs to receive a fair hearing where they have the opportunity to be heard, cross examine witnesses, and present evidence.

127. On occasions when a defendant county prosecutor presents an allegation of neglect or abuse but contain no facts or evidence to support that an incident of abuse or neglect occurred (according to the legal definition of child abuse or neglect); judges will take jurisdiction at adjudication hearings anyway and without considering if the burden of the truthfulness is met.

128. Procedural due process and rules of evidence are disregarded as county social worker hearsay reports alone sustain the detaining of Plaintiffs' children in nearly all cases. This is a violation of the Family First Prevention Act.

129. Judges give a rubber stamp to whatever the county agency asks for even though they don't provide proper notice of hearings, contain sufficient claims or proper pleadings, or seem reasonable given the circumstances. Everything is done at lighting speed without careful deliberation or judging because Emergency Authorization powers are abused.

130. Defendant Agencies exaggerate facts and fabricate evidence in their reports in order to make every situation appear as if they are emergencies. They then obtain a court order which grants them the power and funding they seek to act. Once they obtain these orders using false pretenses, they proceed to injure the Plaintiffs by subjecting them to excessive force, medical battery, harassment, extortion, psychological trauma, and slander all under the guise of "welfare" or "services" from the state.

131. **Police Officers (municipal agents) play their role in the conspiracy by refusing to arrest the offending party,** do regular police work like canvassing witnesses, and failing to enforce restraining orders.

132. In most cases, police work with criminals to harass the victims into compliance with abuse. The police described in the following affidavits covered abuse and worked against the victims when victims reached out to them for protection.

133. Guardian ad Litems (private party), and children's attorney are perhaps the worst offenders because they five a false pretense of representing for children and their rights when all they do is the complete opposite.

134. **Children's attorneys destroy children's voices yet proclaim to represent their interest.** In most case children's attorneys have a pattern of not telling the court what the child wants the court to know and depriving the court of statutory information required to make a fair decision that is in the 'best

interest of the child'.

135. Children's attorneys have a custom of suppressing evidence of the children's true wishes, which are to be returned home. Any evidence showing a bond between parent and children will be quashed by the children's attorneys before it makes it to court. This helps the prosecution whom they are in allegiance with.

136. Ethics for Attorneys for Children, written by the New York State Supreme Court states that the laws hold that Children's Attorneys should "zealously" communicate the child's wishes and interest even if they don't advocate this position. Withholding exculpatory evidence of children wanting to go home with their parents is Fraud Upon the court, malicious, exhibits bias and bad faith. It is also injuriously deprives the rights of children and families. *(Exhibit 14)*

137. **Parent attorneys breach a fiduciary duty owed to parents and work against their client's best interest** as customary in this nationwide conspiracy. They pretend to be on the Plaintiffs' side, but they also play their role in furtherance of the goal of separating as many families as possible by being controlled opposition.

138. Plaintiffs complain that attorneys are sometime appointed against their waiver of attorney. The attorneys continue to practice against the parents' wishes and makes concessions with the other side that are to the detriment of their clients.

139. **Parent Attorneys have a pattern and practice of not objecting to false statements** made by the prosecutor. They have a nationwide custom of not providing legal counsel or writing motions upon request by the client, they refuse to protect continuances that prejudice their client, they don't submit evidence that the client asked them to submit to the court, they refuse to regularly communicate with their client and/or they refuse to communicate with their client in a way they can understand if disabled.

140. **Department chiefs, municipal agencies, and state governors** took steps in furtherance on the conspiracy to defraud the government of money and deny rights to families by their neglect to supervise and train the agents involved, and their refusal to enforce the law even after receiving multiple notices and reports from the public about the malicious behavior by their subordinates.

141. DEFENDANTS et all committed **RICO fraud** by using unconscionable contracts, contracts of adhesion, duress, retaliation, and threats of force in order to make parents sign "consensual" parenting plans or reunification plans.

142. PLAINTIFFS claim that these plans enriched county contractors and were extended out as long as possible in order to get as much money as possible for providing services to the clients.

143. PLAINTIFFS claim that in many circumstances they were prescribed services that they did

not need and forced to undergo medical treatments they did not need. They were forced to endure these 'treatments' for long periods of time, even when unnecessary.

144. After completing the programs or services, the DEFENDANTS breached their side of the contract by finding a different reason for not returning PLAINTIFFS' children or claiming the treatments where ineffective for arbitrary reasons.

145. These contracts are unconscionable because they DEFENDANTS have more bargaining power and no obligation to fulfill their respective side of the contract.

146. Children's attorneys denied children kinship care by failing to investigate relatives who could have been temporary care givers. This denies extended family and children their familiar rights. Children's attorneys would take advantage of unconscionable loopholes in the law that state they must make efforts to investigate kinship care but make no mention of them actually placing them.

147. Children's attorneys who seek to be compensated for the mere appearance of investing potential kinship care with no intention of actual placing them show that they are acting in bad faith and not in the best interest of the children.

148. PLAINTIFFS **allege procedural unconscionability** because they are not given the opportunity to correct any issues on their own and denied the right to act as a free agent and cannot freely contract with whomever they believe will address any issues most effectively. PLAINTIFFS are told they must use given contactors regardless of quality, reputation, compatibility, consent, or success rates.

149. Plaintiffs in their respective affidavits from various states claim that they are indeed painted in a false light by groups of social workers who have conflicting interest. On the one hand they are supposed to help reunify families, and on the other hand they receive bonuses from their employer for removing children from homes and putting children up for adoption.

150. The affidavits are provided to demonstrate a pattern and practice and confirm what auditor reports in nearly all 50 states describe. This is that agencies having more minors than they are capable of keeping track of or care of.

151. GAO reports show an ever-increasing budget for these programs despite the horrific outcomes of children in state custody.

152. Deliberately giving more money to agencies who disregard the law; thus, incentivizing systemic failures and unnecessary intrusions into private family life is evidence of a failure to supervise and train by Joe Biden, Xavier Becerra and related state and municipal officials.

153. Moreover, these multiple accounts in conjunction with auditor reports show a pattern and practice because multiple people described the same experience by different people who hold the same position and job title.

154. Plaintiffs in this lawsuit are suing for the **Intentional Infliction of Emotional Distress** enacted

upon them by the Defendants through their excessively cruel, humiliating, insurmountably corrupt, fraudulent court schemes that illegally separated their families and deprived them of their right to life, liberty and the pursuit of happiness, family integrity, personal privacy, freedom of association, freedom of speech, freedom of privacy and access to reproductive health clinics without due process of law, but through arbitrary and capricious decision making. Plaintiffs filed this suit to seek redress for the injustice they have suffered and continue to suffer.

155. Plaintiffs also seek a **civil injunction** to stop the irreparable harm they are presently suffering and will likely continue to suffer if this honorable court of justice abstains from intervening and protecting them from the malevolent abusers disguised as benevolent welfare officials.

### C. JURISDICTIONAL STATEMENT

156. This Court has subject matter jurisdiction under **28 U.S. Code § 1331** (federal question)**, 28 U.S. Code § 1332** (diversity of citizenship)**, 28 U.S. Code § 1343** (civil rights)**, and 28 U.S. Code § 1346** (United States as defendant).

157. Venue is proper in this Court in accordance with **28 U.S. Code § 1391(b)** which states that: "A civil action may be brought in – (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

158. Venue us proper under 28 U.S.C. 1402 **(b)** Any civil action on a tort claim against the United States under subsection (b) of _____ may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred.

159. This action is brought pursuant to **42 U.S.C.§1983, §1985 & 1986 §1988** and the First, Fourth, Fifth, Eighth, and Fourteen amendments to the Constitution of the United States.

160. The court has jurisdiction under **28 U.S.C. §1343** The District Court shall have original jurisdiction, exclusive of the States, of any action authorized by law to be commenced by any person: To recover damages for injury to his person or property, or because of deprivation of any right or privilege of the citizen of the United States, by an act done in the furtherance of a conspiracy mentioned in 42 U.S.C. §1985.

161. To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section          which he had knowledge were about to occur and power to prevent;

162. To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States

163. To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.

164. When interpreting § 1983, the Supreme Court has considered congressional intent, common-law principles, policy concerns, and principles of federalism. The Supreme Court has relied on the historical background behind the statute in several major decisions interpreting § 1983.2 Congress passed 42 U.S.C. § 1983 in 1871 as § 1 of the "Ku Klux Klan Act." The statute, however, did not emerge as a tool for checking abuses by state officials until 1961, when the Supreme Court decided Monroe v. Pape.3 In Monroe, the Court articulated three purposes for passage of the statute: (1) to "override certain kinds of state laws"; (2) to provide "a remedy where state law was inadequate"; and (3) "to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice."4

165. Monroe resolved two important issues that allowed 42 U.S.C. § 1983 to become a powerful statute for enforcing rights secured by the Fourteenth Amendment. First, the Court held that actions taken by state governmental officials in carrying out their official responsibilities, even if contrary to state law, were nevertheless actions taken "under color of law.

166. In the course of reaching this conclusion, the Court established the important principle that § 1983 "should be read against the background of tort liability that makes a [person] responsible for the natural consequences of his actions.

*167.* Second, the Court held that individuals who assert a violation of federally protected rights have a federal remedy under § 1983 even if the officials' actions also violated state law for which the state affords a remedy. In short, the Court in Monroe held that Congress enacted § 1983 to provide an independent federal remedy supplemental to available state law remedies. The federal judicial forum was necessary to vindicate federal rights because, according to Congress in 1871, state courts could not be counted on to protect Fourteenth Amendment rights because of their *"prejudice, passion, neglect, [or] intolerance."*

168. The Supreme Court has identified the policies underlying § 1983 as including compensating persons whose federally protected rights are violated by action under color of state law and preventing future violations. With Monroe opening the door to the federal courthouse, constitutional litigation against state and local officials developed. Later, plaintiffs seeking monetary damages sued not only state and local officials but began to sue cities and counties as well.

169. They also sought prospective injunctive relief against state officials. Ultimately, the federal courts became the principal forum for bringing state and local governmental policies and practices into compliance with federal law. In Monell v. Department of Social Services, the Supreme Court overruled the part of Monroe that had found that Congress did not intend to

subject municipal entities to liability under § 1983. Employing a "fresh analysis" of the legislative history of the Civil Rights Act of 1871, the Court found that Congress intended to subject municipal entities to liability under § 1983, though not on the basis of respondeat superior.

Monell held that Congress intended that municipal entities would be liable under§ 1983 only when an official's unconstitutional action carried out a municipal policy or practice.

170. The court has jurisdiction under **28 U.S.C. §1355** The District Court shall have original jurisdiction, exclusive of the States, of any action or proceeding for the recovery of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress..."

171. The court has jurisdiction under **28 U.S.C. §1357** because the District Court shall have original jurisdiction of any civil action commenced by any person to recover damages for **any injury to his person or property on account of any act done to him, under any Act of Congress**, for the protection or collection of any revenues, or to enforce the rights of citizens to vote in any state.

172. The court has jurisdiction under **28 U.S.C. §1361** because the District Court shall have original jurisdiction of any action in the nature of mandamus to **compel an officer or employee of the United States to or any agency thereof to perform a duty owed to the plaintiff.**

173. The court has subject matter jurisdiction of the action under **28 U.S.C. §1331** because of the **Federal Question of Law Jurisdiction and** Art.1., section 9 clause 2 of the United States Constitution (suspension clause).

174. The court has subject matter jurisdiction of the action under **28 U.S.C.§1332 (2)** because the matter of controversy is over $5,000,000.

175. The U.S. District Court may also exercise supplemental jurisdiction over the plaintiff's state law claims that arise from the same facts and circumstances under **28 U.S.C. § 1367**.

176. The court has subject matter jurisdiction of the action under **28 U.S.C. 1343(a)(3), (4)** because additionally, plaintiff has a **federal question of law** regarding "Are the current juvenile dependency laws under state statutes unconstitutional?" [ See Troxel v. Granville (2000) 530 US 57, 147 L. Ed 2d 49, 120 S. Ct. 2054].

177. This case arises under the **ANTI-KICKBACK ACTS, 41 U.S.C. § 51 (Date** *Signed into law by President Ronald Regan on November 7th, 1986)*

178. This case also arises under the <u>ADMINISTRATIVE PROCEDURE ACT, U.S.C. §</u> was signed into law on June 11th 1946.

179. This case also arises under the CHILD ABUSE PREVENTION AND TREATMENT ACT **- U.S.C. § , (2018)**

180. This case also arises under the <u>CIVIL RIGHTS ACT OF U.S.C. § (1871).</u> Signed into law by President Ulysses s. Grant on April 20th 1871.

181. This case also arises under the **Class Action Fairness Act of 2005 - 28 U.S.C. § 1332.** as a Mass Tort claim. CAFA defines a class action as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action" (28 U.S.C. § 1332(d)(1)(B); 28 U.S.C. § 1711(2) (definition includes a removed action)). A class need not be certified before a court may assert federal jurisdiction over the action under CAFA (28 U.S.C. § 1332(d)(8))

182. This case also arises under the **ETHICS IN GOVERNMENT ACT, 12 U.S.C. § (1978).** *(Signed into law by President Jimmy Carter on October 26th 1978.)*

183. This case also arises under the **FAMILY FIRST PREVENTION SERVICES ACT, U.S.C. § (2018)** which was signed into law on February 9th 2018.

184. Plaintiffs hereby invoke the **Federal Tort Claims Act. § 410(a)** which provides that: "Subject to the provisions of this title, the United States district court for the district wherein the plaintiff is resident or wherein the act or omission complained of occurred, including the United States district courts for the Territories and possessions of the United States, sitting without a jury, shall have exclusive jurisdiction to hear, determine, and render judgment on any claim against the United States, for money only, accruing, on and after January 1, 1945, on account of damage to or loss of property or on account of personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant for such damage, loss, injury or death in accordance with the law of the place where the act or omission occurred. Subject to the provisions of this title, the

United States shall be liable in respect of such claims to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances, except that the United States shall not be liable for interest prior to judgment, or for punitive damages. Costs shall be allowed in all courts to the successful claimant to the same extent as if the United States were a private litigant, except that such costs shall not include attorneys' fees."

185. Plaintiffs have analyzed the **Federal Tort Claims Act** that ensures that plaintiffs can sue the federal government and its employees or agents for their tortious activities and omissions.

186. This case also arises under the **U.S.C.§ FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT (1994),** signed into law by President Bill Clinton on May 26, 1994.

187. This case also arises under the **HUMAN TRAFFICKING PREVENTION, INTERVENTION, & RECOVERY ACT. H.R. 350 - HUMAN TRAFFICKING PREVENTION, INTERVENTION, AND RECOVERY ACT OF 2015 114TH CONGRESS (2015-2016).**

188. This case also arises under the **JUDICIARY ACT OF MARCH 3, 1875.** Plaintiffs exercise their right bestowed upon them by Congress to present their claims to a federal tribunal.

189. This case also arises under the **JUSTICE FOR VICTIMS OF TRAFFICKING ACT PREVENTING SEX TRAFFICKING AND STRENGTHENING FAMILIES ACT OF 2014,** which was signed into law on Sep 29th, 2014, by President Obama.

190. This case also arises under the **PREVENTING SEX TRAFFICKING AND STRENGTHENING FAMILIES ACT 42 USC 1305** which was signed into law Sept 29th, 2014.

191. This case also arises under the **PROGRAM FRAUD CIVIL REMEDIES ACT (PFCRA )31 U.S.C. 3801-3812 enacted by congress in October of 1986.**

192. This case also arises under the **ORGANIZED CRIME CONTROL ACT- RICO**. 9-110.000 - Organized Crime and Racketeering was signed into law on October 15th, 1970.

193. The **QUI TAM FALSE CLAIMS ACT** - allows whistleblowers to bring lawsuits against companies and individuals who defraud the Federal Government. Congress passed the False Claims Act on March 2, 1863.

194. This case also arises under the **SOCIAL SECURITY ACT 42 USC 301- 1305 Suppl.4,1934.**

195. This case also arises under the **STOP ADVERTISING VICTIMS OF EXPLOITATION ACT (SAVE ACT of 2014) This bill was introduced into the U.S. House of Representatives during the 113th U.S. Congress.**

196. his case also arises under the **STRENGTHENING CHILD WELFARE RESPONSE TO TRAFFICKING ACT H.R. 469-114TH CONGRESS (2015-2016)**

197. This case also arises under the **TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT H.R. 898 - 113th Congress (2013- 2014)**

198. This case also arises under the **VICTIMS OF CHILD ABUSE ACT TITLE II: VICTIMS OF CHILD ABUSE ACT OF 1990.**

199. Basically, this case involves the assessment of "**judicial deception and fraud rampant in the juvenile dependency proceedings through the nation**" involving the parties to this action, violation of constitutional rights and intentional misrepresentation and abuse of process by the defendants. (For reference: The plaintiffs are also entitled to appeal the judgment based on the "legality of the proceeding".) [See In re Troy Z. (1992) 3 4C4th at 1180].

200. All relevant facts, acts and incidents in support of plaintiffs' causes of action took place inter-state throughout all states in the United States. Because of the diversity of citizenship, the above-mentioned court has jurisdiction and is the proper venue to bring a complaint.

### D.   MASS TORT FACTUAL ALLEGATIONS

201. The United States Children's Bureau and the related juvenile justice system was intended to provide safe and stable homes for children who faced abuse and/or neglect in their homes.

202. Numerous Acts of Congress have been passed to keep children safe, stabilize families, and stop human trafficking which often effects children the most.

203. The United States Department of Health a Human Services and the Department of Justice are the primary agencies delegated with the task of fulfilling this contract made on behalf of American people by their Congressional representatives.  These federal agencies have delegated authority to the 50 states, who in-turn delegate authority to local townships and municipalities to carry-out the purpose of these acts on the ground level.

204.  Federal Laws, State Statutes and Welfare Institutions Codes govern the process of removal of children from parents who have been deemed to be abusive and/or neglectful. Because the right to parent is a fundamental right, dependency proceedings must comport with the fundamental requirements of due process- i.e., Notice and a fair opportunity to participate in the proceeding.

205. Moreover, due process afforded to parents in the dependency scheme rely on strict adherence to procedural requirements because even modest procedural irregularities can have prejudicial effects on the parties involved along with long-term damaging consequences.

206. In all 50 states of the United States of America, these laws are reincorporated into state statutes as state law, then reincorporated into municipality codes as Welfare Institutions Codes, and given status in state court with special designations for civil and criminal legal procedures regarding these laws.

207. Among the issues regulate and addressed are:

a. The statutory definition of child abuse

b. The statutory definition of child neglect

c. The statutory definition of imminent danger.

d. The statutory definitions of circumstances that qualify as dangerous or high risk for child abuse or neglect and circumstances that do not qualify.

e. The rights of children and families while children are in state custody.

f. The process, reasoning, and purpose of removing children from homes when they face imminent danger of abuse or neglect.

g. The process for assessing risk and determining the need for continued court intervention.

h. The process for permanency planning and assessing the best interest of the child.

i. The process and burden of proof necessary for terminating parental rights if necessary.

208. The United States Department of Health and Human Services (hereinafter known as USDHHS), is currently overseen by Xavier Becerra. The USDHHS encompasses the Administration for Children and Families which encompasses the Children's Bureau.

209. Therefore, the are responsible for communicating with, training, and supervising agencies nationwide as well as determining if they are eligible for federal monetary grants.

210. The United States Department of Justice is overseen by Merrick Garland.

211. The mission of the Department of Justice is to

212. However, the laws that enabled the states and its related agencies to act on behalf of families, children, abuse victims and trafficking victims are presently being exploited by abusers and are being used to further perpetuate violence against victims.

213. Presently victims cannot rely on state courts, county agencies like the police departments and welfare agencies, or federal agencies like the department of health and human services to seek redress from their abusers or obtain support managing or leaving the abusive situations.

214. In fact, corrupt federal officials, state organizations, state courts, local municipalities, medical professionals, legal professionals, private citizens, and criminals alike have joined forces and conspired to ensure that the victims cannot access the justice system or receive life-saving protection.

215. Victims who come forward to seek safety face a well-organized RICO scheme that is perpetuated and funded by unaccountable government officials who use their jobs, influence, and power to exploit existing governmental policies and practices to further hunt and silence individuals who suffer at their hands.

216. By way of the customs, policies, and practices described below Defendants have defrauded the American people out of billions of dollars and fostered a RICO conspiracy ring that traffics children and families into a perpetual scheme of honest services fraud.

217. Plaintiffs' and their families' rights have been injured as a result of the Defendants customs, policies, and practices of:

    a.    Practice of Negligent Hiring

    i.    Unqualified Oversight Agents,

    **ii.**    **FEDERAL AGENT CULPABILITY**

    b.    Practice of Not Supervising or Holding Accountable bad actors who violates families' rights, instead they are promoted and given even greater responsibility as in the case of DEFENDANT Xavier Becerra who oversaw the California Department of Health and Human Services, ignored corruption in the organization and was himself promoted to the Federal Department of Health and Human Services.

    c.    Practice of not Training

    d.    Policy of not prosecuting criminals and perpetrators of domestic violent failure

    e.    Customer, Policies, Practices, and Procedures of using judicial deception, honest services fraud. by Xavier Becerra and Merrick B Garland.

    f.    Custom of protecting the domestic violence perpetrator.

    g.    Custom of Terminating parental rights of biological parents of minor child(ren) whose d without due process and whose minor child(ren) were taken away unjustly by way of state courts and municipal actors

    h.    Custom of maliciously conspiring to commit fraud upon the court through perjury, intentional misrepresentations, omissions of exculpatory evidence, trickery, and duress.

i.   Practice of placing children in the most restrictive environments even when alternatives are such as in home preventative options are available

j.   Placing children in foster care and group homes when there are family available – again the most restrictive environment possible

k.   Policy of being adversarial and malicious not working for the public interest

l.   Policy of removing children from homes who are not in imminent danger

m.   Policy of retaliating against parents and who speak up for their rights by denying visitation or making them more restrictive

n.   Custom of searing false oaths to court to secure adverse actions

o.   Custom of adopting children to complete strangers because of the arbitrary reason of it being in their based interest – even when no abuse or neglect is alleged or proven

p.   Custom of disregarding Statutory Deadlines for all types of Hearings

q.   Custom of covering up for the co-conspirators and for the offenders

r.   Practice of Filing reports containing errors, omissions, and not providing the legally required information necessary for the court to decide

s.   Custom of doing unconsented to and unnecessary medical treatments on children while in their custody and retaliating against parents if the object to the treatments

t.   Custom of Breaching Reunification Plans with Families

u.   Custom of drawing out cases with abusive discovery practices and continuances

v.   Custom of Rewarding Failure to comply with government mandates for example, when counties neglect children because the snatch too many children than they have caseloads to manage, their budget increases. This creates a loophole for bad actors to take advantage and get more money for having an overload of human chattel on their docket and they never have to improve or comply.

218. The PLAINTIFFS readily ascertain that DEFENDANTS BIDEN, BECERRA AND GARLAND, and DEFENDANT BIDEN'S GOVERNMENT ACTOR DOES' have acted on grounds generally, by unlawfully separating parents from their young children.

219.  Injunctive and declaratory relief is thus appropriate with respect each case.

220. The Plaintiff member's children were unlawfully oppressed and/or unlawfully restrained in the children's liberty without justified cause and in violation of plaintiff's due process right to bring up her

children without governmental interference.

221. Some Plaintiffs are **the parents of** minor children AND adult children who were forcibly separated from their parents as minors and have now reached majority age.

222. Defendants and each of them have denied and prevented Plaintiff from the right to reasonable visitation, the **due process right to bring up her child without government interference** and denied both her daughter and Plaintiff from their right to speak to each other freely.

223. Defendant, **XAVIER BECERRA** ("Becerra") is the director of the Department of Health and Human Services of the United States acting under color of law. At all times mentioned, defendant was a government employee that had a duty to protect the Plaintiffs and ensure their constitutional rights were not violated.

224. The Defendants breached the duty owed to PLAINTIFFS and failed to act with the due care of a reasonable persons or with a reasonable amount of ethics for professionals in their field.

225. Defendant government actors caused the danger that the children were placed in through their pattern and practice of not supervising or reprimanding officials who commit fraud upon the court, conspiring.

226. It has been observed that the state "welfare systems" has been systematically engaged in activities that cause harm to the children under their "protection".

227. Claims are being filed against the Federal and State officials in their individual capacity and the various municipal departments in their official capacities. The federal government officials are vicariously liable as conspirators who turned a blind eye to the fraud, failure to supervise their sub-sub-contractors, and failing to protect victims of the system even though they had the power, knowledge, and ability to stop the atrocities.

228. In addition to this, the author has discussed multiple cases in which the plaintiffs were aggrieved and have exhaustively sought remedies from the state, federal government and the relevant departments that were involved in such atrocities

229. DEFENDANT BECERRA AND DEFENDANT BECERRA'S GOVERNMENT ACTOR DOES have ample ways to keep Plaintiffs together with their children, they give shelters to house immigrant families (including criminal illegal immigrants) while they await the jurisdictional preceding until final adjudication in juvenile dependency cases. If the government feels compelled to continue separation of these parents and children, it must minimally offer to detain them together as they do for foreigners in family detention centers.

1   230. The Due Process Clause of the Fourth Amendment does not permit the government to
2   forcibly take young children from their parents, without exigency or even a hearing. Separation also
    violates the Administrative Procedure Act (APA), which prohibits arbitrary government action.
3
    231. The Judicial Branch may no longer hold trust in the people if this court does not grant
4   immediate Preliminary Injunction against the Department of Health and Human Services.

5   **232. CONSPIRACY TO DEPRIVE RIGHTS**

6   233. All claims are vicariously the fault of Joe Biden, the President of the United States of
7   America, Xavier Becerra, as Head of Health and Human Services, Merrick B Garland as the head of the
8   Department of Justice , the Assistant Secretaries of the Administrations for Children and Families,
    Governors, Local Department Heads, and District Attorneys.
9
    234. Plaintiff alleges, and to the extent applicable, incorporates by reference herein as if set forth
10  in full of the common allegations listed above. Xavier Becerra is vicariously responsible for the following
11  claims.

12  235. DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES engage in conspiracies
    for the purpose of depriving the Plaintiffs of equal protection of the laws of the United States and
13  deprived them of their rights under the Constitution of the United States and the State of California.

14  236. County DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES, and each of
15  them, took several acts in furtherance of the conspiracy, including but not limited to: unlawfully removing
16  and detaining children from the care of a good parents without a warrant, or order, consent, probable
    cause, or exigent circumstances; all for an unreasonable time and is continued to the present.
17
    237. After any alleged basis for detention had been negated; and by procuring false testimony,
18  fabricating evidence, and failing to disclose exculpatory evidence in preparing and presenting a
19  dependency proceeding, the plaintiff suffers and will continue to suffer as a direct cause of the
    DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES actions fees, cost, and expenses
20  including those authorized by 42 U.S.C. section 1988 to an extent and in an amount subject to proof at
21  trial, if required to do so.

22  238. "**Vicarious Liability**"

23  239. DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES    are vicariously liable
24  for misuse of official authority included in, above and after, for all involvement knowingly, to the duties for
    personal purposes. (Van ort v. Estate of Stanewich, 1996 9th Cir Cal) 54 Cal 3d 202 285 Cal rptr 99 814
25  P2d 1341 1991 Cal LEXIS 743.

26

27

28

240. Under the Fourth Amendment to the United States Constitution, minor plaintiffs are at all times entitled, as a matter of law, to remain free from unreasonable search and seizure, in the absence of exigent circumstances, absent a court order or warrant.

241. Plaintiff is informed and believes and so such basis alleges that a reasonable police officer and/or social worker in DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES   situations would have known it was wrongful to seize and detain children from parents and family home without first obtaining a warrant, or court order, to do so.

242. In doing such, cause injury to Plaintiff or acted with a willful and conscious disregard of the rights of Plaintiff in a despicable, vile, and contemptible manner. Therefore, Plaintiff is entitled to an award of punitive damages against the individual DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES and municipality (as opposed to the government as a whole entity) for the purpose of punishing DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES, in effort to deter them and others from such conduct in the future.

243. DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES and each of them, or individuals who were acting under color of state law and doing the things alleged herein above.

244. Each of the individual DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES unknown inclusive, maliciously participated in, maliciously conspired with, approved of, and or aided and abetted the conduct of the remaining DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES under color of law.

245. As a result of defendant's conduct, by the use of threats, intimidation and coercion, plus attempts to threaten and intimidate and/or coerce to interfere with the plaintiffs' rights to exercise and enjoy that set forth and secured by the United States Constitution and other federal laws including but not limited to California civil code §43, §49, §51, §52 (the Unruh Civil Rights Act), and §52.1.

246. As to All County DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES   such conduct includes but is not limited to; creating dangerous situations to justify a compelling state interest; conspiring with other public officials and subcontractors to target and discriminate against Christian families; using intimidation and slander to subject families to peonage; forcing medical treatments on families for kickbacks and to prove their case; inflicting emotional distress on families intentionally to justify the need for mental health services and to ruin families generationally; and not using the professional judgement exercised by a reasonable professional in the same position. All of these activities would shock the conscious of a reasonable person.

247. Defendant government bodies that are vicariously responsible for the conduct of their

respective employees and DOES unknown inclusive, under United States government code and other applicable statutory and case law.

248. As a direct and proximate result of the defendant's actions, plaintiffs have suffered and will continue to suffer physical, mental, and emotional injury, all to an extent and in an amount as stated above in the ways stated above.

249. Under the circumstances of this case, outlined above, minors belonging to the plaintiff that are defined and described as her Penumbra and thus an extension of her, had the right to be free from unreasonable seizure under the Fourth Amendment of the Constitution.

250. All right complained about are "clearly established" such that a reasonable official, lawyer, and or social worker in a similar situation would know it is wrong to interfere and intrude in such described above actions absent of exigent circumstances. That right may not be infringed upon without first obtaining a warrant or other court order to do so.

251. In the absence of extension circumstances, and without any evidence to suggest that imminent danger of any kind would occur at the hands of the plaintiff then or after, the DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES and each of them acting under color of law, agreed and/ or conspired to use excessive force when dealing with Plaintiffs and placed their children in the most restrictive environments possible and terminated Plaintiffs parents' rights, which is comparable to the civil death penalty, without just cause .

252. DEFENDANT'S' conduct was without proper justification or authority, and without probable cause, consent, exigency, or court order. (see, Mabe versus County of San Bernardino (2001) 237 F.3d 1101). Further, County defendant actions were taken with deliberate interference of plaintiffs Rights.

253. DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES acted with a common objective; without any regard to the law or rights of the Plaintiff, and in appearance of deliberate intent to boast of their authority over the Plaintiff.

254. As a direct and proximate result of the DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES' Plaintiffs were injured and make a claim for damages for the amount reiterated and solidified with those authorized by 42 U.S.C. Section 1988, to an extent and in the amount subject to settlement or objection to it by DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES. (Familial Association)

255. DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES, and each of them, maliciously conspired to violate the civil rights of the plaintiff, including violation of the plaintiff's rights found in the 14th Amendment of the United States Constitution, by, but not limited to, removing,

detaining, and continuing to withhold Plaintiff's children from the care, custody, and control of her without proper or just cause and or authority; by subjecting them and their penumbra to a system of authority derived by the use of fraud, coercion, extortion, racketeering, and unconscionability.

256. Plaintiffs' affidavits below will provide facts showing that they suffered actual injury from being denied their First Amendment right to access courts and file meritous claims to prevent them from being harmed. State and County officials, working in their official capacity operated courts in a fraudulent manner by the following methods

    a.    Judges suborning perjury from anyone willing,

    b.    Judges uttering court records,

    c.    Social workers uttering reports,

    d.    Prosecutors misprisioning/concealing the felonious behavior of other employees,

    e.    Prosecutors compounding the crimes of domestic abusers by agreeing not to prosecute in order to further

257. Plaintiff victims were afraid to go to court for fear of being ganged up on and bullied by the staff, attorneys, officials, and the offender. Plaintiffs' motions were thrown out of court and not to considered and moreover, there were not allowed to speak or be heard.

**258. "First Amendment Deprivations"**

**259.** As defined in *Boothe v. Roofing Supply, Inc. of Monroe*, 893 So.2d 123 (2005) "arbitrary and capricious conduct is willful and unreasonable action without consideration or regard for the facts and circumstances."

**260.** Arbitrary and capricious is a standard for judicial review and appeal, often seen in administrative law. Under this standard, the finding of a lower court will not be disturbed unless it has no reasonable basis, or if the judge decided without reasonable grounds or adequate consideration of the circumstances.

**261.** Although there is no set standard for an arbitrary and capricious decision, guidance can be found in *Natural Resources Defense Council, Inc. v. United States EPA*: "5 U.S.C. § 706(2)(A) authorizes the court to "set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." Under this standard, a court must find a "rational connection between the facts found and the choice made" per *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.* (1983). The court must decide whether the agency considered the relevant factors and whether there has been a clear error of judgment; *Citizens to Preserve Overton Park, Inc. v. Volpe*,

1  401 U.S. 402, 416 (1971).

2  **262. "First Amendment Rights to Free Speech and Practice of Religion"**

3  **263.** Child welfare laws and the related statutes are overly vague and cannot be understood by the
4  common person. Common people do not receive adequate notice of the law and cannot determine if
   they are breaking it. Moreover, vague terminology is used like, "the best interest of the child", "imminent
5  danger", "reasonable efforts" etc. This makes non-legislators unable to enforce these laws without being
6  arbitrary.

7  **264.** Plaintiffs are restricted from communicating with their children freely, discussing their values
   and religion. They are monitored and prevented from instilling values in the children. Plaintiff's children
8  names are changed, and their identities and legacies are erased for generations. Christian parents are
9  especially targeted and singled out for their desires to practice traditional parenting skills like
10 breastfeeding, homeschooling, reading the Bible to their children, and using herbs instead of
   pharmaceutical medicines. If parents do no enroll their children in public school, agree with alternative
11 ideologies, feed their babies formula, and give them vaccines, mental health medicine, or consent to
12 surgeries, they are deemed a danger to their own children.

13 265. At all times material, Plaintiff's had a constitutionally protected right under the First
14 Amendment to the U.S. Constitution to speak freely to their children without being monitored or under
   surveillance.

15
16 266. At all times material, Plaintiff's had a constitutionally protected right under the First
   Amendment to the U.S. Constitution to speak freely by practicing their own religion, teaching, and
17 upbringing their children with their own values, and implementing their own parenting style without being
   called crazy or negligent by someone who merely disagrees with their worldview and has a superiority
18 complex.

19 **267. Void for Vagueness**

20 **268.** Vagueness doctrine rests on the _: _process clauses of the Fifth and Fourteenth
21 Amendments of the U.S. Constitution. By requiring fair notice of what is punishable and what is not,
22 vagueness doctrine also helps prevent arbitrary enforcement of the laws.

23 269. 2) Under vagueness doctrine, a statute is also void for vagueness if a legislature's delegation
   of authority to judges and/or administrators is so extensive that it would lead to arbitrary prosecutions.
24
25 270. The following Laws and Acts were established by Congress to protect the welfare of families
   and children; but they have been weaponized against families because they are overly vague. The
26

27

28

following terms are exploited by bad actors to cover a multitude of honest services fraud conduct and weaponize laws meant to help families against families:

   a.  "Best Interest of the Child" (Exhibit 10)

   b.  "Reasonable Efforts" (Exhibit 10)

   c.  "Preferential Consideration" (Exhibit 9)

271.    The void-for-vagueness doctrine dictates that unduly uncertain laws, whether criminal or civil, violate due process and cannot be enforced. The doctrine has two main rationales, one based on individual rights and one based on constitutional structure, that guide its application.

272.    Unduly indefinite statutes, the Supreme Court has instructed, violate due process by failing to provide potential criminal actors fair notice of what is unlawful, and they violate nondelegation and rule-of-law constraints by, in effect, handing over lawmaking responsibility to nonlegislative actors, notably police, prosecutors, judges, and juries.

273.    According to the Court, a statute that does not "give ordinary people fair notice of the conduct it punishes" violates an essential requirement of due process.1616Johnson v. United States, 135 S. Ct. 2551, 2556 (2015).

274.    As the Court has written: "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939).

275.    Because both retributivist and utilitarian rationales for punishment assume that people can ordinarily choose whether to obey the law, the Court has "insist[ed] that laws give the person of ordinary intelligence a reasonable opportunity to" do so.1818Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

276.    Thus, if people "of common intelligence must necessarily guess at [a statute's] meaning," it will be deemed vague. People of common intelligence do not know what "best interest of the child" means.

**277.    "Risk Assessments and Imminent Danger"**

**278.**    Average people do not know what encompasses a risk assessment as prescribed by law, nor do they know, they are being evaluated; therefore, they have no notice.

32

279.     Moreover, most social workers do not use the statutory risk assessment to determine if a child is at risk as evidenced in Exhibits *11 and 13*. Therefore, the terminology is overly vague and results in families being separated and deprived of their free speech for arbitrary reasons.

280.     Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

281.     Vagueness is a due process vice that can be brought into play with regard to any criminal and many civil statutes, but it has a special significance when applied to governmental restrictions of speech: fear that a vague restriction may apply to one's speech may deter constitutionally protected speech as well as constitutionally unprotected speech.

282.     Vagueness has been the basis for voiding numerous such laws, especially in the fields of loyalty oaths, obscenity and indecency, and restrictions on public demonstrations. It is usually combined with the overbreadth doctrine, which focuses on the need for precision in drafting a statute that may affect First Amendment rights; an overbroad statute that sweeps under its coverage both protected and unprotected speech and conduct will normally be struck down as facially invalid, although in a non- First Amendment situation the Court would simply void its application to protected conduct.

283.     **"Vagueness Lends Itself to Arbitrary and Capricious Exercising by Bad Actors"**

284.     The vague language in these laws are what the fraudulent DEFENDANTS take advantage of to secure fraudulent court orders and removals. The laws are not consistent and are applied at the personal whim of the county and state agencies. Children are selected for adoption when they have good personalities and returned home when they are deems hard to deal with. Adoptions, removals, and foster care placements are not determined based on the vague laws but based on trafficker preferences.

285.     **Unconstitutional Delegation of Authority**

286.     Plaintiffs allege that Defendant UNITED STATES unconstitutionally delegated authority to the Departments of Health and Human Services, Justice as a CONTRACTING AGENCY. The FEDERAL CONTRACTING AGENCIES utilized STATES as PRIME CONTRACTORS. The states use local governments as SUBCONTRACTORS, and the local governments utilized sub-contractors as well as subcontractor employees or municipal agents and officers,

287.     To delegate discretionary power to an administrative power, the legislature must lay down standards to govern the exercise of power. In these cases, where the language for making determinations is vague, the delegation is improper and has in turn led to abuses of the power.

288.     DEFENDANTS U.S. by way of Congress has delegated power to DEFENDANT SUB CONTRACTORS to violate a fundamental right. Children are GOD given and cannot be taken (absent abuse or neglect) simply because someone believes they would be better off with a new set of parents or because of the overly vague reasoning onf"in the child's best interest".

**289.     "Ultra Vires: Implied Equitable Actions for Statutory Violations by Federal Officials**

290.     DEFENDANTS, all of them, took actions well beyond the scope of their authority, which was to act in the public welfare, to vexatiously and maliciously prosecuting parents and families in retaliation for exercising their first amendment rights.

291.     North Carolina Business Corporation Act § 55-3-04 state ordinances that do not conform to their state or federal enabling act are void because they a beyond the scope of authority for the local body.

292.     Courts in the Anglo-American tradition have long recognized a claim where an official exceeds the bounds of their statutory authority. Though courts have cited any number of statutory hooks, the implied equitable right of action derives not from particular statutory language or constitutional provisions but rather from the courts' power to fashion equitable remedies.

293.     Federal courts' recognition of the right to sue a federal officer for unlawful action derived from early eighteenth-century British legal practice. Prior to the early 1700s, nearly all suits against British officers were for damages, which meant little could be done to halt or undo the unlawful activity. But around this period, the prerogative writs emerged to enable judicial control of administrative action.

294.     In 1700, the King's Bench first *annulled an administrative proceeding, exercising its flexible authority to correct public wrongs*. This judicial review of administrative action for injunctive-like relief was imported into American law.

295.     The Judiciary Act of 1789 provided for prerogative writs against federal officers and vested the courts' equity jurisdiction as provided in the Constitution.

296.     The Process Acts enabled judicial review of federal executive action through prerogative writs under state law. And Marbury v. Madison recognized a common law tradition even presumption—of judicial review of administrative action to protect the rule of law

297.     In Osborn v. Bank of the United States and United States v. Lee, the Court made clear that plaintiffs' claims would not be barred by sovereign immunity.26 In Osborn, the Court also departed from the traditional prerogative writs and common law damages claims to recognize a claim in equity.27 This led to the idea that any official violation of a federal statutory right implied a right to judicial recourse, and federal courts, sitting in equity, had the authority to fashion injunctive relief.

298.     "Strict Scrutiny Standard"

299.     If an ordinance infringes on a fundamental right, the burden is on the state or federal agency to justify the compelling interest of the statute.

**300.     "State Created Danger"**

**301.**     Defendants cause do more harm than good with through their policies as seen by the abysmal statistics for foster care children. Children runaway from homes because they are unhappy and require mental health because of the tortious acts of the Defendants.

**302.**     Defendants are not acting in their best interest but in the worst interest because foster children have worse outcomes than children who remain at home and create a self-perpetuating system where they essentially get paid to cause harm and pretend to fix the harms, they themselves caused.   The costs to tax-payers, and families who are participating in the mandatory programs, outweigh the benefits of the programs. The only people who benefit from the programs are the contracts who get paid. (Exhibits 11-14-21)

**303. "Fourth Amendment Deprivations"**

304. Using capable authority to seize Plaintiffs' children and enter their homes without warrants; or obtaining warrants by maliciously falsifying evidence, and presenting fabricated evidence to the court, and maliciously refusing to provide exculpatory evidence in a dependency proceeding is a violation of the Constitutional Rights of the Plaintiffs.

305. As the direct and proximate result of these DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES actions, plaintiffs have suffered, and will continue to suffer permanent physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial, if so necessary.

**306. "Right to Be Free from Medical Examinations and Notified of Medical Examinations or Invasive Treatments done on Minor Children"**

307. Plaintiffs are aggrieve the injury to their constitutional right as parents to be present at their children's medical examinations in Greene, 588 F.3d 1011. Relying on Wallis, Plaintiffs reiterate the right

of parents and children "to be with each other during potentially traumatic medical examinations" absent limited, valid circumstances. *Id.* at 1036. We noted that the "children's right to their mother's comfort and their mother's right to provide such comfort were . . . at their apex" where the medical examination included inspection of and photographing of the child's genitals. *Id.* at 1037.

308. The United States Court of Appeals for the Ninth Circuit most recently addressed these constitutional rights in *Mann v. County of San Diego*, 907 F.3d 1154 (9th Cir. 2018). *Mann* involved medical examinations of children at PCC, the same facility and type of examinations at issue here, without notice to the children's parents. *See id.* at 1158. We concluded that, "under *Wallis*, the County is required to notify the parents and obtain parental consent (or a court order) in advance of performing the Polinsky medical examinations, and permit parents to be present for these examinations." *Id.* at 1162. Where the County fails to notify "parents about the examinations and [performs the examinations] without obtaining either the parents' consent or judicial authorization," the County violates the constitutional rights of children and parents. *Id.* at 1161 (citing *Wallis*, 202 F.3d at 1141). First, the County "violates parents' Fourteenth Amendment substantive due process rights." *Id.* at 1160–61. Second, the County violates the children's Fourth Amendment "right to 'be secure in their persons . . . against unreasonable searches and seizures.'" *Id.* at 1164 (ellipsis in original) (quoting U.S. Const. amend. IV).

309. **"Right to Be Free from Search and Seizure in their own homes"**

310. At all times material, Plaintiff's had a constitutionally protected right under the Fourth Amendment to the U.S. Constitution to be free from illegal searches of their homes and seizures of their children. PLAINTIFFS were subject to unconsented to medical examinations, diagnosed with medical conditions by non-medical professional, and had their children seized based on false oaths and trickery.

311. Defendants violated the Fourth Amendment of Plaintiffs by using force, to "seize" the Plaintiffs; children. Moreover, the force was not objectively unreasonable. The Supreme Court has articulated the following tests for determining when officers have seized an individual:

1. Whether "the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen."386

2. Whether, as a result of an official show of authority, a "reasonable person would have believed that he was not free to leave," and the person in fact submitted to the assertion of authority.387

3. Whether there was "a governmental termination of freedom of movement through means intentionally applied."

312. **"Fifth Amendment Violations"**

313.     Plaintiffs as a class were subjected to fraudulent court proceedings which deprived Plaintiffs of their right to property, life, and liberty without due process of law.

314.     The Constitution states only one command twice. The ___ ___ ___ Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law."

315.     The Fourteenth ___ ___ ___ ___, ratified in 1868, uses the same eleven words, called the Due Process Clause, to describe a legal obligation of all states. These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures.

316.     **"Eighth Amendment Deprivations"**

317.     At all times material, Plaintiff's had a constitutionally protected right under the Eighth Amendment to the U.S. Constitution to be free from excessive force or cruel and unusual punishment. PLAINTIFFS were jailed or threatened with jail for not handing over their children to strangers. Moreover, parents were separated from their children over minor things and placed in the most restrictive environments when other solutions were available.

318.     Termination of parental rights is akin to the civil death penalty. Families experienced the death penalty and were deprived of their right to be free from excessively harsh, cruel and unusual punishment.

319.     Because of social worker exaggerations and fraudulent court officers, parents had their rights terminated which is cruel and unusual and not reasonable under the circumstances described by the PLAINTIFFS in their affidavits or in the reports filed against them.

320.     **"Least Restrictive Environment Statutes written into acts are routinely violated."**

321.     It is cruel and unusual to separate children and families using fraud by omission and exaggeration. Moreover, it is excessive force to place children in foster homes when the non-emergency situations could have been addressed using less force and keeping children in their homes or in kinship arrangements that the parents have many times already made and consented to. Children are traumatized and this goes against their mission the Children's Bureau and Administration for Children and Families which says its mission is to create independent and thriving families (Exhibit 15)

322.     Unlike excessive force claims brought under the Fourth Amendment, in which the officer's subjective motive or intent is irrelevant and the constitutionality of the use of force is evaluated under an objective reasonableness standard, malice is the central inquiry under the Eighth Amendment for a prisoner's claim alleging the use of excessive force by prison guards. The Eighth Amendment

Mass Tort Claim for RICO Fraud

standard is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Plaintiffs allege the latter.

323.     The Supreme Court held that five factors are relevant in determining whether officers acted maliciously when they used appropriate force: (1) the need for force; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; (4) "the extent of the threat to the safety of staff and inmates"; and (5) "any efforts made to temper the severity of a forceful response." Plaintiffs allege the forcible separation of their families was unnecessary to the extent of the threat.

### 324. "Fourteenth Amendment Deprivations"

325. At all times material, Plaintiff's had a constitutionally protected right under the Fourteenth Amendment to the U.S. Constitution to receive due process before their children were removed from their home and during the investigation.

### 326. "**Equal Protection Clause**"

327. Families who have Christian values are routinely discriminated against and targeted while families who are atheist are treated more favorably thus they are denied their equal protection under the law.

### 328. "**Convergence of Parent's Rights and Interests with the Child's Rights and Interests**"

329. State interference with the parent-child bond is often framed as a "parental rights" issue. However, the same issue could also be framed as one of state interference with the right of a child. Courts have noted that children have a concomitant fundamental right to the state of well-being which derives from "'the continuity of affectionate care from those to whom [they are] attached through bonds of love.'" *Roe v. Conn*, 417 F. Supp. 769, 776 (M.D. Ala. 1976)(cite omitted); *see also In re J.P.*, 648 P.2d 1364, 1369, 1377 n.13 (Utah 1982)(citation omitted)("'prior and fundamental right of a parent to rear his child; and concomitantly, of the right of the child to be reared by his natural parent'"); *In re Perales*, 369 N.E.2d 1047, 1051 (Ohio 1977). The right described in *Roe* is sometimes called the **Child Liberty Doctrine**, for it is a right describing a child's right to be free from harmful and arbitrary state confinement.

330. A child cannot represent him or herself, and thus has a right to be represented by those who have the most similar alignment of familial, biological, property, and economic interests. When the state interferes with the parent-child bond, it imposes a disinterested caretaker upon the child. Over a long period of time, the service rendered by a caretaker who is motivated by the bonds of affection and/or a close alignment of interests with the child is likely to be quite different than the service rendered over the

long term by a disinterested party. Caretakers with professional expertise in some specialty may have a more refined clinical approach to some facet of a child's development, but professionals have no special systemic motivation to apply their services to obtain the maximum benefit for a particular child when assistance requires a significant personal, emotional, or financial investment or risk.

331. The same concept applies to other concerns that are de facto concerns when parental rights are litigated. For example, parents who are forced to defend against improper state interference often must expend tremendous quantities of time, money, and emotional energy in the effort. Yet if parents' financial resources are depleted defending against state interference, the children of those traumatized parents are also likely to have a lower standard of living and a depleted inheritance.

332. Consequently, "while there is still reason to believe that positive, nurturing parent-child relationships exist, the *parens patriae* interest favors preservation, not severance, of natural familial bonds." *In re J.P.*, 648 P.2d at 1377 n.13 (quoting *Santosky v. Kramer*, 455 U.S. 745, 766 (1982)); *see also Parham v. J.R.*, 442 U.S. 584, 600-03, 610-11 (1979); *Dickson v. Lascaris*, 423 N.E.2d 361, 363 (N.Y. 1981) ("rule fosters both [parents' and child's] interests by recognizing that they ordinarily converge").

333. The **Parental Liberty Doctrine** is really a component of the much broader **Family Liberty Doctrine** (which overlaps with the **Right to Family Autonomy**, a facet of liberty oriented towards familial privacy and association). Jurists, journalists, and politicians have tended to focus on "parental rights" or "parental liberty," because parents are often in a better position to assert family prerogatives in protection of the children. Often the public does not understand any term other than the widely-used colloquial expression **parental rights**. But to be technically precise, the **Child Liberty Doctrine** protecting the interests of children, as well as the state's interests in general health and safety, are similarly intertwined with and served by the **Family Liberty Doctrine**. Children and society are better off when children are not treated as creatures or property of the state.

### 334. Substantive Due Process

335. There is a fundamental right for families to be able to freely associate with one another.

336. Families also poses a fundamental right not to be subject to judicial deception, and fraud.

337. The fundamental right to physical liberty is implicated with any restraint of a child's physical body or sensory faculties in a captive informational environment which occurs without consent of the minor's parents, regardless of whether the government restraint is achieved through compulsory school attendance, government assumption of child custody, involuntary hospital admission, containment in a mental health facility, confinement in a concentration camp, forced national "service" to the community,

or incarceration in a criminal correction facility.

338. Irreparable harm is caused even by temporary derogations of First Amendment familial association, or of other fundamental rights such as Fourteenth Amendment family liberty. Such violations may be stopped by injunction or stay. *Elrod v. Burns*, 427 U.S. 347 (1976).

Proponents of the "best interest" standard often attempt to trump or entirely sidestep these evidentiary and procedural protections.

### 339. "Procedural Due Process"

340. Statutory requirements agencies use Reasonable Efforts to prevent the removal of children from the families are routinely disregarded. DEFENDANTS bear the burden of proving that they could not achieve their interest of public health, safety, and general welfare without removing children from their homes and putting them up for adoption. Removals from home have consistently been arbitrary and unreasonable for their efforts they wish to achieve.

341. The Due Process clause of the Fourth Amendment applies to all "persons" on United States' soil and thus applies to all Plaintiffs.

342. Plaintiffs have a liberty interest under the Due Process Clause in remaining together as a family.

343. The separation of Plaintiffs from their children violates the Substantive Due Process Clause because it furthers no legitimate purpose not to mention a compelling government interest.

344. The separation of Plaintiffs from their children also violates the Procedural Due Process Clause because the acts were undertaken without notice or a fair hearing. It's not enough to have a hearing, it must be fair, and both sides must have equal opportunity to be heard.

### 345. "Attendant Evidentiary Protections"

346. For temporary or preliminary court orders, such as home searches or child seizures, except for termination of parental custody or visitation, the Fourth Amendment of the *Constitution of the United States* requires probable cause.

347. For final court orders, or for permanent termination of parental custody or visitation, clear and convincing evidence is typically required under United States law. Procedural due process is also required for the parents and child. At minimum, the government must make an initial showing, by clear and convincing evidence, that a parent has inflicted harm by placing the child in clear, present, and grave danger.

348. Over the years, the Supreme Court has recognized this fundamental right in many cases. For example, in Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639–40 (1974), the Court said, "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." The Court reiterated this theme three years later in Moore v. City of East Cleveland, 431 U.S. 494, 503–04 (1977): "Our decisions establish that the Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition. It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."

**349. "The Customs and Policies of Depriving Rights Under Color of Law are Nationwide Thus Constituting a Pattern and Practice"**

350. A custom or policy is one that is a "deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Castro, 833 F.3d at 1075 (ellipsis in original) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion)).

351. The Supreme Court has made clear that policies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain

352. obvious constitutional violations, see City of Canton v. Harris, 489 U.S. 378, 387 (1989), and, in rare instances, single constitutional violations are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality, see Bd. of County Comm'rs v. Brown, 520 U.S. 397, 405–06.

353. "There is a Common Practice by all Defendants and that is a Deliberate Failure to Train and Failure to Supervise Subordinates"

354. Failure to train may constitute a basis for Monell liability where the failure amounts to deliberate indifference to the rights of those who deal with municipal employees. City of Canton, 489 U.S. at 388–89. Mere negligence will not suffice to show Monell liability. Dougherty, 654 F.3d at 900 (citation omitted).

355. To allege a failure to train, a plaintiff must include sufficient facts to support a reasonable inference (1) of a constitutional violation; (2) of a municipal training policy that amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury would not have resulted if the municipality properly trained their employees. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007) (citing Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

1    Connick v. Thompson, 563 U.S. 51, 61 (2011) (citation omitted).

2    356.    Single acts may trigger municipal liability where "fault and causation" were clearly traceable
3    to a municipality's legislative body or some other authorized decisionmaker, Brown, 520 U.S. at 406.
     Where, for example, a "city has armed its officers with firearms[,] . . . the need to train officers in the
4    constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so
5    could properly be characterized as deliberate indifference to constitutional rights." City of Canton, 489
     U.S. at 390 n.10.
6
7    357.    Defendants Government Officials and Actor Does' wrote a blank check to these agencies and
     failed to train them and evaluate their performance by way on the due process rights of parents and
8    families.

9    358.    DEFENDANTS have an affirmative duty to protect both Plaintiffs' and their children from
10   harm because that is their stated mission. Defendants failed to behave like reasonable people from
     an objective standard because a reasonable person would not harm the people they are tasked with
11   protecting.

12       **359. "Clearly Established"**

13       **360.** An official "cannot be said to have violated a clearly established right unless the right's
14   contours were sufficiently definite that any reasonable official in [his or her] shoes would have
15   understood that he [or she] was violating it." Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). "This
     exacting standard gives government officials breathing room to make reasonable but mistaken
16   judgments by protect[ing] all but the plainly incompetent or those who knowingly violate the law." City
17   and County of San Francisco v. Sheehan, 135 S. Ct. 1765, 1774 (2015) (internal quotation marks
     omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011). "This is not to say that an official action
18   is protected by qualified immunity unless the very action in question has previously been held unlawful . .
19   . but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." Hope v. Pelzer,
20   536 U.S. 730, 739 (2002) (quotation marks omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640
     (1987)). Furthermore, "general statements of the law are not inherently incapable of giving fair and clear
21   warning, and in [some] instances a general constitutional rule

22       361. There are no circumstances in a dependency proceeding that would permit government
23   officials to bear false witness against a parent. If an officer submitted an affidavit that contained
     statements he knew to be false or would have known were false, had he not recklessly disregarded the
24   truth, . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of
25   qualified immunity is lost.'" Id. (describing and quoting Hervey v. Estes, 65 F.3d 784, 788 (9th Cir.
26   1995)).

27
28
                                                                                                              42

362.     A constitutional right is clearly established where a Supreme Court case or a case within the relevant circuit prohibits the particular conduct at issue. Boyd v. Benton County, 374 F.3d 773, 781 (9th Cir. 2004). "[W]hile closely analogous prior case law involving an identical fact context is not required for qualified immunity to be withheld, the unlawfulness of the action in question must be apparent in light of some pre-existing law." Devereaux v. Perez, 218 F.3d 1045, 1053 (9th Cir. 2000) (citing Mendoza v. Block, 27 F.3d 1357, 1361–62 (9th Cir. 1994)).

363.     But there is more to establish that these social workers had "fair warning" of the unconstitutionality of their conduct. Precedent establishes the right to be free from judicial deception in child custody proceedings. See, e.g., Costanich, 627 F.3d at 1111–12 ("We have previously held that when genuine issues of material fact arise regarding fabrication of evidence in a child abuse investigative report, a police officer is not entitled to qualified immunity because '[c]redibility is an issue for the trier of fact.'") (alteration in original) (quoting McSherry v. City of Long Beach, 560 F.3d 1125, 1130 (9th Cir. 2009), withdrawn and superseded by 584 F.3d 1129).

364.     The United States Court of Appeals for the Ninth Circuit held in *Greene* with a section 1983 case decided in 1990 by the Tenth Circuit, *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990). We described that civil rights case as "holding [that] social workers who deliberately fabricated evidence of child sexual abuse to secure a removal order [were] not entitled to qualified immunity." *Greene*, 588 F.3d at 1035.

### 365. "Foreseeability"

**366.** It was reasonably foreseeable that unconstitutional misrepresentations to the juvenile court would result in medical examinations on the Minors without their parents' knowledge or consent. Thus, a reasonable social worker would understand that providing false information concerning notification to parents when requesting a juvenile court order for a medical examination on minors in protective custody would violate or at least disregard a substantial risk of a violation of the Parents' rights. *Cf. Hope*, 536 U.S. at 739.

**367.** Defendants' and Defendant Actors Does' misrepresentations to the juvenile court set in motion a path by which the Minors would be subjected to unconstitutional medical examinations. This scenario is comparable to an individual who provides false information to obtain a search warrant. *Cf. Mann*, 907 F.3d at 1164 (citing U.S. Const. amend. IV). Regardless of whether they were responsible for issuing or executing a warrant that resulted in an unconstitutional search, their judicial deception alone is sufficient to overcome their qualified immunity. *See Herveyv. Estes*, 65 F.3d 784, 788 (9th Cir. 1995) ("[I]f an officer 'submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth [,] . . . he cannot be said to have acted in

an objectively reasonable manner,' and the shield of qualified immunity is lost." (quoting *Branch v. Tunnell*, 937 F.2d 1382, 1387 (9th Cir. 1991), *overruled on other grounds in Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002))); *Whitaker v. Garcetti*,486 F.3d 572, 581 (9th Cir. 2007) ("A seizure conducted pursuant to a warrant obtained by judicial deception violates the Fourth Amendment." (citation omitted)).

**368.** Thus, workers, through their alleged judicial deception, can be held liable for depriving the Plaintiffs' rights under color of law.

### 369. "Defendants Cannot Claim Qualified Immunity"

**370.** A public official sued individually is not subject to liability unless the official's actions were malicious, corrupt or outside the scope of official duties. Epps v. Duke University, 122 NC App 198 (1996). The qualified immunity applies only to public officials, not to public employees. Generally public officials occupy offices created by statute, take an oath of office, and exercise discretion in performance of their duties. Pigott v. City of Wilmington, 50 NC App 401 (1981); Gunter v. Anders, 114 NC App 61 (1994).

**371.** DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES are disqualified from immunity in this case and its entirety because a county, state, and federal officials are liable for acts and omissions of its employees promulgated by a pattern, practice, policy, or custom.

**372.** Governmental immunity is not applicable to constitutional violations. Sale v. Highway Commission, 242 NC 612 (1955) (taking of property without just compensation); Corum (denial of free speech). Tort claims (for either an intentional tort such as assault or for negligence) against a governmental body for acts or omissions of governmental officials or employees (acting within the scope of employment)

**373.** Just as the Court in *Hope* used an ADOC regulation and a DOJ report to support its conclusion that the officials were on fair notice of the wrongfulness of their conduct, here, a pertinent state statute warns defendants in unmistakable language of the personal consequences of lies, perjury, and deception: the loss of immunity for such conduct. Furthermore, the statute focuses on behavior designed wrongfully to affect dependency proceedings in court, the citadel of Due Process.

374.    City and County DEFENDANT AND DEFENDANT'S GOVERNMENT ACTOR DOES   are not immune per Government Code §815.2, nor are their superiors if they allowing the omitting and encourage the despicable and vile behaviors above and below as stated. (Garcia versus city of Merced)

375.    The statutory basis for bringing suit against public entity DEFENDANT AND DEFENDANT'S

GOVERNMENT ACTOR DOES   by citing Government Code §815.2 where alleged State law claims for assault and battery by a peace officer, abuse of process, false arrest and imprisonment, definition per se and violation of California Civil Code 52. 1 2008 Garcia V city of Merced decal 637 F supp 2D 731-2008 us dist Lexus 2135.) This code has applicable codes in all 50 states.

376.        Government Code has addressed the very acts alleged in this case with a statute enacted in 1995. The Code says, (a) [T]he civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to [the Cal. Welfare and Insts. Code] shall not extend to any of the following, if committed with malice:

377.        (1) Perjury. (2) Fabrication of evidence. (3) Failure to disclose known exculpatory evidence (4) Obtaining testimony by duress . . . fraud . . . or undue influence . . . . (5) '[M]allice' means conduct that is intended . . . to cause injury to the plaintiff or despicable conduct that is carried on . . . with a willful and conscious disregard of the rights or safety of others.

378.        **Cal. Gov't Code § 820.2** did not come about because of someone's academic concern about possible wrongful conduct by social workers in connection with dependency proceedings. The Bill, Assemb. B. 1355, 1995–96 Reg. Sess. (Cal. 1995) ("AB 1355") was the direct result of a notorious case, James W. v. Super. Ct., 21 Cal. Rptr. 2d 169 (Cal. Ct. App. 1993), wherein the trial court granted absolute immunity for egregious acts resulting in the removal of a child from her family. Although the trial court was reversed on appeal, the issue generated statewide concern. AB 1355 was hotly debated and opposed by the County Welfare Directors, the National Association of Social Workers, the California State Association of Counties, the California Independent Public Employees Legislative Council, Inc., and the California State Council of the Service Employees International Union. See Cal. B. Analysis, 1995–96 Reg. Sess., Assemb. B. 1355 (Sept. 8, 1995). We find it utterly implausible that social workers in California were not aware in 1999 of this recent change in the law.

379.        In KAHLEIGHIA N. ROGERS, et al, Plaintiffs, v. CUMBERLAND COUNTY DEPARTMENT the United States District Court E.D. Western Division denied qualified immunity to social workers who fabricated evidence.

**380.** Most analogous to the Plaintiffs' claims is *Greene*, in which the appeals court concluded that municipal agents were not entitled to qualified immunity "as to the false representation claim, as the [plaintiffs'] right to be free from judicial deception in securing the removal order was clearly established at the time of [defendant's] alleged misrepresentations to the court." 588 F.3d at 1034. Prior cases establishing this right in the context of protective custody were decided well before the date of the alleged conduct in March 2016.

**381.** Therefore, agencies had fair warning that material omissions and misrepresentations with a deliberate disregard for the truth to a juvenile court would violate the Constitution.

**382. "Rooker-Feldman Not Applicable"**

**383.** Appeals courts have held that, where a party commits "extrinsic fraud" on a state court by submitting a false declaration *and* preventing the other side from presenting any response, the *Rooker-Feldman* doctrine will not preclude a federal court from hearing certain claims based on injuries arising from the state court order that resulted from this extrinsic fraud. *See Kougasian*, 359 F.3d at 1140; *cf. Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 859–60 (9th Cir. 2008) (*Rooker-Feldman* does apply, despite alleged fraud by the opposing party, when the federal plaintiffs' objections to the fraudulently obtained judgment had been presented and rejected in state court);

**384.** "To state a claim for relief in an action brought under§ 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Here, the loadbearing allegation in the sole § 1983 cause of action against Lisk and Jemison is that, acting under color of state law, they engaged in "judicial deception" by affirmatively "misrepresent[ing] and/or conceal[ing]" crucial facts when they requested the order authorizing intrusive examinations of the Benavidez children and that they "knew" that the facts presented "were not true."

**385.** Plaintiffs claim judicial deception resting upon *affirmative fraud* is asserted, the merits of the underlying constitutional claim largely collapse into the qualified immunity inquiry: *every* reasonable official would understand that committing *affirmative fraud* on a court in order to obtain authorization for intrusive examinations is unconstitutional.[2] *See, e.g.*, *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004) ("It is clearly established that judicial deception may not be employed to obtain a search warrant."); *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) ("deliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake"); *see generally Sandoval v. County of San Diego*, 985 F.3d 657, 687–88 (9th Cir. 2021) (Collins, J., concurring in judgment in part & dissenting in part) (noting that, where the requisite scienter is high enough, the merits of the scienter issue and the qualified immunity inquiry may overlap).

**386.** Defendant Government Officials and Actors Does are attorneys and high-level federal officials, it is clearly established to them that allowing agents to knowingly make false statement to obtain a court order for an intrusive examination was a violation of constitutional rights.

**387.** Even under Rule 9(b), scienter "may be alleged generally," *see* Fed. R. Civ. P. 9(b), and the

complaint's allegations are sufficient on this score as well. The complaint alleges that Defendant Government Officials and Actor Does knew that those representations were false, because it is in their job description that they know relevant laws, and therefore they knew it was wrong.

388.    "**Defendants Commit Several types of Fraud**"

### 389. "Honest Services Fraud"

**390.** Plaintiffs and their families are caught up in a services fraud scheme where they're merely human chattel bargained and traded for. The state courts have become "kangaroo courts" and operate like they do in third world country. Families are broken up and children are traded like chattel in the worse human trafficking scheme imaginable. All the officials in the court room are getting paid to milk the family dry and devour legacies. Families are victims of crimes under 18 U.S.C. § 1346 but state and federal attorneys along with Defendant MERRICK B GARLAND will not prosecute the criminals and turn a blind eye.

### 391. "Program Fraud and Medical/Health Care Fraud"

**392.** 18 U.S.C. § 1346 criminalize the failure of public officials and corporate executives to report their financial gains from business dealings with corporate or government entities or "enriched themselves as a result of the scheme through salary, bonuses, grants of stock and stock options, other profits, and prestige."

**393.** In the recent case of McDonnell v. United States, the Supreme Court clarified more statutes. 18 U.S.C. § 201 makes it a crime to offer or solicit anything of value to influence an "official act." The Court construed "official act" narrowly as "a decision or action on a question, matter, cause, suit, proceeding, or controversy that involves a specific exercise of formal governmental power. Nevertheless, the Court left open the possibility that alternate routes may be available to prosecute bribery schemes involving conduct that may be beyond the scope of McDonnell.

394. Federal fraud prosecutions expanded after the 2010 U.S. Supreme Court decision in Skilling v. United States. The Court ruled in that case that fraud under § 1346 is a scheme that involve bribes and kickbacks.

395. "**Program Fraud Civil Liberties Act**" 28 U.S.C. § 3802-3803; 31 U.S.C. § 3801;

396. Congress enacted the PFCRA to give agencies the ability to initiate administrative proceedings on claims of $150,000 or less, when the U.S. Department of Justice elects not to pursue False Claims Act remedies for the claims. Federal agencies may administratively pursue these "small" false claims and certified false statements within six years of the claim being made.

397. A person may be penalized $5,000 per claim or statement and may also be assessed up to double the amount falsely claimed. The Department's regulations pertaining to PFCRA can be found at 43 C.F.R. §§ 35.1-35.47.

398. The PFCRA different from the False Claims Act (FCA) in that it provides an administrative remedy promulgated to complement the FCA.PFCRA cases typically involve smaller claims and false statements the Department of Justice might not otherwise select for criminal or civil enforcement. Under the FCA, 31 U.S.C. §§ 3729-3733, damages are treble rather than the double damages available under the PFCRA.

**399.    "False Claims Act Violations"**

400.     The range of penalties under the FCA is from $11,181 to $22,363 for violations occurring after January 29, 2018, rather than $5,000 for DOI PFCRA cases. The PFCRA's liability provisions are similar to the liability provisions of the False Claims Act, except PFCRA extends to false statements even in the absence of any claim. Under PFCRA, the false statements must be certified.

**401.    "Defendants meet Statutory Elements for Fraudulent Claims"**

   a.  "Person

   b.  Makes, presents, submits, or causes to be made, presented, or submitted to the Government or a recipient of the Government

   c.  False, fictitious, or fraudulent

   d.  Claims or statements

   e.  Person knew or had reason to know were false

   f.  To Federal authorities or their agents.

**402. "Federal Agents Compound the Fraud"**

**403.** When the Defendant Department of Justice by way of GARLAND refuse to do their prosecutorial job of investigating and prosecuting white collar crime, they compound the crime because they make receiving justice nearly impossible for victims.

404.     The False Claims Act is ignored by Defendant GARLAND and lower-level Attorney Generals because the judicial machinery of the courts and related agencies have been tainted.

405.     In effect, the Skilling decision § 1346 empowered Defendant GARLAND with more designations for fraud prosecutions of corporate executives, public officials, and fiduciaries who

48

engage in "self-dealing" or further their self-interests, while supposedly acting in the interests of others to whom they owe a fiduciary duty, to cases in which there are allegations of bribery or kickbacks.

406.     Because of Defendant GARLAND'S refusal to prosecute criminals and investigate these agencies, as well as lower-level attorneys covering up for "self-dealing" judges and officials on a lower level, the crimes are compounded, and the Plaintiffs are furthermore harmed and deprived of any access to justice or the court.

### 407. "Federal Rule 60D and Multidistrict Health Care Fraud Initiatives"

408. The Global remedy/settlement sought is to set aside these judgements for fraud on the court.

409. The following are factual allegations shall be set out as per each Plaintiff.

### 410. *PLAINTIFF MELODY RODGERS*

411. I MELODY RODGERS, do solemnly swear to the truthfulness of the following statements to the best of my knowledge. Plaintiff MJR has demonstrated herein how Defendants conspired against her, inflicting continuous emotional distress, for one cause, "to permanently separate Plaintiff MJR's children from her." The scheme consisted of removing Plaintiff MJR's children from their home, denying reunification services, terminating parental rights without cause, violating her Constitutional Rights, inter alia.

412. Defendants acted in concert and conspired together to commit the tortious acts described herein. Accordingly, these Defendants should be held jointly and severally liable for any damages awarded to Plaintiffs, as a result of this action.

413. Plaintiff MJR, has four minor children: Plaintiffs MR, HR, SB, and PB. Plaintiff MJR is a college graduate of the University of North Carolina at Chapel Hill and is currently a 2nd-year law student at the Northwestern California University School of Law. Plaintiff is also an award-winning, well-respected, former public-school teacher; she taught inner-city youth in Baltimore MD and Washington DC for 5 years through non-profit programs "Teach for America, Education Based Latino Outreach, and Financial Literacy Foundation."

414. Plaintiff taught all elementary school subjects including 1st Grade & 5th Grade, as well as, High School Finance, which is a category of Home Economics curriculum. All Plaintiff MJR's students passed the end-of-year testing regardless of disability or aptitude.

49

415. Furthermore, Plaintiff MJR is a God-fearing mother of four whose aim has always been to raise her children to be respectful, hardworking, and contributing members of society with good morals and ethics based on the Holy Bible.

416. Plaintiff was defrauded, emotionally distressed and deprived of their Civil Rights and Due Process rights by the Defendants JOE BIDEN, XAVIER BECERRA, MERRICK B GARLAND, GAVIN NEWSOM, JERRY BROWN, COUNTY OF LOS ANGELES and its employees and officials, and their co-conspirators since February of 2016.

417. **The RICO/Conspiracy to Snatch Plaintiff's Children MR and HR though Substantive Unconscionability**

418. In 2..  , Plaintiff MJR and her children were temporarily homeless due to financial hardship. Plaintiff MJR was working full-time as a substitute teacher as well as going to UCLA School of Continuing Education during the evening to gain pre-med credentials so she could qualify for a better job and thus alleviate the financial hardship.

419. Plaintiff MJR received childcare from the Hope Street Family Center which is part of Dignity Health, California Hospital Medical Center. In addition to providing childcare for Plaintiff MJR's minor children, MR and HR, Dignity Health also provided counseling services, as well as housing referrals.

420. On or around October 2016, Plaintiff MJR made a tongue in cheek comment to Araceli Cortez, a social worker that was later taken out of context and misconstrued. Plaintiff MJR indicated that being homeless and not having a place to sleep at night made her want to kill herself.

421. Social worker Araceli Cortez asked Plaintiff MJR more questions about this statement and Plaintiff MJR clarified that this was a flippant statement that was often used by her classmates as they studied for exams and that she did not mean anything by it and it was a figure of speech to indicate being stressed.

422. Araceli Cortez asked Plaintiff MJR if she wanted to give DCFS temporary custody of her children and Plaintiff said "No -Way" because her children were not the problem, housing and finances were the problem.

423. Plaintiff MJR signed a document with Araceli Cortez as a good-faith testament to this conversation and to clarify any potential misunderstanding. She also, apologized for the comments that she had picked up from her peers.

424. **PLAINTIFF MJR's Circumstance Had Nearly Resolved Itself Pre-Invasion**

50

425. By December of 2015, Plaintiff MJR had found a 2 bedroom apartment and began moving in with daughters MR and HR. Social workers also set Plaintiff MJR with counselor Monica Rosenblum ("Rosenblum").

426. Plaintiff MJR also started receiving child support for both children which helped alleviate financial stress and allowed MJR to buy furniture for the apartment and items for her daughters.

427. Plaintiff MJR continued to meet with counselor Rosenblum and shared with her updates about the recent accomplishments and goals she had achieved.

428. On February 23, 2016, MJR mentioned to counselor Rosenblum that she wanted to take a leave of absence from UCLA because the classwork was requiring increased amounts of time, and conflicting with the daycare schedule. MJR mentioned that she wanted to spend more time homemaking and was unable to do so while in school because the classes were requiring evening study sessions.

429. Plaintiff told Rosenblum that the UCLA Continuing Education registrar stated that Plaintiff could withdraw from the quarter and receive a refund for tuition if the withdrawal was for medical reasons. Plaintiff asked counselor for a note to take to her school to withdraw from her classes for mental health reasons.

430. Rosenblum agreed to provide the note because Plaintiff stated that stated she was feeling anxious related to her school schedule, test-taking and making good grades. Before writing the note, Rosenblum asked Plaintiff the question of if she felt like harming anyone.

431. Plaintiff said no but found the question to be leading because she had said nothing during their sessions that indicated that she was thinking that. Additionally, she had already clarified that any misperceptions that she had heard from Araceli Cortez were taken out of context. Plaintiff believed Rosenblum was trying to get her to say those statements in order to have a reason to detain her children.

432. Rosenblum again asked Plaintiff MJR if she wanted to talk to DCFS about giving them temporary custody of her children. Plaintiff again said no because she could resolve the issue of stress by simply withdrawing from classes and freeing up her schedule from the additional obligation.

433. Rosenblum said that she would refer Plaintiff to DCFS anyway just to talk. After waiting for an hour for DCFS to arrive to the Hope Street Family centers, Plaintiff MJR indicated that it was late a night and she just wanted to go home.

434. Rosenblum said she could arrange for a safety check to be done at Plaintiff MJR's home since she could not wait. Plaintiff agreed to this and went home with her two children.

435. Around 10:00pm February 23, 2016, Plaintiff MJR received a phone call from a wellness team. They indicated that they were backlogged, and they were wondering if they still needed to come for a wellness check that night or if they could come the following morning. Plaintiff MJR indicated that she was fine and that it was also getting very late, so it would be better if they came in the morning. The safety team agreed to come the next day.

436. Around 11:00pm February 23, 2016, Plaintiff received a loud banging on the door and looked outside to see a DCFS Emergency Social Worker MEZA and two LAPD officers. Plaintiff MJR asked them why they were at her house through the door, and they demanded that Plaintiff open the door and let them in immediately. Under duress, and because of embarrassment she was caused in front of her neighbors, and the perceived authority of the Defendants, Plaintiff opened the door against her will.

437. DEFENDANTS barged into Plaintiffs home and began walking around with a hostile attitude. They had no regard or concern for the fact that Plaintiff MJR and her children were in bed and sound asleep. DEFENDANTS began relentlessly torturing and interrogating PLAINTIFF MJR by repeatedly asking her if she felt suicidal or depressed. When DEFENDANT Social Worker asked PLAINTIFF these questions she would frown and lean forward as to give the impression she is waiting for the right answer. PLAINTIFF MJR, who had just recently been woken up from sleep abruptly and startled by strangers barging into her living room, explained to the DEFENDANTS that she was not suicidal and was tired of being asked the same questions repeatedly because she had already stated that this was a misunderstanding.

438. PLAINTIFF was respectful to all agents and spoke to them truthfully and calmly, but PLAINTIFF believes officers were acting in bad-faith and just looking for any statement to twist and turn so they could take the PLAINTIFF'S children.

439. PLAINTIFF'S Children **were not in imminent danger** and neither the LAPD nor Social Worker reports provide facts to indicate adverse incidents or the existence of exigent circumstances to justify why PLAINTIFFS children were removed from her home that night without a warrant. DEFENDANT also tricked PLAINTIFF by telling her the children would be home if she just came to court and explained that everything is ok.

440. DEFENDANTS ER SOCIAL WORKER wrote in her report that PLAINTIFF'S apartment was messy, but this was an exaggerated, misrepresentation, made in bad faith in order to commit Fraud upon the Court and paint PLAINTIFF MJR in a False Light before the court. There were also omission of fact and exculpatory evidence that would have provided clarify context, but the report left these facts out.

441. PLAINTIFF MJR was fortunate to have obtained a new apartment and was in the process of unpacking, cleaning, organizing, and putting together furniture so it is expected that during this process things will be "messy", but PLAINTIFF MJR's home was never dirty or unclean.

442. DEFENDANTS Social Worker knowingly and intentionally defrauded the court by misrepresenting a positive occasion and progress in the Plaintiff's life, as a bad occasion. She did so by omitting facts and otherwise exculpatory evidence that the Plaintiff had just moved into the home. She also played with words by calling boxes of belonging "messy" and lead the court to believe the apartment was unclean by making a blatantly false claim.

443. Defendants noticed that PLAINTIFF MJR had an extra-long cell phone charging cable for her iPhone and made a false report that the cord was wrapped around the baby's neck. This statement is purely made up because although Plaintiff does own an extra-long cable, it was not wrapped around the baby's neck.

444. The purpose of an emergency child removal is for children in imminent danger – because Plaintiffs and her children were in their home peacefully asleep, and there was no abuse or neglect, DEFENDANT had no reason to take children under a emergency or exigent circumstance.

445. This judicial deception by way of inflammatory statements, false reports, and perjury harmed Plaintiff formed their basis for the Juvenile Court taking jurisdiction over PLAINTIFFS children.

446. On or about February 29, 2016, Defendants and EISNER, Deputy County Counsel, collectively with Co-Defendants knowingly filed a Juvenile Dependency Petition against Plaintiff MJR and her children by falsely claiming that Plaintiff had a mental health and emotional problems and they the children were in danger of being abused or neglected.

447. Even though the dependency petition contained no allegations of abuse or neglect as required by WIC 300 Commissioner MARPET took jurisdiction anyway.

448. On or about February 29, 2016, Commissioner MARPET yelled at Plaintiff and said that she should be taking medication. Commissioner MARPET violated Plaintiffs procedural due process rights by preventing Plaintiff from being heard and having an unbiased, fair and meaningful opportunity to be heard.

449. Defendant MARPET denied PLAINTIFF MJR the right to object to untrue statements or present evidence. He took actions in furtherance of the Conspiracy to commit Fraud Upon the Court and Deprive Plaintiffs of their rights, by taking jurisdiction over children that did not fit the description of children in Welfare & Institutions Code § 300 et. Seq. Instead, he used arbitrary reasoning to act as a judge and harm Plaintiffs.

450. Additionally, Defendant MARPET did not require that Defendant DCFS show proof that they made reasonable efforts to prevent the removal of the children. He rubber stamped the requirement as being satisfied without discussion, and disregarded all statutory burdens of proof for evidence, and civil rules of procedure.

451. HALL and ABERA prevented Plaintiff MJR from adequate visits with her children by making her visit monitored and always at an inconvenient location. They moreover tried to prevent her children from immediately going into kinship care by coming up with excuses on why the paperwork was not processed. This results in MR being abused by her caregiver by being beaten and dragged on the floor. HR had to experience the emotional distress of no longer having her mother's milk and companionship at such a young age.

452. Defendants were aware that Plaintiff MJR was receiving her apartment through the Section 8 program, and they worked as hard as they could to keep children out of the home in order to cause mom to lose the very benefit that had stabilized her family.

453. Defendants came to Plaintiff's MJR 1 week after her children were detained and noticed that her house was spotless with the help of her grandmother who flew into town to help her with childcare. She withheld this evidence from the court and attempted to convince Plaintiff MJR to say she was mentally depressed because as she said, "Anyone would be depressed with everything we are doing to you, and we are going to be in your life for a very long time".

454. Defendant would repeatedly call Plaintiffs phone and tell her that if she wanted to get her children back, she needed to do whatever they said, and they insisted she leave her Section 8 apartment and move her mom in as the only way. Plaintiff MJR said she had no place else to stay but they insisted she become homeless or else. They would also repeatedly antagonize Plaintiff MJR by saying that her children were about to be put up for adoption if I didn't take medication.

455. Los Angeles Dependency Lawyers ("LADL") were representing Plaintiff at the time, and they played their role in the conspiracy by refusing to present plaintiff's evidence to the court that Plaintiff had received a clean bill of health from a therapist and that her apartment was unpacked and ready to be lived in because she had received some help from her church family to help fix any concerns.

456. LADL hired social worker YVETTE RAMIREZ to write a report about the Defendant that would serve to counteract the biased report by LA COUNTY. On the day of court hearing RAMIREZ called Plaintiff MJR that she had been too sick to prepare the report and would be too sick to come to court and testify on my behalf. Defendant LONEISHA THOMPSON did not seek a continuance and neglected to prevent the incident from prejudicing her client.

457. On March 22, 2016, through the same Fraud scheme committed between Juvenile Dependency Court officials, the court declared that Plaintiffs MR and HR were children described by section 300, subdivision (b)(l) without a valid cause. The sustained section 300 Petition documented that Plaintiff suffered from mental and emotional problems that rendered her incapable of providing regular care for Plaintiff MR and HR.

458. Plaintiff MJR continually asserted that she was not depressed or suicidal and that she was being badgered into confessing feelings which she did not have in order to satisfy the Defendants DCFS. Plaintiff continually asserted that Plaintiff DCFS was trying to cause emotional pain to the Plaintiff in order to coerce her into therapy.

459. Plaintiff spoke to several county therapists who all indicated that Plaintiff was not in need of any mental health services whatsoever and that any stress experienced by Plaintiff was normal and did not interfere with her ability to care for her children.

460. They wrote letters to indicate that Plaintiff MJR was healthy to DCFS, but DCFS rejected these letters and by trickery and duress coerced mother into undergoing psychological therapy as a they prescribed.

461. Plaintiff MJR was told by Defendant ABERA as well as by Defendant Los Angeles Dependency Lawyer -Joe that if she wanted to be reunited with her children as quickly as possible, then she should accept that she has a mental health problem and start seeing a Psychologist now; before reunification services were ordered by the court, because by doing that, Plaintiff could be completed with the services by the time they services are ordered and get her children back immediately.

462. Because of this advice, Plaintiff sought out a psychologist to evaluate her for any mental and emotional problems. Later on, ABERA used the fact that Plaintiff MJR was attending counseling against her and used it as proof that she had a problem. Plaintiff felt entrapped because she was seeing a therapist based on duress.

463. Plaintiff provided a copy of the DCFS report to the psychologist so that she could know exactly what the accusations were and what concerns that DCFS had.

464. Plaintiff attended several counseling sessions and was declared fit by her Psychologist and the same was communicated in a letter to Defendant DCFS's Social Worker that indicated, "It appears that Melody has now corrected most of the areas of difficulty (as accused by the department) and is a fully committed mother. She spent considerable time this Christmas season making a nice holiday for her children, and her neighbors in her new apartment; helping others who were alone."

465. In her report psychologist, Sharon Valentino ("Valentino"), stated that she began seeing Plaintiff MJR. Valentino stated in her report that Plaintiff MJR saw her for issues relating to her children and her parenting of her children. It concluded that all problems that Plaintiff MJR previously had were now resolved, that she is now able to be a good mother, and she could have them full time to properly raise her children. However, Defendant DCFS did not communicate the latest medical update to the Court, which misled the Court in making more prejudicial error in its judgment.

466. Plaintiff herself presented this evidence but Defendant MARPET disregarded the positive report because it did not come from one the county's own therapist. He ordered the Plaintiff to attend Kedren Mental Health clinic which is a clinic for severely mentally ill patients.

467. Plaintiff MJR wanted to reunify with her daughters, so she agreed to getting psychological counseling at Kedren Mental Health as part of a Reunification Plan.

468. Plaintiff MJR a happy and reasonable law-abiding citizen was being coerced into therapy and being told that her own feelings were not real or true. Even though Plaintiff was happy, reports would continually say she was not depressed and paranoid, and even though she accomplished a lot each and every day, DCFS would continually report that she was isolating and suicidal. Plaintiff MJR was told she must confess and believe that she has those feelings and that if she didn't admit to being suicidal then she was lying.

469. Plaintiff MJR was afraid when she went to Kedren because it was like a mental hospital and Plaintiff did not feel like she fit in. There were people drooling, talking to themselves, and screaming. It was emotionally traumatizing to be in the building.

470. On April 06, 2016, the Juvenile Dependency Court made an order placing Plaintiffs MR and HR with their maternal grandmother, Plaintiff JR.

471. From April through September 2016, Plaintiff MJR resumed therapy at Kedren Community Health Center ("Kedren") with a psychiatrist, where she participated in at least seven sessions ranging in duration from 30 to 90 minutes; after evaluation, she was not recommended medication by a psychiatrist. Despite not being prescribed medication, Defendant DCFS continually throughout the case, and even into the present time, will write in reports that Plaintiff MJR fails to take medication. This is tantamount to practicing medicine without a license because they cannot say that I should take medicine when I am not prescribed any.

472. Around August 2017, a Kedren therapist reported that Plaintiff MJR had "been working on treatment goals which include utilizing positive coping skills to manage daily stressors and positive parenting psycho-education." He reported that Plaintiff MJR had been compliant over the past four

months with her mental health treatment and that she denied ideations of self-harm and harm to others. The therapist also reported that she presents engaged in sessions and motivated to complete the court-ordered plan.

473. By January 2017 Plaintiff MJR completed at least 12 sessions of parental education classes as well.

474. **LOS ANGELES COUNTY DCFS Slandered Plaintiff to Mother and Family, which Exacerbated already Strained Family Relationships in a Malicious Act to Prevent Reunification in Contradiction to Congressional Intent of Acts to Reunify**

475. DEFENDANTS slandered the name of MJR because they called her extended family members and used language to suggest that I was crazy. They would encourage family members to disregard their gut instinct, and request that they suspend what they have known of me for years and consider their perspective.

476. SOCIAL WORKERS would then ask them suggestive questions which would indicate that they believe I have a medical issue in their professional opinion. Using Scienter, various DEFENDANTS would call and act as if they possess special knowledge to determine if someone has a medical diagnosis.

477. As a result of this false information about PLAINTIFF MJR'S medical state, PLAINTIFFS families turned on her and no longer associated with her or invited her to family functions.

478. During the weekend of October 7 - 8, 2017, Plaintiff MJR was visiting children and her mother Plaintiff JR in North Carolina. Plaintiff MJR called Defendant SOCIAL WORKER SUPERVISER HEIDI MARTINEZ (MARTINEZ) to remind her that the court had granted the agency discretion to liberalize visits and because she had complied with every aspect of the reunification plan, there is no reason for her visits to be supervised.

479. MARTINEZ called PLAINTIFF JR on the phone and after a private conversation, MARTINEZ called Plaintiff MJR on the phone and told her that she had decided to liberalize visits. PLAINTIFF was very happy.

480. Plaintiff MJR took her children on a visit to see their grandfather that day. On the way back from the visit Plaintiff MJR took Plaintiffs JR's car to the carwash JR became outraged when she found out and MJR did not understand why she would be upset that someone cared enough to pay to have her car washed. JR threatened MJR by telling her that as a result of washing her car without permission, she was going to go back to Defendant DCFS and tell them that she was crazy.

57

481. Plaintiff MJR believes that JR was being manipulated by DEFENDANT MARTINEZ to create 'drama' because DCFS was running out of allegations against MJR and needed new claims in order to justify continuing to place Plaintiffs children with her mother JR. Defendants DCFS pitted Plaintiff JR against Plaintiff MJR by telling plaintiffs mother JR that if she did not go along with the narrative of saying Plaintiff MJR was crazy, then she would lose custody of the children completely and never see her grandchildren again.

482. Plaintiff JR had also become susceptible to the slander that was repeated by DCFS who kept telling her that her daughter Plaintiff MJR was "crazy and that she just didn't see it because she is her mother". Plaintiff JR had her brother contact DCFS to tell them that Plaintiff MJR was crazy and had washed her car without permission which resulted in an argument. Plaintiff MJR tried to present evidence to a judge that showed that, she was indeed the victim and that there was no motive to get into an altercation, she had witnesses that saw her trying to make peace, and that the entire incident was a setup by the Department to prevent reunification of the family Plaintiff JR had literally apologized and admitted that she had overacted and that it was not Plaintiff MJR's fault but pressure and persuasion from the Department for her to act in that manner

483. DCFS filed an Ex-Parte Application pursuant to section 385 to modify Plaintiff MJR's visitations from unmonitored to monitored. Defendant DCFS also recommended terminating family reunification services. Defendant DCFS acknowledged that Plaintiff MJR appeared to be in literal compliance with her court-ordered programs, including individual therapy and parenting classes, and relayed Plaintiff MJR's expression of love and affection for her daughters.

484. However, the still continue to allege that they believed "mother's continued unpredictable behavior would be detrimental to Plaintiffs MR and HR's health and safety, particularly at their young ages." – which was a fancy way of blaming the mother for the incident.

485. **Willful Blindness and Reckless Disregard *for t*he Truth**

486. LA COUNTY SOCIAL WORKERS would become triggered and get defensive when directly confronted about spreading malicious gossip. The acted as if they were too busy to speak to the PLAINTIFFS and had a very aggressive attitude and unprofessional tone of voice.

487. Moreover, DEFENDANTS when presented with any exculpatory evidence or facts that did no go along with the narrative they wrote about you, would pretend as if they never received the information or they would transfer PLAINTIFF'S case to another worker and leave the exculpatory information off. The new SOCIAL WORKER would then go to court and feign to not know about the information because the old SOCIAL WORKER did not give them the entire file.

488. his record tampering and intentionally falsification of records and omissions of important documents is part and parcel to the judicial deception and perjury that is the everyday activity of DEFENDANTS.

489. When PLAINTIFF "WITNESSES" tried to talk with Defendant Social Worker to give more details about any investigation, DEFENDANTS would get defensive or act like they were too busy to receive the information or say that they will call back and never call back. If the witness tries to call back to speak positively about the PLAINTIFF, then they will not answer the phone. If non-witnesses call to speak negative about the PLAINTIFF, then they will answer the phone and entertain all hearsay.

490. LA COUNTY DCFS picks and chooses which witnesses to receive information from and only choses witnesses that say what they want to hear. When Amber Rodgers, the sister of Plaintiff MJR and daughter of MR tried to offer eye-witness evidence about the situation because she had witnessed via video conference, Defendant MARPET, and Defendant DCFS refused to acknowledge the testimony. Yet, they received the statements from Plaintiff JR's Brother via email when he was not there.

491. **Refusal to do a Reasonable amount of due diligence inquiry and investigation**

492. Social workers acting in a reasonable way do a reasonable amount of investigation before they make a report. They get multiple accounts and take all facts into consideration.

493. An unreasonable, biased, and unethical social worker is going to take one person's account as the sole basis for their report and they won't bother to verify the statements. The hasty rush to judgement is confirmation and lack of thorough investigation denies Plaintiff due process and indicates a disregard for the truth by the Defendants.

494. It also shows that the decision was pre-planned and deliberately contrived by the agency to further their agenda and push their narrative.

495. **Advanced Brainwashing Techniques**

496. DEFENDANT co-conspirators are so intent on promoting their false narrative that they use brainwashing techniques to get their slander and misrepresentations to become reality. DEFENDANT co-conspirators are 'stealthy word-smiths' who dupe unwitting individuals into turning on their family members by using the power or persuasion and repeating lies over and over again.

497. They punish these individuals by ignoring them, when the individual disputes the validity of their conclusion, they reward individuals who agree with them by selling them empty promises that they could become potential paid foster parents. This punishment and reward system serves as a mean to solidify their preferred narrative and manipulate individuals into saying what the agency wants them to say.

498. There are countless studies that indicate that repetition is a highly effective form of brainwashing and when used by a person in a position of authority, it can lead to people believing false information a truth.

499. DEFENDANT co-conspirators tried to convince PLAINTIFF MJR by repeating very harmful and deliberately hurtful lies that were knew were untrue because Plaintiff told them so and had been examined by a medical doctor.

500. DEFENDANTS repeatedly said that PLAINTIFF was suicidal, depressed, paranoid and heard voices. They repeated these malicious lies in order to inflict emotional distress upon PLAINTIFF, brainwash PLAINTIFF, and essentially harass her into believing things they wanted to be true.

501. PLAINTFF MJR resolved that she would not allow complete strangers to tell her how to feels and what to think. Moreover, she resolved to not allow people to speak for her and write negative things about her.

502. **Acting in Bad Faith and with Malice to Inflict Pain**

503. DEFENDANTS SOCIAL WORKERS and the DEFENDANT prosecutors recklessly destroyed PLAINTIFF'S family and showed a reckless disregard for the truth and the law. They abused the court and corrupted its function by making it a tool for domestic violence and an honest services fraud scheme to deprive families of their fundamental rights to familial association and family integrity

504. They pretend to act in the best interest of children and only remove children when absolutely necessary, but they are a family's worst nightmare who try to inflict the most amount of pain possible all under color of law and safety.

505. Commissioner Marpet coerced PLAINTIFF MJR into going to a medical facility called KEDREN, which was for severely mentally ill. This was a form of torture and cruel and unusual punishment because PLAINTIFF was scared to go to the facility and should not have to associate with people that she does not feel safe around. This made PLAINTIFF an involuntary servant, deprived her of her freedom to contract with whom she wishes, harmed her emotionally, and caused her to miss job opportunities because they only take appointments in the middle of the day.

506. **Knowingly and Intentionally Committing Perjury, Fraud Upon the Court, and Abuse of Process**

507. DEFENDANTS carefully craft juvenile petitions to present to a court that they know is full of false information in order to intentionally create a false record and defraud the court and ultimately taxpayers billions of dollars.

508. DEFENDANTS are required to know the law, or work under a supervisor who knows the law, so ignorance of the law and what information a petition should contain and not contain is not an excuse. (Exhibit 10, Exhibit 12- page 3)

509. DEFENDANTS passed knowingly false information along to several different people in order to cause confusion and make the source of the information hard to trace and confront. It also slanders the name of the PLAINTIFF more when it appears as if multiple people are saying the same thing. Deliberating leaving off all exculpatory evidence or information that would exonerate the PLAINTIFF is a showing of intent and that the false information was not an honest mistake.

510. **Honest Services Fraud Scheme**

511. DEFENDANTS assign PLAINTIFF   to MJR to endless rounds of therapy to enrich their providers by extending out the services for arbitrary reasons. After completing all the requirements and being an involuntary servant PLAINTIFF MJR was told there was now another reason for the termination.

512. **Bright Line Laws**

513. DEFENDANTS know that depriving families of their due process rights are against the law because the agency has been sued over this exact same behavior on several occasions.

**514. Consent Decrees**

515. They are also presently under several consent decrees for these same actions, but they violate those decrees and judgement without a second thought.

516. **Harm Families and Break them Up Leaving Families Worse Off**

517. DEFENDANTS are not helping families or children but depriving them of rights and acting against public policy.

518. The DEFENDANT are funded to help families to stabilize and thus keep children safe at home when at all possible. DEFENDANTS worked tirelessly to separate PLAINTIFFS and ignored all pleas from children MR and HR to go home. By this use of excessive force and placing children in a more restrictive environment than necessary, they violated PLAINTIFFS rights to First, Fourth, Eight, and Fourteenth Amendment Rights.

519. On February 13, 2018, the Juvenile Dependency Court terminated Plaintiff MJR's family reunification services stating that she "failed to take responsibility for her actions and also failed to recognize how her behavior was alarming and could potentially be harmful to her children." These

eloquent words are carefully crafted to sidestep the fact that he layed blame on Plaintiff MJR without deliberation or hearing the facts.

520. In May 2019, the Juvenile Dependency Court ordered legal guardianship for Plaintiffs MR and HR with their maternal grandmother, Plaintiff JR.

521. Plaintiff JR tried to contact DCFS and explain to them that it was a misunderstanding on her part, but DCFS then turned against Plaintiff JR and from then on set out to punish her for speaking the truth by not giving her kinship care of the next pair of children DEFENDANTS DCFS snatched from Plaintiff MJR.

522. **Snatching on Plaintiff MJR's Youngest Children SB and PB**

523. PLAINTIFF MJR was again targeted by LACOUNTY when they recklessly moved known pedophile, fraudster, con-artist and repeat offender KERNELL STERLING BROWN JR. ("BROWN") next door to her under the Section 8 program without disclosing his criminal background.

524. A month after moving into the same apartment complex as PLAINTIFFS, T BROWN moved in several of his rambunctious adult children and relatives.

525. PLAINTIFF MJR and neighbors repeatedly communicated to the LACOUNTY Section 8 program that they did not feel safe with BROWN breaking the rules and allowing unauthorized tenants to live in the unit, but COUNTY failed to enforce the rule and allowed the guests to stay.

526. BROWN moved in numerous related adults, and they all began to team up as a clan to intimidate, threaten and harass the tenants in the apartment unit.

527. Plaintiff MJR met BROWN in 2016 while he was her next door neighbor. At that time, Plaintiff MJR was emotionally traumatized and devasted, because her first two children Plaintiffs MR and HR were recently taken by Defendant DCFS, without cause. Defendant BROWN began to show interest in Plaintiff MJR. MJR was no interested in BROWN but because she had no protection from the authorities, she acquiesced into being his girlfriend against her will.

528. BROWN was nice to Plaintiff MJR on most occasions but, as neighbors testified, when he drank alcohol he became a completely different person. BROWN would become angry, get into arguments with the neighbors, and physically abuse Plaintiff MJR for any reason.

529. On one of these occasions, BROWN demanded Plaintiff MJR's key to her white Ford Explorer. When Plaintiff MJR refused to give him the key, he hit her in the head and made her give him the key. After he took the key, he drove Plaintiff MJR's SUV into the neighbor's car that was parked in the same parking lot.

530. After the collision with the parked vehicle, BROWN fell asleep in the driver's seat. A male neighbor came and pulled him from the car, and put the vehicle brakes on. The neighbor complained to BROWN that he had ruined her car and he promised to pay her $100 a month for the car which was worth about $600. BROWN begged Plaintiff MJR for the money to pay their neighbor and when Plaintiff MJR refused to give it to him, he smacked her, stole the debit card, and stole her money.

531. According to Cal. Pen. Code § 13701 (b), "Every law enforcement agency in this state shall develop, adopt, and implement written policies and standards for officers' responses to domestic violence calls by January 1, 1986. These policies shall reflect that domestic violence is alleged criminal conduct. Further, they shall reflect existing policy that a request for assistance in a situation involving domestic violence is the same as any other request for assistance where violence has occurred."

532. Here, each time BROWN hit Plaintiff MJR, she called the police and reported the incidents, but Defendant LAPD Officers refused to arrest BROWN because Plaintiff MJR didn't have any physical marks or bruises. As to the records, there were seven domestic violence calls for this address, but BROWN was never arrested.

533. Plaintiff MJR, at all times, was a victim of domestic violence and without law protection, she began making plans to leave BROWN. MJR started saving money and looking for another apartment. Plaintiff MJR had two jobs, she drove for Uber on weekends, and worked as a substitute teacher for private schools on the weekday. BROWN noticed Plaintiff MJR was making plans to leave and started accusing her of cheating.

534. On September 19, 2018, Plaintiff MJR came home from the gym. BROWN was drunk out of his mind and started accusing her of cheating. Plaintiff MJR kindly ignored the accusations and went into the kitchen to make dinner for the family. BROWN started shouting obscenities and Plaintiff MJR called him "a drunk." BROWN went into the bedroom and got his baseball bat and started hitting Plaintiff MJR with it on the bottom half of her body. Each time the baseball bat hit her body, Plaintiff MJR apologized for calling him a drunk but despite the apologies BROWN then dragged Plaintiff MJR by her braids, stripped her of her house robe, and threw her outside completely naked. The upstairs neighbor heard Plaintiff MJR screaming and threw her a house robe to wear so she would not be naked outside. Alecia Ward, another neighbor, called the police and a third neighbor allowed Plaintiff MJR to wait in her house until the police arrived. This time, BROWN was finally arrested and taken to jail.

535. While BROWN was in jail, he sent his family members to harass Plaintiff MJR. On October 20, 2018, Plaintiff MJR had to call the police to get BROWNS's adult daughter to leave the home after BROWN gave her the keys to enter Plaintiff MJR's home.

536. On October 26, 2018, Plaintiff MJR was granted a Restraining Order against BROWN and his adult daughter, as well as, sole physical custody of minor children, Plaintiffs SB and PB.

537. On December 23, 2018, Defendant BROWN came back to Plaintiff MJR 's home despite the Restraining Order. Defendant BROWN came back with his adult daughters and tried to get into the home using force. He drilled the locks off the door and came in with his daughters. When Plaintiff MJR tried to shut the door and keep them out, a physical altercation began to occur, and Plaintiff MJR was forced to use physical force to expel the aggressors and protect herself. BROWN and his daughter called the police and Defendant SANDATE arrested Plaintiff MJR for PC-245(A)(1).

538. According to Cal. Pen. Code § 13701 (b), LAPD Officers "shall encourage the arrest of domestic violence offenders if there is probable cause that an offense has been committed. These policies also shall require the arrest of an offender, absent exigent circumstances, if there is probable cause that a protective order issued under Chapter 4 (commencing with Section 2040) of Part 1 of Division 6, Division 10 (commencing with Section 6200), or Chapter 6 (commencing with Section 7700) of Part 3 of Division 12, of the Family Code, or Section 136.2 of this code, or by a court of any other state, a commonwealth, territory, or insular possession subject to the jurisdiction of the United States, a military tribunal, or a tribe has been violated. These policies shall discourage, when appropriate, but not prohibit, dual arrests. Peace officers shall make reasonable efforts to identify the dominant aggressor in any incident. The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor. **In identifying the dominant aggressor, an officer shall consider the intent of the law to protect victims of domestic violence from continuing abuse, the threats creating fear of physical injury, the history of domestic violence between the persons involved, and whether either person acted in self-defense.**"

539. Immunity does not apply when excessive use of force by a police officer or negligent performance of a police officer's duties. (*Robinson v. Solano County* (9th Cir. 2002) 278 F.3d 1007, 1016.)

540. A victim who has acted reasonably to defend oneself or another from harm is not subject to arrest. This provision is intended to prevent police officers from arresting the victim along with the abuser, and recognizes the fact that victims have the right and may try to defend themselves without being subject to arrest. If an officer investigates and has probable cause to believe that a domestic abuse assault occurred but the victim was not injured, the officer may arrest the abuser, although is not required to do so. Moreover, the officer must find out if there are any no-contact or protective orders in effect against the abuser and enforce such orders. Here, Defendant SANDATE did not arrest BROWN even though he knew that BROWN was the dominant aggressor, that he was out on bail and had violated a restraining order; he refused to hear Plaintiff MJR and the testimony of neighbors that would

immediately clarify the facts that she acted in self-defense, and he indeed arrested the victim, Plaintiff MJR.

541. On December 23, 2018, Defendant DCFS received a referral alleging that Plaintiffs SB and PB were victims of emotional abuse, due to a reported altercation between mother and father, where mother attempted to attack father with a butcher knife and she was arrested.

542. On January 2019, Defendant LA COUNTY Social Worker DRAKE reported after an unannounced visit at Plaintiff MJR's home and found that Plaintiff MJR and her two minor children, Plaintiff SB and PB were no longer in the home. In an effort to protect Plaintiff MJR and her minor children from Defendant BROWN, Plaintiff MJR moved to North Carolina, her home state.

543. On February 14, 2019, with the full knowledge that Plaintiff MJR and her children were residents of North Carolina, Defendant ALLEN filed an initial section 300 Petition on behalf of Plaintiff MJR's children, Plaintiffs SB and PB. The Petition alleged that the children "were at substantial risk of suffering serious physical harm based on the violent physical and verbal altercation between mother and father (counts a-1 and b-1), and mother's mental and emotional problems (count b-2)."

544. Social workers mailed the notice of the hearing to the address where Plaintiff MJR formerly lived in order to prevent the court from realizing they lacked jurisdiction based on the Plaintiff and her children not being residents of California. She also did this so Plaintiff MJR would not know about the hearing and miss it.

545. On February 15, 2019, neither parent, Plaintiff MJR nor Defendant BROWN appeared for the Detention Hearing. The Juvenile Dependency Court made an order to detain the children, Plaintiffs SB and PB, from both parents and issued protective custody warrants for the children and a no-bail arrest warrant for Plaintiff MJR.

546. Notice of the date, time, and location of the hearing, with a copy of the petition attached, must be served, as soon as, possible after the petition is filed and no less than 24 hours in advance of the hearing if the child is detained. (§§ 290.1, 290.2.) If the whereabouts of the parents are unknown, the agency must exercise due diligence (i.e., conduct a good faith inquiry that is thorough and systematic) to locate and notice the parent. Failure to give notice to a parent of dependency proceedings violates due process and is "fatal" to the court's jurisdiction. (*In re Claudia S*. (2005) 131 Cal.App.4th 236.) Insufficient notice would mean that the jurisdictional and subsequent findings are subject to reversal on appeal. (*In re Arlyne A*. (2000) 85 Cal.App.4th 591, 598–600.) The court cannot assume jurisdiction over a minor when his whereabouts were unknown. (*In re Baby Boy M*. (2006) 141 Cal.App.4th 588, 601-602.)

547. Here, Plaintiff MJR, who resides in North Carolina, was not present at the Detention Hearing, because she had not received Notice. Defendants DRAKE AND ALLEN, as reported, knew that Plaintiff MJR and her children's whereabouts were unknown; yet, did not perform due diligence in attempting to locate them in order to provide appropriate Notice for the Detention Hearing.

548. On March 05, 2019, BROWN nformed Defendant LEVINGSTON that "he is a Truck driver and he is currently in Oklahoma (where he'll be for the next two months); afterward, he will be in Texas. BROWN denied knowing the mother and children's exact whereabouts but reported that they were "somewhere in North Carolina. BROWN was informed about the protective custody warrants on the children and warrant for arrest on the mother.... BROWN reported that the children are safe and well cared by mother as she often FaceTime's him so that he is able to see/speak with the children. BROWN stated that he is not pressing criminal charges against mother but mentioned that he is no longer in a relationship with mother due to their discord."

549. On March 07, 2019, Plaintiff JR reported that, "They (children) are with Melody in North Carolina." On July 17, 2019, Defendant LA COUNTY received an immediate response referral alleging BROWN sexually abused his granddaughter, R.B.

550. On July 31, 2019, Plaintiff MJR was exonerated of all criminal charges that were pending against her. At the trial, Plaintiff MJR was exonerated of all charges by an impartial jury who decided that Plaintiff MJR was acting in self-defense in her own home. At the trial, Defendant SANDATE committed perjury during his testimony – he said that Plaintiff MJR was belligerent which was why he arrested her and refused to acknowledge her restraining order; however, after the video footage of his body cam was played for the jury, video revealed the Plaintiff MJR spoke calmly to Defendant SANDATE. The video also reveals his refusal to canvas or speak to witnesses.

551. After the trial, declared not guilty of any crime, Plaintiff MJR returned to pick up his children from Defendant BROWN's sister's house who was helping her as a babysitter, and found out that BROWN had taken their children. Plaintiff MJR went immediately to BROWN's house to retrieve their children and was forcibly retrained/locked inside the bathroom by BROWN.

552. On the same day, Commissioner MARPET sent law Enforcement Officer, to BROWN'S apartment to detain the children. Defendant swore a false oath that Plaintiff's children were in imminent danger because he wanted to retaliate for having lost the criminal case. He stated in the report that Plaintiff had pending criminal charges even though he knew that the children were not in danger, and Plaintiff MJR did not have pending criminal charges because the incident in questions had been determined to be an act of self-defense.

553. That evening, Commissioner MARPET granted LAPD officer SANDATE'S requests for an expedited removal order and requests to dispense with Notice of the Removal Order to Detain the children from mother and father. SOCIAL WORKERS were not present the removal even though Defendant SANDATE said he had a social worker present.

554. MARPET and SANDATE were aware of the outcome of the criminal case against Plaintiff MJR and knew that she did not pose any threat to her children based on actions taken in self-defense; they were aware or should have been aware that Plaintiff MJR has full custody of her children and that they cannot remove custody from BROWN who had already lost it. Therefore, the order was unsupported by probable cause; therefore, violated Plaintiff MJR's Federal Constitutional Rights against unreasonable searches and seizures.

555. Plaintiff MJR has a video recording of the incident which shows BROWN pretending to not be working with LA COUNTY. It also shows Plaintiff MJR being told to go into the bathroom, and it shows Sandate detaining Plaintiff MJR and walking past suspected pedophile BROWN.

556. **Reasonable Officer**

557. A reasonable police officer who know or should have known that Plaintiff MJR was a victim of domestic violence by BROWN and that BROWN had already imprisoned Plaintiff MJR at other times against her will; however, instead of protecting Plaintiff MJR and her children and keeping them safe from the aggressor, Defendants SANDATE and CORTEZ detained the children and Defendant SANDATE arrested Plaintiff MJR pursuant to the no-bail arrest warrant and again breached his duty to protect Plaintiff MJR.

558. A reasonable police officer would speak with witnesses and not rely on the word and testimony of a 7-time convicted felon who was out on bail, had a restraining order granted against him in the past, and was presently facing sexual molestation charges. Reasonable officers arrest criminals and not victims.

559. Defendant LA COUNTY Social Workers falsely declared on their report that the parents actively concealed the children. In fact, as previously reported, Plaintiff MJR had been a resident of North Carolina for nearly seven (7) months and she had sole physical custody of her children who were also residents of Charlotte, North Carolina. Defendant DCFS's Social Workers were aware that Plaintiff MJR had relocated to North Carolina immediately after the attack from BROWN and was only visiting California temporarily to address the criminal case, which she was exonerated from all charges.

560. Plaintiff MJR relocating away from BROWN with children and supporting them independently demonstrated a change in circumstance that Defendant DCFS refused to acknowledge. Unless

Defendant DCFS had a reason to believe that the children were in danger, it did not have a compelling reason to separate the children from their mother. On information and belief, Defendant LAPD Officer, Defendant SANDATE and Defendant DCFS's Social Worker acted with malice and with the intent to cause injury to Plaintiff MJR or acted with a willful and conscious disregard to the rights of Plaintiff MJR in a despicable, vile and contemptible manner.

561. Making false statements in a dependency petition with the intent that the court rely on it, causing the parents to temporarily lose custody, seriously infringes on a parent's constitutional rights. See *Beltran*, 2008 WL 193319, at *1 (no absolute immunity where a social worker "fabricated evidence during an investigation or made false statements in a dependency petition affidavit.").

562. According to California Code, Government Code - GOV § 820.21:"Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice: Perjury, Fabrication of evidence, Failure to disclose known exculpatory evidence, Obtaining testimony by duress, as defined in Section 1569 of the Civil Code , fraud, as defined in either Section 1572 or Section 1573 of the Civil Code , or undue influence, as defined in Section 1575 of the Civil Code .As used in this section, "malice" means conduct that is intended by the person described in subdivision (a) to cause injury to the plaintiff or despicable conduct that is carried on by the person described in subdivision (a) with a willful and conscious disregard of the rights or safety of others."

563. On August 2, 2019, forty-eight (48) hours after the children were detained, Plaintiff MJR was to appeared at the Initial Detention Hearing pursuant to federal procedure; however, after heading to the Edelman Children's Court on the bus from jail, Plaintiff MJR was told to return back to jail for the weekend, as the matter had been continued without reason. (Cal. Juv. Rule 5.670).

564. Here, MARPET, after issuing a warrant to arrest Plaintiff MJR on a non-arrestable offense, held Plaintiff MJR in prison longer than the forty-eight (48) hour Detention hearing window; thus, depriving Plaintiff MJR of her substantive and procedural Due Process Rights. Although, Plaintiff MJR case was set for hearing, Defendant MARPET continued it without justification.

565. MARPET, DCFS, AND SANDATE's actions in detaining and mistreating Plaintiff MJR were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of the constitutional right, power, privilege, or immunity, and without observance of procedure required by law

566. On August 5, 2019, MARPET exacted cruel and unusual punishment upon Plaintiff MJR, when he refused to allow her to return to the location that contained her clothing and personal property. MARPET released Plaintiff MJR from jail, where she had to wear a black paper suit as clothing. As a result of this suit, Plaintiff MJR faced public shame and humiliation and was regarded as a criminal although she never committed any crime.

567. A Social worker by the name of Lasean Davis asked Plaintiff MJR to sign a general consent form authorizing medical treatments on her children SB and PB. MJR did not sign consent forms, but DAVIS took SB and PB to a county clinic without notifying the mother. There they received highly intrusive physical exams of their private parts as well as vaccinations.

568. Defendant DAVIS continually lied to Plaintiffs MJR and JR and told them that she was processing the kinship care paperwork but later on she would provide an excuse when she never got around to doing it.

569. LA COUNTY social workers DRAKE, DAVIS, ALLEN, BURCH-PARKER, WADE and head NICOLS conspired to write a false report and tell the court that Plaintiff MJR had pending criminal charges when she has a clear criminal record. They also told the court that BROWN only had 1 felony criminal charge and a minor driving infraction. They left off 6 of his felonies and attempted to downplay his criminal record, convictions for conspiracy, work history as a former LA COUNTY employee, and his conviction for embezzlement of county funds for writing checks to himself from the LA COUNTY treasury.

570. On August 5, 2019, FRANK OSTROV, Court-Appointed Attorney for Plaintiff MJR, signed a document from Defendant LA COUNTY, providing Plaintiff MJR's children's personal information; including their date of birth and social security numbers, while Plaintiff MJR was behind bars, in jail, and under duress.

571. Moreover, Ostrov gave Plaintiff MJR false information and bad legal advice when he stated that "it is not possible to appeal the case until the end of the trial." This essentially denied Plaintiff MJR of effective legal counsel to preserve her right to a fair hearing.

572. On August 23, 2019, DCFS filed an Amended Section 300 Petition on behalf of the children. The Amended Petition contained the original counts and additional allegations that the children were at substantial risk of suffering serious physical harm and sexual abuse based upon the father's sexual abuse of his granddaughter and his adult children when they were children (counts b-3, d-1, and j-1). DCFS perseveres with the same allegations against Plaintiff MJR by omitting with malice exculpatory evidence on their records.

573. On December 3, 2019, Court held a trial-setting conference and appointed new counsel to represent Plaintiff MJR. Counsel for Plaintiff MJR requested that the Dependency Investigator (DI) and DCFS's Social Worker be placed on call for the Adjudication Hearing. The court ordered the DI on call

574. On December 17, 2019, the Court, along with its Officers of the Court, conspired together to prevent the Court from receiving evidence in Plaintiff MJR's favor. According to WIC § 317, providing for the appointment of counsel in dependency cases, a parent could waive counsel at any point and had the right to represent him or herself. Here, Judge SUN denied Plaintiff MJR's request to proceed pro se and refused to hear her case until Plaintiff MJR agreed to Court-Appointed Attorney, MEL HATAMIAN, to represent her. SUN suppressed Plaintiff MJR's right to present evidence and denied Plaintiff MJR's her right to have a fair and unbiased hearing; Plaintiff MJR was not allowed witnesses to present before the Court to testify on behalf of Plaintiff MJR. Moreover, Defendant SUN continued the case beyond the statutory limits, which was to the convenience of the opposing side and to the detriment of Plaintiff MJR and her children who are languishing in Foster Care and removed from their home and their relatives' love.

575. At this Section 300 Petition Hearing, Defendant CLC's Appointed Attorney, Alyson Bashor ("Bashor"), breached her fiduciary duty to Plaintiff MJR's children by going along with a scam that harmed them and was in direct opposition to their expressed and verbalized wishes. Bashor lied and said that the children were too young to talk and therefore could not make a meaningful statement to the court when indeed they have expressed their wishes to the attorney on several occasions and former reports indicate that the children where very expressive and communicated well.

576. Plaintiff MJR has evidence by way of phone recording of her children saying that they want to be returned home and also the Foster Parent, Nakeya Clark ("Clark"), wanted to testify to the same facts.

577. Defendant CLC's Attorney, Alyson Bashor ("BASHOR") lied to the Court in order to mislead the Court by stating for the record on December 17, 2021, that the children and Foster Mom, Clark, were not present to testify in court, when indeed they were present in Court and wanted to testify. Bashor had in fact told them to leave and come back later when she calls. Bashor, never called them to come back.

578. When Plaintiff MJR called Clark, she told her that she was still waiting to testify but was told to come back later. Mother convinced the court to admit Ms. Clark. She was admitted via Defendant BASHOR'S cell phone. BASHOR told Ms. Clark to mute her phone until she was called upon to testify, JUDGE Sun deliberately never called on her to testify and did not make a record of her presence. This was witness tampering and falsifying a court record.

579. Minor's Counsel (children's attorney) carries a lot of weight with the courts. According to 2020 California Rules of Court Rule 5.242, Counsel is charged with the representation of the child's best interest. Their role is to consider what is in the child's best interests. They are a neutral voice for the child, without compromising the child's rights or emotional well-being. According to 2020 California Rules of Court Rule 5.242, Counsel is charged with the representation of the child's best interest. The role of the child's counsel is to gather evidence that bears on the best interest of the child and present that admissible evidence to the court in any manner appropriate for the counsel of a party. If the child so desires, the child's counsel must present the child's wishes to the court.

580. On February 15, 2020, Defendant DCFS's Social Worker Investigator, Teela Allen ("Allen"), provided a report with knowingly false statements and intentional omissions of exculpatory evidence in order to obtain a court judgment against Plaintiff MJR. Allen specifically made misrepresentations to conceal the fact that the aggressor and domestic violence perpetrator was BROWN, not Plaintiff MJR and omitted a large portion of his lengthy criminal record to conceal his previous crimes of moral turpitude.

581. Specifically, Defendant LEVINGSTON and BENNET falsely asserted that in December 2018, Plaintiff MJR struck father's back and chased him while holding a butcher knife and was arrested for assault with a deadly weapon. Defendant LEVINGSTON also asserted that on prior occasions Plaintiff MJR refused to take her psychotropic medication and suffers from paranoia, suicidal ideation, depression, anxiety, isolation, and erratic behavior. On this basis, Defendant LEVINGSTON and BENNET alleged that the children were in danger of suffering physical harm based on domestic violence between mother and their father (counts a-1 and b-1), and mother's mental and emotional problems (count b-2). LEVINGSTON had received this story from another social workers and had no first-hand knowledge of the incident but was more than happy to sign her name on the petition without doing any further investigation.

582. Here, Defendants maliciously and fraudulently omitted exculpatory evidence. Defendants knew or should have known that Plaintiff MJR was declared not guilty by a jury, because she acted in self-defense; therefore, she cannot be considered a danger to her children.

583. Defendants maliciously omitted to inform the Court that Plaintiff MJR had already obtained a Restraining Order against BROWN at the time of the incident and that Plaintiff MJR has been relocated to North Carolina, far away from the aggressor, to protect her and her children. They left off this information to mislead the court into believing that Plaintiff MJR was not taking necessary steps to prevent the incidents or to protect her children. They also did not want to expose that they had been negligent in failing to enforce a restraining order for a domestic violence victim.

584. Moreover, regarding Plaintiff MJR's purported mental and emotional problems, Defendant DCFS's Social Worker Investigator's Report continued to refer to contested hearsay allegations of 2016, even when Defendant DCFS's Social Worker Investigator knew or should know that Plaintiff MJR followed the Court Order and had been observed by several psychiatrists who have always stated that Plaintiff MJR has no mental and emotional problems and does not need drug therapy. Defendant DCFS has never presented substantial evidence of Plaintiff MJR's mental and emotional health.

585. HEAD OF LA DCFS BOBBY D CAGLE, demonstrated bad faith business practices under the UCC, when he signed the aforementioned reports that did not contain any actual child abuse or neglect allegations to support a Petition under the Welfare and Institutions Code of California.

586. On February 20, 2020, after several continuances and without good cause, the Court proceeded with the combined Jurisdiction and Disposition Hearing. The Court has continued the case several times in violation of the California Welfare Institutions Code Section 352, even though the Jurisdiction Hearings cannot be held past 6 months from when the children were detained on July 31, 2019. MARPET held a hearing for a continuance on his own motion, January 2021, more than 18 months past the children's detention.

587. At the hearing, Defendant LA COUNTY Social Worker's Report and police reports were used as evidence to substantiate false claims and no witnesses were called. Defendant HATAMIAN tried to convince Plaintiff MJR not to express her true wishes to cross-examine Defendant DCFS's accusing Social Workers. Defendant HATAMIAN did not act in the best interest of Plaintiff MJR, when she gave Plaintiff MJR bad advice. However, Plaintiff MJR insisted that Defendant HATAMIAN cross-examine the DI on the report that was submitted to determine where the DI obtained the evidence to support the allegations. The court denied Plaintiff MJR's request and said that it saw no basis to have the DI present before the Court to be cross-examined.

588. The Court declared the children Dependents of the Court and made an order to remove them from both parents' custody. The Court ordered "no Family Reunification Services for Plaintiff MJR. However, according to section 361.5, subdivision (b)(l0) Cal. Rules of Court, rule 1456(c), the court must find that the welfare of the child requires that she be removed from parental custody because of substantial danger, or risk of danger, to her physical health if she is returned home and that there are no reasonable means to protect her without removing her. Moreover, Here, LA COUNTY DCFS did not present evidence that Plaintiff MJR was not fulfilling any of her responsibilities or had any actual allegations related to mental illness.

589. The California Welfare & Institutions Code mandates Defendant DCFS to make reasonable efforts to return the child home, when the danger or threat no longer exists. Here, there is no evidence

presented by Defendant DCFS that it attempted to return the children and there is no evidence presented by DCFS supporting the allegations against Plaintiff MJR.

590. At the same hearing, although Plaintiff MJR was exonerated from all charges due to self-defense, DCFS's Social Workers committed perjury in open Court and announced that Plaintiff MJR had been convicted of lesser charges.

591. DCFS's Social Worker did not present evidence to substantiate this claim and deliberately misled the court in order to maliciously prosecute Plaintiff MJR. Dependency proceedings are not to be prosecutorial in nature. DCFS intentionally and willfully withheld exculpatory evidence that would have proven that Plaintiff MJR was not mentally ill. They disregarded statements from all parties that spoke favorably of Plaintiff MJR and attested to her intelligence and mental health in order to distort character and true identity of Plaintiff MJR.

592. MARPET assisted DCFS's Social Workers make their arguments by suggesting they re-word phrases in such a way as to make it appear as if Plaintiff MJR was physically violent. In this instance, MARPET expressed an appearance of partiality. "Fraud or impartiality in a court makes the order and judgment void, because the court is not impartial."

593. At each hearing and trial, Plaintiff MJR requested in open Court that her children be placed with their grandmother, Plaintiff JR and siblings, because it would be in the best interest of the children to be with family; and Plaintiff JR expressed a willingness to care for her grandchildren. This request was expressly denied until "after the Dispositional Hearing", still not commenced to this day.

594. Here, JUDGE SUN should have dismissed the case, because the court must have subject matter jurisdiction in order to hear a case. (In re *Nelson B*. (2013) 215 Cal.App.4th 1121, 1128.).

595. Under section 300, subdivision (b), the court can assume jurisdiction if it finds there is a substantial risk the child will suffer serious physical harm as a result of the parent's failure or inability to provide regular care. A finding of the parent abuses substances is prima facie evidence the parent is unable "to provide regular care resulting in a substantial risk of physical harm." (*In re Drake M*. (2012) 211 Cal. App. 4th 754, 767; Welf. & Inst. Code § 300, subd. (b).)

596. However, a parent's use of controlled substances, without something more, is not itself sufficient. (*In re Destiny S*. (2012) 210 Cal.App.4th 999, 1003; *In re Alexis E*. (2009) 171 Cal.App.4th 438, 453.) The Department must show the parent's substance abuse poses a "specific, non-speculative and substantial" risk the child will suffer serious physical harm. (*In re Drake M*., supra, 211 Cal.App.4th at p. 767; *In re Destiny S*., supra, at p. 1003; In re David M. (2005) 134 Cal.App.4th 822, 830.)

597. Domestic violence only supports the exercise of jurisdiction under section 300, subdivision (b) if there is substantial evidence the domestic violence is ongoing or likely to continue and either directly harmed or placed the child at risk of suffering physical harm. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.)

598. Removal at disposition may not be warranted due to the heightened standard of proof[1] or changes in circumstances during the passage of time[2]. Substantial risk of future harm requires that this risk exists at the time of the jurisdictional hearing. *In re R.M.* (2009) 175 CA4th 986, 989, 96 CR3d 655; *In re Destiny S.* (2012) 210 CA4th 999, 1004, 248 CR3d 800 (conduct occurred 9 years before current petition was filed).

599. Although jurisdiction may be established under WIC § 300 (a), (b)(1), or (d), by a showing that the child has suffered prior physical harm under WIC § 300(b)(1), jurisdiction may not be continued unless the risk of harm continues. An allegation in a petition or evidence simply that there was a prior allegation of unfitness is not substantial evidence without evidence the allegation was substantiated. (*In re Miguel E.* (2004) 120 Cal.App.4th 521, 547.)

600. In *In re I.R.* (2021) 61 Cal. App. 5th 510, the Second Appellate District found that there was insufficient evidence to justify removing a minor under section 361, subdivision (c)(1). Jurisdiction over the minor was based on a single incident of domestic violence between the parents, where Father slapped Mother. By disposition, Father no longer lived or communicated with Mother and did not display violent behavior outside of the relationship with Mother. The Second Appellate District found that the sole source of potential danger to the minor while in Father's care, which was supported in the record, was his history of domestic violence with Mother, but **the record did not contain substantial evidence that the domestic violence between Mother and Father was likely to continue. There had been no contact between Father and Mother since the minor's detention and neither Mother nor Father**

---

[1] Even though jurisdictional finding may be based on substantial evidence, dispositional findings have a different focus an heightened burden of proof – clear and convincing evidence (§ 361, subd. (c)(1); *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995 996, 1011.) This heightened standard is premised on the notion that even after parents have been found to have abused or neglected their children "keeping children with their parents while proceedings are pending, whenever safely possible, serves no only to protect parents' rights but also children's and society's best interest. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1066-1067.)
[2] Even though children may be dependents of the juvenile court, they shall not be removed from their parents unless there is clea and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional wel being and there are no "reasonable means" by which the child can be protected without removal. (§ 361, subd. (c)(1).) Whe considering if the child will be in substantial danger if permitted to remain in the parent's custody, the court must consider no only the parent's past conduct, but also current circumstances and the parent's response to the conditions that gave rise to juvenil court intervention. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451-452.)

**expressed an intention to reconcile their relationship and there was no demonstrated unwillingness to stay away from each other.**

601. In addition, children may be found described by WIC § 300(b)(1) although they have suffered no direct harm when there is a pattern of domestic violence that has not been corrected. In such situations of "secondary abuse," evidence that the child was present and witnessed domestic violence with the expected result that the child suffered emotional abuse is sufficient to sustain a petition. In *re Healther A.* (1996) 52 CA4th 183, 194, 60 CR2d 554 (mother had permitted unsupervised visit with perpetrator of domestic violence). However, if the evidence does not establish that the child was present and witnessed the violence, the fact of domestic violence in the home may not be sufficient to sustain the petition. See, *e.g., In re Alysha S.* (1996) 51 CA4th 393, 398, 58 CR2d 494.

602. To determine whether domestic violence is ongoing and likely to continue, courts look at a number of factors, including the proximity of the event to the filing of the petition, whether the child was present or exposed to the violence, the number and severity of the incidents, and the parents' subsequent actions. (See e.g. *In re Daisy H.*, supra, 192 Cal.App.4th at p. 717.)

603. Here, there is no substantial evidence that children were exposed to danger or that Plaintiff MJR posed a danger to her children. Plaintiff MJR presented evidence of operative Restraining Order for both BROWN and his adult daughter from the Los Angeles Superior Court; yet, ignored.

604. Plaintiff MJR also presented evidence from the Clara Shortridge Foltz Criminal Justice Court that proved she was acting in self-defense in the episode reported by Defendant DCFS. Plaintiff MJR took every legal remedy in the State of California to protect herself and her children from BROWN; moreover, January 2017, moved to North Carolina far away from him. Kernell is restrained in jail, and Plaintiff MJR has a new and happy life in North Carolina; therefore, there are no possibilities that domestic violence is likely to continue.

605. Dependency may not be based on WIC § 300(b)(1) when any mental disorder or substance abuse cannot be tied to any harm or risk of harm to the children who are well cared for and loved, and when the parents' problems do not impact their ability to care for the children. *In re David M.* (2005) 134 CA4th 822, 829-839, 36 CR3d 411; see also *In re A.L.* (2017) 18 CA5th 1044, 1049-1051, 227 CR3d 3 (mental illness alone not enough even with one incident of violence).

606. Mental illness alone is not enough for jurisdiction unless DCFS can show it caused harm to the child. *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318 ["The Department has the burden of showing specifically how the minors have been or will be harmed and harm may not be presumed from the mere fact of mental illness of a parent."]

607. "'Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be "infected" by the parent. The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety. . . . It cannot be presumed that a mother who is proven to be "schizophrenic" will necessarily be detrimental to the mental or physical well-being of her offspring. . . . The social worker must demonstrate with specificity how the minor has been or will be harmed by the parents' mental illness.'" (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540; *In re Heather P.* (1988) 203 Cal. App. 3d 1214, 1228-1229, overruled on other grounds, *In re Richard S.* (1991) 54 Cal. 3d 857, 866, fn. 5, internal citations omitted, italics in original; *In re David D.* (1994) 28 Cal.App.4th 941, 953; *In re Janet T.* (2001) 93 Cal.App.4th 377, 390.)

608. Defendant LA COUNTY DCFS offered no evidence to substantiate the claim that Plaintiff MJR had mental and emotional problems or had failed to take psychotropic medications. There was no medical record or diagnoses presented by a qualified physician to support those claims. Lacking a medical diagnosis, the evidence presented by Defendant DCFS to support their claim was a list of an assortment of assertions from a variety of non-ailments. Plaintiff MJR today is happily married and has a happy life in North Carolina.

609. On February 27, 2020, Plaintiff MJR filed a Notice of Intent to file a Petition for Writ, challenging the February 20, 2020, Court Orders.

610. On June 05, 2020, Niti Gupta, assistant of HATAMIAN, filed a letter to the Appeals Court stating that Plaintiff MJR could find no reason to file an appeal. The court of Appeals allowed Plaintiff MJR to file her appeal.

611. On June 5, 2020, Plaintiff MJR's Counsel, Defendant HATAMIAN, advised the Court that he was unable to file a Petition for Writ on behalf of Plaintiff MJR.

612. On July 23, 2020, Plaintiff MJR, as an in pro per litigant, filed a Petition for Extraordinary Writ Relief, pursuant to 8.452 in the Court of Appeal, seeking to challenge the juvenile court's jurisdiction and disposition orders at February 20, 2020, adjudication hearing. In part of her brief, Plaintiff MJR. argues that there was insufficient evidence to sustain the domestic violence and mental health allegations pursuant to WIC § 300, subdivision (a) and (b). Plaintiff MJR pointed out that Defendant DCFS's Social Workers did not testify or make themselves available for cross-examination at the request of Plaintiff MJR. MJR objected to the statements in the reports which were hearsay, but MARPET relied solely on the report anyway.

613. On July 30, 2020, the Court of Appeal of the State of California Second Appellate District, Division Three, issued an order to show cause stating our intent to decide the matter on the merits.

Mass Tort Claim for RICO Fraud

614. On October 21, 2020, the Court of Appeal granted the petition for extraordinary relief and concluded that the Court violated Plaintiff MJR's right to Due Process by denying her the opportunity to cross-examine the dependency investigator and social worker. The Court guaranteed order that "A peremptory writ of mandate shall issue directing the juvenile court to reverse its jurisdictional findings sustaining counts b-1 and b-2, and dispositional orders as to Plaintiff MJR only, entered on February 20, 2020. In addition, the court shall vacate any subsequent order terminating parental rights. On remand, the court shall conduct a new jurisdiction and disposition hearing as to Plaintiff MJR consistent with the views expressed in this opinion." *Melody R. v. Super.* Ct. CA2/3.

615. On March 11, 2021, CAGLE and DCFS Social Workers, Marcal Maye-Henderson and Allana Darter, submitted a report with the same fabricated evidence against Plaintiff MJR, stating that "Pursuant to WIC §361.5(b)(10), Defendant DCFS recommends No Reunification Services for Plaintiff MJR, as the Court terminated Family Reunification Services for children's half-siblings and no subsequent effort to treat problems that led to the removal of those children." The report presented the same original false allegations against Plaintiff MJR.

616. On December 12, 2021, Defendant CAGLE and Defendant DCFS's Social Workers Regina Minor and Darryllisha Burch-Parker continued with malicious and fraudulent intent, their practice of fabricating evidence and omitting exculpatory evidence in their reports. In addition to the previous false and inaccurate allegations against Plaintiff MJR Defendant DCFS's Social Worker reports that Clark stated that, when Plaintiff MJR, calls the children, Plaintiff SB's behavior noticeably changes and the calls cause "more harm, then good." However, Ms. Clark, is ready to testify that she never made such a statement.

617. On June 9, 2022, "the Court finds there is no full .26 Report and no In and Out for father. The .26 Hearing is continued to 08/17/2022 for receipt of a full .26 report and for an In and Out for father to be transported to court." Even though the department did not file a report, request a continuance, or let the jail know about the court hearing, Judge Sun granted a continuance for the department in excess of statutory law.

618. On June 2022, Plaintiff MJR filed an appeal on the order to continuance for the appeal being unlawful and prejudicial, an appeal which is still pending.

619. **No Notice of Medical Treatments on PB**

620. Plaintiff MJR's son is presently at risk of being medicated simply for being a young boy. MJR found out through the foster mom the Defendant MINOR was trying to place PB on medication. Defendants MINOR and HARRIS did not inform mother of the evaluations or treatments.

621. On or around September 1, 2022 Defendant MINOR reprimanded Foster care giver Nakeya Clark for daring to inform mother about medical procedures on her child.

622. Witness Nakeya Clark also informed Plaintiff MJR that Defendants MINOR and HARRIS were pursuing surgery to cut the Achilles of PB because he walks on his tippy toes. Plaintiff MJR told Clark that she objected to this extreme treatment which leads to children having a limp for the rest of their life. Plaintiff petitions this court for an immediate injunction on any medical procedures on her children.

### 623. **No Kinship Care for Children for 3 years now**

624. Plaintiff's grandmother was a foster care provider and day care providers for 20 plus years. She was denied custody of her great grandchildren despite providing all the necessary paperwork for the kinship care and being available for inspection. Each and every time a deadline came, Defendant Social Worker would make an excuse and say they did not receive all the documents since the case was transferred.

625. Plaintiff's mother Judy Rodgers who was granted custody of MR and HR was not given care of her grandchildren SB and PB and no reason was provided, only endless excuses for 3 years when children are supposed to be placed in a kinship care within 30 days of entering state custody.

626. LA COUNTY Social Worker Supervisors CHASE and BENNET continually play with words and say they are "trying to expedite the process" but they continually pass the case to new people and have to start again from scratch.

627. Social Workers HARRIS and DAVIS conspired to misspell Plaintiff's mother's name on paperwork in order to delay the process. After the name was typo was pointed out, and they corrected it, they deliberately provided her wrong social security number and later said it was a typo.

628. Plaintiffs' children have experienced emotional distress caused by the prolonged separation from their siblings and often cry because they cannot be together.

629. The social workers who were responsible for placing Plaintiff's eldest children with her mother, started retaliating against Plaintiff's mother as soon as she stopped cooperating to saying negative things about Plaintiff MJR. As a form or control, manipulation, trickery, and duress, Supervisor HARRIS declined to give younger children SB and PB to their relatives unless they agree to go along with the slander of Plaintiff MJR. This malice shows they do no work towards family reunification but pit loved ones against each other.

630. Plaintiff MJR contacted the California Office of the Foster Care Ombudsman but they declined to investigate the matter. (Exhibit 16)

631. Ever since Defendants LA COUNTY and the co-conspirators have come into the lives of Plaintiff MJR and family, there have been no more family reunions or happy birthday wishes. The families is split and divided because they are pitted against one another by the malicious agents who claim to help families.

632. Defendants' conduct, as set forth herein, is a substantial factor in causing Plaintiffs harm, which constitutes gross negligence such that Defendants are liable and Plaintiffs are entitled to Punitive damages, and Attorney's cost and expenses for which Plaintiffs seeks judgment of this Court.

633. Plaintiffs intend to show that the factors the jury may consider in determining the number of punitive damages, which should be awarded include:

    a.    The nature of the wrong committed by Defendants;

    b.    The character of Defendants' conduct;

    c.    The degree of culpability of Defendants;

    d.    The situation and sensibilities of the parties concerned; and

    e.    The extent to which Defendants' conduct offends a public sense of justice and propriety.

**PLAINTIFF MALACHI CHAPMAN**

634.     The Complainant filed an affidavit stating that Maycock Tashana violated Soc. Serv. Law § 413. Notably, on or about January 25, 2017, Complainant's child had a circumcision performed, and he had to return to Mount Sinai hospital on February 14, 2017, for a post-surgery appointment. During the weekend of February 12, 2017, the child was underdressed, and the child should have warmer clothing, especially after a blizzard. Complainant asked Maycock about the child's appearance and wanted to make sure that lateness was not an issue for the upcoming appointment. Ms. Maycock became aggressive and cursed at Complainant and used inappropriate sentences to describe her displeasure about the appointment and that she would not attend it.

635.     In a previous fictitious petition, Ms. Maycock stated that she was being recorded during pick-ups and drop-offs. Complainant recorded the interaction, and she was portrayed as being something different than what was recorded. Upon the departure from Ms. Maycock, Complainant filled out one of her many Domestic Violence Reports. On the day of the doctor's appointment, Ms. Maycock returned to the precinct after 36 hours to file a report. After receiving the report, she went to family court and obtained an order of protection against Complainant without being present or even looking into Complainant's prior reports (12 reports unanswered by the court).

636.     Claimant also alleges that Maycock is liable for Harassment and Identity theft (The reason why Claimant requested for pick up and drop offs at the 78 precincts was because Ms. Maycock threatened her and she violated the tort defined in Domestic Violence Civil Laws Citation: Soc. Serv. Law § 459-a. Claimant contends that such act or acts have resulted in actual physical or emotional injury or have created a substantial risk of physical or emotional harm to Claimant. Along with committing the tort, Claimant further contends that Ms. Maycock has committed other torts such as assumption of risk (during pick-ups and drop-offs and the child has new bruises); suborning perjury (per *Summers v. Tice*); intentional and negligent misrepresentation (during the respondent's affidavits); and fraud and related activity in connection with computers for illegal fillings for child support.

637.     Complainant contends that Fried Alan, as Attorney, committed several torts under general duty. Accordingly, Complainant contends Fried is liable for suborning perjury, intentional and negligent misrepresentation, abuse of process and malicious prosecution, and conspiring both against Complainant's human rights and constitutional rights when he suggested that Complainant must undergo a mental health analysis and another CPS visit.

638.     Complaint also contends that Love Ayanna as the child's lawyer, committed several torts under general duty. Accordingly, Complainant contends Fried is liable for suborning perjury, intentional and negligent misrepresentation, abuse of process and malicious prosecution, and conspiring

both against Complainant's human rights and constitutional rights when it was suggested that Complainant must undergo a mental health analysis and another CPS visit.

639.     Complaint further states that Judith Waksberg, as the Presiding judge, unreasonably inflicted or allowed harm to be inflicted, or a substantial risk thereof, including the infliction of excessive corporal punishment in failing to provide the child with proper supervision or guardianship. Waksberg had a general duty to protect the constitution and protect others' rights; she did not do that for the Complainant. When Complainant asked for a subpoena from the 78th PCT, they documented Ms. Maycock's unfortunate behavioral patterns and unhealthy attendance patterns. Accordingly, Complainant contends that the Judge committed an abuse of process and malicious prosecution. During multiple court appointments, Waksberg noticed that Ms. Maycock had a tardiness issue but she ignored it and this action violated assumptions of risk. It also proved that she was late on purpose, but it demonstrated the lack of conviction towards authority.

640.     Complainant alleges that Fasone John, Child Support Magister, entered a fictitious order in the system against Complainant on September 23, 2019. Notably, Complainant has been taking care of the child in a private capacity via Citibank; the child has had this account since he was six months. Robin Maycock, who is the child's grandmother, went down to Social services and signed up for Medicaid and babysitting money. Such actions like this are in clear violation of multiple laws such as the Social Security Act (recently enacted on December 2020, section 203), Office of Inspector General (OIG), and Medicaid fraud. Complainant never submitted W '2 information, and they took Complainant's income, which is another violation of the 4th amendment. Accordingly, Complainant contends Fasone is liable for suborning perjury, intentional and negligent misrepresentation, abuse of process and malicious prosecution, and conspiring both against Complainant's human rights and constitutional rights.

641.     Complainant contends that Hozer-Weber, Ana, Child Support Magister, Weber colluded with the Social Services attorney to seek rears from the time the order was filed since February 2019. As stated before, Complainant brought the fact that Tashana Maycock had fraudulently tried to abuse the system with two filled frivolous petitions; they were later dismissed due to no-shows from her. Complainant spoke about the bank account; he mentioned the agencies' guidelines from the Social Security Act (recently enacted in December 2020, section 203), Office of Inspector General (OIG), and Medicaid fraud. Besides, he never submitted W '2 information, and they took Complainant's income which is another violation of the 4th amendment. Accordingly, Complainant contends Weber is liable for suborning perjury, intentional and negligent misrepresentation, abuse of process and malicious prosecution, and conspiring both against Complainant's human rights and constitutional rights.

642.     Complainant contends that Landaverde Kathleen, Case Manager at the Appellant Court, had a general duty to submit court paperwork and not appear to infringe against Complainant's

right or collude with the opposing parties. Complainant did not ask for a case manager and does not know why he was given one after his first appeal. Complainant told Kathleen that he did not need a case manager. She proceeded to email Complainant all these rules regarding the court and why she is essential within Complainant's appeal process. Accordingly, Complainant contends Kathleen is liable for suborning perjury, intentional and negligent misrepresentation, abuse of process and malicious prosecution, and conspiring both against Complainant's human rights and constitutional rights.

643. Complainant contends that Maycock, Robin, the child's Grandmother, committed multiple accounts of fraud, identity theft, Medicaid fraud, Child Support Fraud, in violation of 18 U.S. Code § 1030. She also committed suborning perjury and intentional and negligent misrepresentation (during the respondent's affidavits).

644. **PLAINTIFF LAURIE REYNOLDS**

645. The undersigned, LAURIE N. REYNOLDS, do hereby swear, certify and affirm that: I am over the age of 18 and am a resident of the state of Florida. I have personal knowledge of the facts herein, and, if called as a witness, could testify completely thereto. I suffer no legal disabilities and have personal knowledge of the facts set forth below.

646. Katina [Unknown Surname], DCF Employee came to our new home I secured for my children and me after contact with the Department of Children and Families. Help was needed after escaping from domestic violence. Katina [unknown surname] stated there would be help on the way. I expressed that I was already attending individual counseling at the Betty Griffin Center, the closest domestic violence shelter, located in Saint Augustine, Florida.

647. I had explained to Katina that assistance was needed, explained how Mark Reynolds was registered as a kidnapper on a national level and the history of violence he has inflicted. Yet, false promises of assistance were made.

648. This CPS worker then engaged in conspiring with Mark Reynolds for a removal of my children, G. R. and S. R., with two police officers and the opposing party to place the children back into the abuse without a court order on the upper floor of the Florida Department of Health in St. Johns County, Florida, in September 2017 after Katina had stated we were meeting to discuss how the Department could help us as domestic violence survivors. This violated my rights under the 4th Amendment of the United States Constitution against Unreasonable Search and Seizures.

649. Richard Thibault (Florida Bar#: 540201)

650. Denied my right to a trial at the shelter hearing that was administered to continue the opposing party's custody of G. and S. R. The shelter hearing was not discussed, no rights were

explained, no options were discussed and the provocation and manipulation into signing the parenting plan when I demanded a dependency trial from Thibault, resulted in him stating, "A trial will do no good." This short and manipulated discussion occurred briefly at Judge John M. Alexander's bench the day after I was deceived by the Department into gaining assistance as domestic violence survivors. This was the shelter hearing.

651.    Florida Statute 673.3051: Duress and Undue Influence Florida Statute 838.022 Malfeasance; official misconduct

652.    Emily Earnest, Family Integrity Program Caseworker

653.    Appointed case manager as directed by the Department of Children and Families as an employee of the Family Integrity Program. This case was passed on to this program.

654.    According to my former attorney, Jared Loucel, this case manager, and the Department violated five counts of the right to due process including the right to a shelter hearing in late November 2018, when the opposing party, Mark Reynolds, fell into a prolonged coma, hospitalized at Flagler Hospital in Saint Augustine, Florida, while having custody of the children during the dependency case when it was open. G.R. and S. R. were placed with non-relative former neighbors, Jack, and Monique Cooke, without a shelter hearing for over three weeks, and did not notify me, their mother.

655.    Judge John M. Alexander stated at the emergency hearing of November 2018, "I have sat on this bench for over 25 years, and I cannot remember any other time when your department did not call for a shelter hearing [paraphrased]." The lack of a shelter hearing violates

656.    Judge John M. Alexander [retired] alluded to collusion between the opposing party, Mark Reynolds, and the Florida Department of Children and Families in the placement of my children, G.R. and S. R., and that collusion is in relation to his association to his history of being a police officer for the Dayton, Ohio police department. The actual placement with the non-relative former neighbors, Jack and Monique Cook, was expressed to me through my children at previous scheduled visitations. Judge Alexander reprimanded the Department and the attorney at the time, Cooper, at the emergency hearings of November 2018. Cooper stated, "We concede, Your Honor."

657.    Emily Earnest did not and would not accept the counseling I had already engaged in at the Betty Griffin Center even before the dissolution of marriage, and, afterward, the opposing party's injunction for protection were filed.

658.    Emily Earnest made the statement, "We cannot use this as a way of fulfilling that part of the case plan because the files are confidential." This decision violated

659.    On August 22, 2018, an email was sent to Earnest reminding her that Judge Alexander

Mass Tort Claim for RICO Fraud

wanted to move into unsupervised visitation. Yet, the Family Integrity Program only temporarily moved into unsupervised visits, returning to supervised visits after only a short period with no explanation. This decision violated the right to due process.

660.    Emily Earnest further denied my rights when my former attorney, Jared Loucel, attended a monthly case plan meeting and stated, "I have a question. Why is it that S. is deemed safe to be with the mother, but G. isn't?" Earnest then exclaimed, "We didn't know where to put him (referring to the fact that Mark Reynolds never adopted my son)." This decision violates

661.    Earnest completely ignored the fact that Dr. David Bortnick of Saint Augustine, Florida, who conducted the psychological evaluation, never stated that I was a harm or was I prone to violence but suggested counseling. I was never prescribed psychotropic medicine and voluntarily took a drug test even before the dependency case, DP-02, was opened.

662.    Further, former attorney Sam Jubran, one of nine attorneys in North Florida to be currently board certified in family law, attended a case plan meeting during the dependency case and explained, "There is no cause of action in this case," for which there was no response from the Department.

663.    S. R. expressed urgently from November 2018 to the end of January 2019 that she wanted to be with me and did not want to go back. When I would ask her why at counseling sessions with Laura Newberry at Children's Home Society of Florida, she would state, "Because I'm scared." This was ignored by Earnest. Newberry had eventually written a recommendation that I was safe to be with her and should be a part of the custody plan. The judge ignored this recommendation. This judicial decision violated

664.    Violations.

665.    Florida Statute 787.06 Human Trafficking Article 1 Section 9 Due process

666.    Chapter 39 Section 402 Right to a Shelter Hearing Florida Statute Section 777.04

667.    Conspiracy

668.    Florida Statute 838.022 Malfeasance; official misconduct

669.    Kassandra McCune LMHC, Big Bear Behavioral Health

670.    Falsified documents with the assistance of Mark Reynolds in a biopsychosocial assessment for my son, G.R., administered by Big Bear Behavioral Health. The document is incomplete in that it fails to show that M. R. is a non-relative, does not mark that he was a temporary guardian at the time, and refers to M. R. as a stepdad, when no adoption ever took place, and he is not G.'s biological

84

father. The document fails to mention the psychological damage and harm that comes from brainwashing a child into believing a non-relative is a relative. A document from the Commonwealth of Virginia deems me as G. R.'s legal parent who signed an agreement with the other biological party that I would have sole legal custody of G. McCune also colluded through the influence of the Family Integrity Program to preserve the custody of my children in the abuse to further the funding of their Department of Children and Families.

671.    Florida Statute 839.13 Falsifying records Florida Statute Section 777.04 Conspiracy

672.    Florida Statute 838.022 Malfeasance; official misconduct

673.    Toni Mitchell, Director, The Village Academy

674.     Educational records were requested from my daughter's school, The Village Academy, on April 19, 2018. No records were ever sent and my rights as a mother were denied. There was never a response from her school. There is evidence to suggest, since Judge John M. Alexander suspected collusion between the Department and Mark Reynolds, that he is also engaging in parental alienation, also suggested by my former attorney, Ashley Boyd, in both a petition and a motion.

675.    Violation.

676.    Florida Statute Chapter 1002 Part II Child and Parental Rights Florida Statute Section 777.04 Conspiracy

677.    Florida Statute 838.022 Malfeasance; official misconduct

678.    Paige Trafton, Counselor, Big Bear Counseling

679.    As a counselor for my son, G. R., Trafton denied my son's reports that he wished to return home and felt fear in living with the opposing party at several counseling sessions. This is a violation of Florida Statute Chapter 1002 Part II Child and Parental Rights.

680.    Emails were also sent to Trafton about G.'s increasing depression and my concern for him on May 29, 2018. Reports of G.'s openness about the urgency to return home were not pressed in the dependency court and Trafton denied "the best interest of the child" in collusion with the Family Integrity Program in order to extend their funding through G.'s placement with the temporary guardian.

681.    Florida Statute Chapter 1002 Part II Child and Parental Rights Florida Statute Section 777.04 Conspiracy

682.    Florida Statute 838.022 Malfeasance; official misconduct

683.    Carol Burnett, Azalea Health, Palatka, Florida

684. After completing and scheduling more than the required number of counseling sessions in order to fulfill that part of the parenting plan, Carol Burnett concluded with sending a letter to Judge Alexander stating that she was worried that I would alienate the children from the opposing party, Mark Reynolds, in the future, and did not recommend reunification, after multiple counseling sessions made her uncomfortable when I explained Mark Reynolds history of abuse and violence against the children and me. This prediction, not based on facts but based on pure speculation, was utilized to prevent reunification, thus denying my rights as a mother, and as part of the conspiracy to further the funding for the Family Integrity Program.

685. I find it highly offensive for Ms. Burnett to make such outlandish statements and citing concern with the exercise of my Constitutional rights when it comes to breastfeeding and my rejection of vaccinations. I have the right to my own opinion when it comes to every one of my children's spiritual, physical, mental, emotional and psychological health and development choices as their mother. I believe as professionals they should take classes in Constitutional rights and seek mental help in being able to decipher what civil rights are.

686. Carol Burnett is mentally ill for stating that I did not have the mental capacity to continue to raise my daughter, S.R., and my son, G.R., successfully as I had for nine years as his only parent, simply because of my association with Mark Reynolds, and considering I had only had one civil case before ever meeting this individual, and that was in obtaining sole custody of my son, G.R. Burnett should engage in psychological sessions to overcome the inconsistency in experiencing and hearing that children are living in domestic violence firsthand and yet claiming that it is the risk of parental alienation that dominates the issue. This is bizarre and offensive to my children and any child that has been denied their rights to speak out against domestic violence inflicted upon them, simply told they must stay quiet and not raise their voices. This raises a major professional concern for any child that attends any counseling at Azalea Health in Palatka, Florida, as this counselor insists that they stay in abuse that will permanently damage them cognitively. It may be prudent for Carol Burnett to also attend child psychology classes to understand the effects of both children being separated from their loving mother and living in a home of neglect and abuse. Or, alternatively, to disengage and leave this profession altogether.

687. Burnett had a professional and ethical responsibility to act in a certain way and failed.

688. Florida Statute Section 777.04 Conspiracy

689. Florida Statute 838.022 Malfeasance; official misconduct Florida Statute 760.02 of the Florida Civil Rights Act of 1992

690. Amanda Bleak, Counselor

691.     Served as G. R.'s counselor after Paige Trafton had stated that she would "move on with her career." Bleak failed to address the "best interest of the child" in G's dependency case when he stated that he was afraid of living with Mark Reynolds, and M.R. had simply excused it as "bad behavior." This professional behavior further enabled the Florida Department of Children and Families and the Family Integrity Program to continue their funding by G's placement and ignoring the abuse in the home that was occurring.

692.     Family Resource Center, Visitation Center, Saint Augustine, Florida

693.     Family Resource Center will not reveal the name of a monitor who was negligent on February 201\ 2021. The monitor was negligent when she told Mark Reynolds, my abusive ex-husband, and the current guardian to my son G. R. that he wanted to run away. Once my abusive ex-husband learned G. wanted to leave, he emotionally traumatized him. My son will need several years of therapy amounting to nearly $130,000 in medical expenses.

694.     Florida Statute Section 777.04 Conspiracy

695.     Florida Statute 838.022 Malfeasance; official misconduct

696.     In 2018, I was in communication with the Florida Department of Revenue about adjustments to the child support that I was ordered to pay after perjury led to the children living in Mark Reynolds' home. They had stated that they saw a warrant for my arrest but that it needed to be rescinded as I was paying. The agent instructed me to contact St. Johns County courthouse to rescind the signed order and that it was in error. Evidence has been submitted for review as to that written statement.

697.     Nevertheless, the Palatka Police department arrived at my home seeking my arrest for a civil charge for paying child support. A payment of $1400 was received at the Palatka, Florida county jail for my release.

698.     Florida Statute 787.02 False Imprisonment

699.     The order for permanent guardianship was obtained by fraud.

700.     Mark Reynolds, ex-husband, and his abuse were enabled by St. Johns County, Florida and their government officials, including Barbara Jacobi, GAL, for a Failure to Supervise once the children revealed their fear under video surveillance that was suppressed evidence for the court. Additionally, there was an enabling of litigation abuse through a Failure to Protect when my son was assaulted and battered by his temporary guardian on March 7, 2019. This was enabled due to the policies allowed by St. John's County and their disregard for the violations of the right to due process that were addressed in the Emergency Hearings of November 2018.

701.   I want the unlawful order for child support ordered and all debts for the Florida Department of Revenue to be refunded to the payee, Laurie Reynolds, and all remaining debts to be expunged, no longer to be a burden to my family now or in the future. Along with that, I demand the driver's license be reinstated and sent to a confidential address.

702.   An injunction is requested as to be enforced against the city of Saint Augustine, Florida, preventing the city from enforcing their statutes on the declaration that their actions have been ruled unconstitutional, as they have caused irreparable harm against my children psychologically for their development and irreparable harm regarding the time lost in continuing to raise G. and

703.   S. R. in the way that I had begun as their mother.

704.   I want the order for permanent guardianship voided and my children, Gray and Skye, returned. I fully want injunctive relief of the law.

705.   ***Tijana Vidanovic***

706.   Complainant avers that Huang Joy, a Social Worker who was in training when Complainant's case was going on, violated the 4th and 14th Amendment, and Basic Human Rights of Complainant and her Son,

707.   Complainant contends that Gomez Danette, a Judge, violated Article 1, Article 2 and Article 5 of Human Rights and 14th Amendment.

708.   On October 7th Los Angeles DCFS came to the Holy Cross Hospital in Mission Hills and detained my newborn son due to my positive drug screening.

709.   I immediately asked them for help and begged them not to take my son, but the CSW Baghdeserian told me that he can't help me and that he is just there to detain my son.

710.   Afterwards, I went to Court and got the case plan and after refusal of SW Huang's help; I found all the needed help by myself and completed my whole case plan and much more by November of 2017.

711.   Nevertheless, Judge Gomez involuntarily terminated my parental rights in December of 2018, without any given valid reason.

712.   I was shocked to hear the Judge's decision and I asked her why she terminated my rights; to which she replied: "Because I said so!"

713.   Therefore, my son and I unfairly inhumanly separated, not because I failed to do something, but because Judge Danette Gomez said so.

714. Judge Danette Gomez exceeded the bounds of reason by the Court by ignoring substantial evidence that proves that I fulfilled all obligations set before me; It was reversible error to deny me reunification due to my completion of the case plan and my progress and the bond my son had with me.

715. The juvenile court found that Mother had changed her circumstances and carried her burden in proving her changed circumstances. (11 RT 417.) 19 *Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297.)

716. It was an undisputed fact that I changed my circumstances. The Judge with a bias decided that the return of custody of my son doesn't serve his best interest. With which my son's attorney Tracy Hendrix strongly disagreed. My son's GAL recommendation was immediate return of my son to my custody, and she is the only one who observed my son while he was detained by Los Angeles DCFS.

717. Therefore, her recommendation speaks volumes, especially considering that the bond study that I requested was denied every time and that Judge never even see my son and his interactions and good spirits with me vs his interactions and overall state while in DCFS custody and with foster parents, who failed in times to properly care for him, but we're allowed to adopt him.

718. Judge Danette Gomez committed reversible error in finding that beneficial Parent- Child relationship was an exception to adoption and then terminating my rights, without any explanation or proof of evidence why termination happened.

719. My son shared a beneficial Parent-Child relationship with me, making termination of my parental rights erroneous and my son will be the one who is harmed by its severance.

720. My case is not a unique case and drug addiction is a serious issue, but recovery can and does happen. It has in my case. I reclaimed my life and I am living free from addiction. With continued and strong sobriety under my belt, and God in my life, I have four years free from addiction. I completed an inpatient and outpatient substance abuse program. Today I have a sponsor and a commitment to AA/NA meetings and other groups. My case demonstrated that I addressed the conditions that gave rise to dependency and that it was in my son's best interest to be returned to me.

721. Judge Danette Gomez made an irreversible error by terminating my rights. In the alternative, as I proved that the benefit exception to adoption existed, Judge Gomez denied me the opportunity to remain a part of my son's life and to provide and care for him as Mother should.

722. *Teresa Goin* - The State of Michigan County of Oakland

723. **COMES NOW**, Teresa Goin, being first duly sworn, under oath, and states that the

89

following information is within his personal knowledge and belief: I am an adult of sound mind and hence competent to swear this Affidavit.

724.    Sometime in 2005 I lived in a 3-bedroom apartment at 845 W. Alpha Parkway Waterford, Michigan. It was common for my children to play at the basement of the apartment.

725.    During such sessions, it is common for the children to have occasional accidents due to so much play.

726.    On or about 28th October 2005, when my children were playing in the basement, I was upstairs. My 3-year-old son Caillou Model fell and bumped his head. As a result of the injury, the eyes of my son were swollen which would be expected as a natural reaction to the injury.

727.    My son did not have to get stitches on its head; Neither did he suffer any concussion. Immediately after the said accident, and out of an abundance of caution, I took my son to North Oakland Medical Center in Waterford Michigan to receive immediate medical attention.

728.    At the North Oakland Medical Center, Doctor Loren C. Chudler concluded that my son did not suffer any major injuries despite the fall. From the medical examination, there was no mention of medical abuse of the child.

729.    On 1st November 2005, I took my son for a follow- up and examination at Beaumont Hospital in Royal Oak. After the medical follow up, and to my utter shock, I was informed that the Child Protective Services had been contacted regarding the health status of my son with view to conduct an assessment, investigation, and intervention regarding a potential case of child abuse and neglect.

730.    On or about 29th November 2005, the State accused me of abusing my children through proceedings formally filed in the State of Michigan 6th Circuit Court Family Division of Oakland. On or about 7th November 2005, a preliminary hearing was conducted wherein the DHS Protective Services Division wrote a letter accusing me of neglect, physical abuse and recommending the termination of my parental rights.

731.    The medical doctors from Beaumont Hospital in Royal Oak indicated that the injury was an accident but Della Simms, my caregiver, told them that they should call DHS on me.

732.    Della was trying to get custody of my children and because she could not call herself, she told the doctors to call to get around the patient – client special relationship that we had. Instead of helping me with my disability like she was contract to do, she decided to use color of law to steal my children.

733.    Della Sims, my supposed caregiver, repeatedly called the visitation center where I

visited my children and told them confidential information about my case and requested custody of my children. Della Sims was allowed to attend the confidential proceedings, but my witnesses were not allowed to enter the courtroom or testify on my behalf.

734.    I met social worker Daniella Stephens at court. She withheld exculpatory evidence from the court that I disciplined my children appropriately, corrected them lovingly, and they she had witnessed them saying that they want to be returned home on multiple occasions.

735.    Social worker Danielle Stephens recommended that I take parenting classes. She told me to go ahead and take them so that way when the judge asked me to take them, I would already be done. I later found out that taking these classes would not lead to reunification with my children

736.    During the whole case, the state appointed attorney, Thomas Mengesha, to be lawyer representing me in the proceedings. I told my attorney, Thomas Mengesha, in his office that the injury in question was an accident but he told me that he believed that I did do it and that I should plead no contest.  The only advise my lawyer gave me was to plead no contest or else never see my children again. Because I was under duress from this statement, I complied with the veiled threat and during the bench hearing on 15th March 2007, I pleaded no contest without appreciating what no contest plea meant. I have a mild learning disability.

737.    The lawyer did not explain what no contest meant to me either. The lawyer only told me that I would lose my children if I do not plead no contest.

738.    Hence, the bench went by default. As such, I lost an opportunity to refute the lack of intention in the accusation by the DHS Protective Services Division. I also lost an opportunity to present Monika, a witness who had turned up to testify to my fitness as a mother.

739.    After strictly following the advice given by the lawyer, I gradually lost my rights to see my children. It first started with supervised visitation of the children.

740.    On or about 17th October 2006, I had a court hearing and was waiting for it to begin but was told that the court hearing was cancelled because the referee/judge had a personal issue that he had to deal with.

741.    My attorney did not show up for the hearing and neither did any of the other counsel.  I received a call from the disability coordinator telling me that this would be the last time I saw my children and that I should be prepared to tell them goodbye. I told her that I had not heard this from my attorney. My attorney was not there to represent me when my rights were terminated, I did not have a termination hearing, and never called me again.

742.    I genuinely believed that the state-appointed lawyer deliberately did not defend my best

interest during the proceedings and that my counsel was conspiring against me to help DHS win their case because he intentionally gave me bad advice and threatened me whenever I asked a question.

743.    Following the case, I was only allowed supervised visitations. On 8 September 2006, Della Sims tried to obtain custody of my children but was unable to as she was not the court's first choice. As of October 17, 2006, I lost the rights to see my children forever even though they were given to their dad. The children could have lived with their dad without my parental rights being terminated. This was excessive force and a cruel and unusual punishment in violation of my Fourth and Eighth Amendment rights

744.    I am aggrieved with the violation of my right to due process which has resulted into loss of the relationship with my children which is both unwarranted and unfair and is solely attributable to the lack of due process in the purported assessment, investigation and intervention carried out by the Child Protective Service.

745.    I am further aggrieved that I was conspired against by the very people who claim to help families and children in need. The social workers, attorneys, and referee all worked together to commit Fraud upon the court by intentionally misleading the court that I common boyhood accident was intentional abuse by me, worthy of having my parental rights terminated.

746.    I have suffered emotionally from the fraudulent actions and the relationship with my children was permanently damaged because they believed the lies that were told about me.

747.    **PLAINTIFF CECELIA EVERTEZ**

748.    Complainant avers that Randolph, Kevin, a Judge in the termination of guardianship., violated Complainant's rights under 1st, 4th, 5th and 14th Amendment of the Constitution of the United States of America.

749.    Complainant further avers that Vincent Tinnerello, Supervisor, Department of Children and Families, violated Complainant's rights under 1st, 4th, 5th and 14th Amendment of the Constitution of the United States of America.

750.    Complainant contends that Bringman, Jennifer, Case Worker for Termination of Parental Rights, violated Complainant's rights under 1st, 4th, 5th and 14th Amendment of the Constitution of the United States of America.

751.    Complainant also avers that Roberts, Tasheedah, an Attorney, violated Complainant's rights under 1st, 4th, 5th and 14th Amendment of the Constitution of the United States of America.

752.    Cecelia and Antonio Evertez are the grandparents of Mariah E.- F. and Dora E. - F. On

March 6, 2015 our Grandchildren were taken into custody by the Department of Children and Families (DCF). This case is predicated on false allegations and lies and every attempt to expose the truth was denied. The information contained herein is proof that the false allegations and lies are in violation of the Constitution as set forth in section 18 USC 242 deprivation of right and a violation of the 1st, 4th, 5th, and 14th amendment. Below is a sequence of events and the participants who took part in this case which led to an unwarranted termination of guardianship.

753.    Judge Kevin Randolph was the presiding judge at the initial trial. Prior to the case going to trial all the attorneys including the prosecuting attorney agreed to dismiss the case if my Husband and I would agree to sign a no contest form.

754.    My Husband and I agreed to sign the no contest form in order to be reunited with our Grandchildren. However, in spite of this agreement Judge Kevin Randolph angrily rejected the no contest agreement and the case went to trial. The trial did not cover pertinent factors to establish our innocence or guilt by the defense attorneys or the prosecuting attorney. Pertinent to the trial was an allegation of sexual assault to one of my Grandchildren which was reported to the police by my Husband; this matter was not covered during the trial. There was a DCF employee who testified in Court regarding a safety agreement which was signed by my Husband. A third notable testimony at the trial was Family and Children's Aid; the two therapists for my Grandchildren; MCCA and other service providers who testified in Court who were in favor of reunification (See Exhibit 1). Oddly, the trial was predominantly interceded with objections by Judge Kevin Randolph regarding incorrect cross examinations of witnesses by the attorneys. Judge Kevin Randolph ruled against our case and on December 23, 2015, my Grandchildren were committed to the Department of Children and Families.

755.    Judge Kevin Randolph's decision was based on allegations by DCF which were not covered during the trial and my husband, and I were unaware of many of these false allegations and lies to defend ourselves or ask our attorney to challenge these false allegations and lies. In Judge Kevin Randolph's Memorandum of Decision, he states that I signed a safety agreement on July 13, 2012, this is not true (See Exhibit 2).

756.    Further, Judge Kevin Randolph 's report of Ofori Koran, an investigative social worker, is incorrect. In meeting Ofori Koran his attire was unacceptable, he wore a wrinkled shirt which was slightly smelly. At that time, I had an 11-year-old Granddaughter, Ofori Koran informed us of his engagement to get married and has a 2 ½ year old son. I felt compelled not to sign the safety agreement which Judge Kevin Randolph speaks of due to Ofori Koran's attire, mannerism and of his lecture.

757.    When                returned the next day my Husband signed the safety plan solely because we came to the conclusion we cannot allow our Daughter to have unsupervised visits to avoid

further conflicts with DCF. When the trial ended, I distinctly remember Judge Kevin Randolph asking DCF if they were in favor of reunification of our Grandchildren and DCF replied they were in favor of reunification.

758. My Husband and I continued to comply with DCF's service plan, and we were very hopeful we would be reunited with our Grandchildren. My Husband and I could not afford to hire another attorney to appeal Judge Randolph's decision, therefore, I attempted to be a pro se litigant.

759. Attorney Rasheedah Roberts became the attorney for my Grandchildren after the trial ended under the direction of Judge Kevin Randolph. Attorney Roberts replaced Attorney Bruce Schreiber who was in favor of reunification. As Attorney Roberts did not partake of the trial she missed out on the fundamental facts of the case. I had very little she would make arrangements to meet at my home; Attorney Roberts never fulfilled her promise. On another occasion, prior a judge making his entrance to the courtroom, I gave Attorney Roberts a list of rebuttals to the lies and misrepresentation by Jennifer Bringman, the DCF caseworker who was part of the TPR proceeding; Attorney Roberts did not respond to my list of rebuttals (See Exhibit 2). In an attempt to give Attorney Roberts my side of the story regarding the case, Attorney Roberts began to yell at me over and over again and said I was trying to entice an argument; nothing could be further from the truth. All in all, my case and its interaction with Attorney Robert was no more than 10 minutes of her time with me. Thereafter, my Grandchildren were adopted and had a name change without my knowledge.

760. On January 3, 2021 I submitted to the Court a Writ of Mandamus in the Interest of Justice and Immediate Relief (See Exhibit 8). This matter was addressed in Court on January 7, 2021, and was denied.

761. On January 12, 2021, I submitted to the Court a Motion of Reconsideration (See Exhibit 9) this Motion was denied. I now seek justice from the Federal Government of the United States of America for relief of injustice.

762. On April 8, 2016, my Husband and I met with Vincent Tinnerello, a supervisor at DCF. This meeting was at the suggestion of my therapist; therapy was a part of our service plan by DCFS. My therapist thought a supervisor could resolve the issues with the foster care family as there were so many reasons to not have my Grandchildren in foster care. We were also hoping to increase our visitation to more than three days a week in our endeavor for reunification with our Grandchildren.

763. There were many issues which were not in the "best interest of the children" in foster care - ring worms; front teeth chipped off; failing grades; poor attire and our Grandchildren were frequently placed in other foster homes by the foster family for family vacations, early school dismissals, etc. Vincent Tinnerello reacted unconcerned regarding these issues. "In the best interest of the children,"

reacted very bizarrely and he abruptly left the room and this meeting set the stage for Termination of parental Rights (TPR).

764.     In an email dated 9/14/2016 Jennifer Bringman informed me she is replacing our former caseworker, Shavonne Dash. My first in-person interaction with Jennifer Bringman was met by hostility by Jennifer Bringman in Court. Jennifer Bringman made a statement which was inaudible, but she also stated she thinks my Husband and I allowed our Daughter to attend an in-home visit with our Grandchildren which is not true.

765.     Under the direction of Jennifer Bringman came an influx of additional false allegations and lies too numerous to list here, however, a brief list of Jennifer Bringman's misinformation was distributed to all the attorneys (See Exhibit 3). Additionally, Jennifer Bringman ignored her own organization's findings whereas the State of Connecticut Department of Children and Families Investigation Protocol explicitly states the medical records of my Grandchildren were up to date. I, also, submitted to the Court an application to subpoena records to expose Jennifer Bringman's lies regarding false statements of medical records.

766.     I also requested to get the testimony of the in-home service providers, one of which was our previous case worker (See Exhibit 4). It should, also, be understood that DCF and the Court will go to extreme measures to disrupt a family's bond to the extent of being inhumane. For example, when our case changed to TPR we could no longer have in-home visits. DCF changed our weekly two-day unsupervised in-home visit plus a one day supervised visit to a one day three hour visit per week with supervision.

767.     This visit could not be in our home, the visit had to be supervised in a neighboring town. When winter approached, we could no longer go to parks and we could not find restaurants or other places to let us spend three hours together and our Granddaughter wanted to spend every moment of the three hours with us. My request to Jennifer Bringman and the Court for a one day in-door visit at our home was denied (See Exhibit 5).

768.     Further, Jennifer Bringman and other members of DCF have successfully caused division in our family. For example, the oldest Granddaughter gradually stopped all visits with us. I explained this unusual behavior to my therapist and my therapist informed me to have family therapy; my Motion was denied by the Court (See Exhibit 6). My complaint to the Court dated 12/27/2017 was ignored (See Exhibit 7).

769.     Another inhumane factor of DCF are the untrue comments DCF is telling my Grandchildren I said about them and the untrue made-up statements DCF will tell my Grandchildren I said about them; all to steer the case to their advantage.

770.     Jennifer Bringman, DCF and the Family Court are relentless by any means in their endeavor to take Children.

771.  **PLAINTIFF NATASHA LOACH**

772.     As an independent action based on federal Rule 60(d)(3), N.L is seeking to redress the rampant fraud upon Court in the prior proceedings. In this complaint, N.L states that the action is based upon the "illegal. Improper, unethical, and fraudulent action of Texas Department of Family and Protective Services and others, and its lawyers in the prosecution of the case against N.L in their suit underlying the case".

773.     More specifically. N.L alleges manipulation of documents, misrepresentation of federal state and federal regulations and case laws, and further encouragement of witnesses to provide only such evidence or testimony that would favor the Department's position. The Department, through its attorneys, misled the district court by alleging that they presented accurate reports when in fact, they had submitted fabricated reports. N.L further contends that several other incidences of fraud occurred during the trial, including submission of fraudulently acquired non-accurate exhibits that did not contain facts about the case, which in their character was misleading.

774.     The original Court's impartial review was fatally compromised by its lack of awareness of crucial facts making it reasonable to claim a Rule 60(d)(3) claim. Valerio v Cascade Corp. 80 F.R.D 626. 640 N.10 (N.D Cal. 1978), aff'd 645 F.2d 699(9th Cir. 1981)

775.     The RULE 60(d)(3) is a codification of the Court's "inherent power and authority to investigate whether a judgment was obtained by fraud." Universal Oil Products Co. v Root Ref.Co., 328 U.S 575, 580, 66 S Ct. 1176, 90 I. ED (1946). As explained by the Ninth Circuit in United States v Estate of Stone hill, 660 F. 3D 415, 44-45 (9th Cir.2011), most frauds upon cases arise out of the scheme of one party to hide key facts from the Court and the opposing party including perjury or non-disclosure in a way so fundamental that it undermines the working of the adversary process itself. In allowing the adversary case to proceed, the Court acted in similarity to the position in Lavender v. Prober (In Re Lavender); 180 F.3d 1114 (9th Cir 1999) where rule 60 (d)(3) was applied where debtors perjury was part of the scheme to "hide a key fact from the court and the respondent" Stone Hill,660 F.3d at 445. The perjury was serious enough to constitute a fraud upon the Court because the Court or parties couldn't be aware of the deception.

776.     STATEMENT OF FACTS

777.     The Applicant was sued by the Department on or about June 23, 2020, wrongfully alleging that Mother, who is also the defendant, neglected her children                         and left them

under the care of persons who exposed them to physical, mental, and psychological harm, including allegedly exposing them to illegal drugs in this case cocaine and Marijuana. The children were eight and six years respectively at the time of the final hearing.

778.     For the purpose of confidentiality and the children's best interest, the parties were henceforth identified as W.T {Willow Thorne}, Illinoi Thorne {I.T} and N.T {Natasha Loach.

779.     Emergency Removal Order - The Texas Department of Family and Protective Services sought custody after an investigator responding to a report of neglectful supervision allegedly found that the children were living in unsanitary conditions, that there was little or no food in the house, and that it appeared the children had little in the way of clothing, bedding, or toys which according to N.L witnesses was not the truth.

780.     The investigator also expressed concerns because "it appeared to have some trafficking going in and out of the home," reporting that a neighbor had witnessed drug dealing from the home and because N.L. had permitted "several adults with an extensive criminal history, to include illegal substance charges, to live in the home and have access to her children." In June and October 2018, N.L. took hair follicle tests, both of which were allegedly positive 2 for cocaine even though further tests by N.L turned negative. The children's hair was also tested in June 2018—I.T.'s test was claimed to be positive for cocaine, and W.T.'s was also claimed to be positive for cocaine and Marijuana. At the final hearing, the trial court heard testimony from a Department caseworker, the children's guardian ad litem, N.L., and N.L.'s sister.1

781.     The caseworker testified about the children's hair follicle tests and the conditions from which they were removed; that N.L. took two hair follicle tests that were positive for cocaine but denied any drug use; that N.L. had not completed any of her services, including therapy; that the siblings had to be separated from each other due to fighting and because I.T. made an outcry of sexual abuse against W.T.; that W.T. showed "extensive behaviors where she has wanted to harm herself and has had to be hospitalized"; and that W.T.'s behavior and mental health had improved through her participation in a therapeutic foster home. The guardian ad litem testified similarly, claiming that the children came into care testing positive for cocaine—"the same drug that [N.L.] had allegedly tested positive for"—but claimed that N.L. had denied any drug use. She also testified that N.L. had not made progress on her family plan and had "been very threatening" to the ad litem on several occasions.

782.     N.L. testified, denying any drug use and asserting that she had attempted to comply with her family plan. She also testified that the Department investigator had exaggerated the unsanitary conditions in the home and that W.T. had not displayed the behavioral issues reported during the case while W.T. lived with her and had acquired them during the separation and abandonment by the

1 | Department into the foster system.

2 | 783.  DetentionHearing

3 | The trial court found that N.L. had engaged in conduct or placed the children with others who engaged in
conduct that endangered the children's well-being and that termination was in the children's best
4 | interest. See Tex. Fam. Code § 161.001(b)(1)(E), (2). 1 The trial was held via video conference due to
5 | COVID-19. See Second Amended Emergency Order Regarding COVID-19, Travis County Civil & Family
Courts, Admin. File No. GN-61-121012, signed and filed May 7, 2020.On appeal, N.L.'s court-appointed
6 | attorney had filed a motion to withdraw supported by an Anders brief, concluding that the appeal is
7 | frivolous and without merit. See Anders v. California, 386 U.S. 738, 744 (1967); In re P.M., 520 S.W.3d
8 | 24, 27 (Tex. 2016) (per curium) (approving use of Anders procedure in an appeal from the termination of
parental rights).

9 |

10 | 784.  According to the Attorney, the brief meets the requirements of Anders by presenting a
professional evaluation of the record and demonstrating why there are no arguable grounds to be
11 | advanced. See 386 U.S. at 744; Taylor v. Texas Dep't of Protective & Reg. Servs., 160 S.W.3d 641,
12 | 646-47 (Tex. App.—Austin 2005, pet. denied). N.L.'s counsel has certified to this Court that he provided
N.L. with a copy of the Anders brief and motion to withdraw and advised her of her right to examine the
13 | appellate record and to file a pro se brief. To date, N.L. has not filed a pro se brief. The Department
14 | responded to the Anders brief, stating that it would not file a brief unless we requested one.

15 | 785.  Disposition

16 | 786.  During the life of the proceedings, the courts had denied N.L an opportunity to present
witnesses who had substantial testimonies, which would have swayed the Court not to find for
17 | termination of L.N's Parental rights under Texas statutory law 161.001(b)(1)(E.

18 | 787.  Moreover, the TXS DFPS defrauded the Court by largely declaring and submitting
19 | fabricated evidence prepared by the social worker Ms. Salazar and appointed guidance of minors W.T
20 | AND I.T.

21 | 788.  As a consequence, the Court and the Associate Judge that despite him presenting an
adequate number of witnesses to prove that minors W.T and I.T were not neglected by N.L as alleged by
22 | the TXS DFPS, the Associate judge failed to acknowledge such as sufficient evidence and chose to rely
23 | on his own discretion while determining parental rights. In reality, N.L was described by most witnesses
as a pleasant, responsible, understanding, and hardworking mother to the minors.
24 |

25 | 789.  In addition, the Department relied on claims of positive hair follicle drug tests both on
mother and minors as a show of acts that violate the minor's best interest. The alleged drug tests were

26 |

27 |

28 |

1    contrary to other tests taken by N.L that had turned out to be negative for both Cocaine and Marijuana.

2    790.    The Department failed to offer facts as to evidence supporting the positive drug test
3    allegations as true, nor prove how these caused actual or proximate harm to the minors. The judge failed
     to acknowledge these variations in evidence, nor did the Court consider the mother's own evidence that
4    contravened the Department's report. The Associate Judge already being in fraud eventually held for
5    termination of N.L's parental rights.

6    791.    In several occasions, N.L presented to the Department through the social worker that
     she had paid child support with proof of checks. She had also attended recommended psychological
7    treatment. The mother was not in need of mental treatment and care. This was done to defraud the
8    Court and deny the mother the right to raise her children without extensive government interference.

9    792.    Ryan Smith, attorney for the petitioner, suppressed evidence regarding the child's
10   health and well-being while under Placement services, evidenced by pictures of bruising and swelling on
     the minor's face. This was suppressed with an intention not to bring to light material facts of the case and
11   the child's best interest to the Court and thereby defraud it into arriving at the desired judgment.

12   793.    Neale Potts Attorney Ad Litem suppressed evidence of harm to minor I.T while under
13   placement and foster service and also that minor W.T occasionally and persistently contended that they
14   wanted to live with the mother or that minor I.T was also happy with and looked forward to all the
     supervised visits with N.L.
15
16   794.    Cathy Rothas Guardian Ad Litem suppressed evidence of mistreatment and abuse of
     the minor by the social worker and the foster parents. This evidence was critical in determining what was
17   in the children's best interest and subsequent reunification with the biological parent.

18   795.    Through such a willful and orchestrated plan to suppress evidence N.L, W.T and I.T
19   were denied their due process right as this omission of critical evidence from official court records was
     unprecedented and amounted to fraud on the Court by the attorneys and the entire judicial staff and the
20   Associate Judge of the district court.

21   796.    Consequently, the fraud eventually led to the silencing of the voices of the innocent
22   minors, go against Texas Family code that advocates for and requires the judiciary to prioritize the
     child's best interest and, in general, obstruction of justice.
23
     797.    The Court appointed attorney for N.L failed to guarantee her constitutional right to
24   receive effective legal assistance of counsel. The counsel was deficient in her representation of N.L in
25   requesting for proper preparation of witnesses, objecting the presentation of inaccurate or fraudulently
     procured evidence, something that greatly prejudiced N.L. the counsel did not make an effort to ask the
26
27
28

questions which were relevant as pertaining to N.L or the children living conditions, the mother's mental health or that of the children's well-being while under placement or foster families.

798.    On the occasion that Witnesses Kim Johnson and son Farid Harris were unable to offer their testimony over Life-size services offered by the Court on technical grounds, the counsel did not object to the Court's decision that the witnesses were not there to testify. This effectively denied N.L an opportunity to call these key witnesses to testy. The court systems themselves were not functioning as reasonably expected, and the Associated judge failed to adjourn the Court sufficiently to allow N.L access to the witnesses through alternative means.

799.    It was an error and a fraudulent act, considering the number of challenges experienced with modern technology. N.L had a right to be given further opportunities to overcome the technical difficulties. By failing to object, the counsel waivered the errors arising on technical grounds. Neither did he provide the offer of proof that eventually denied the two witnesses an opportunity to testify on facts that would have made a difference in the trial outcome.

800.    The Associate Judge was largely biased and harsh at N.L and often denied her an opportunity to speak in Court or provide her testimony adequately nor submit relevant material facts. When it was not necessary, the Associated judge adjourned the hearing from time to time in order to make severe the effects of separation and subsequent termination on the respondent N.L and her children W.T and I.T.

801.    The Associated judge would, in a rush, declare N.L witnesses as not available to testy without considering the circumstance of the hearing something that went against N.L constitutional rights. He knowingly relied on falsified reports to terminate the mother's parental rights, given that the mother had decried misrepresentation and falsification of the evidence by the social workers and applicants' attorneys. This was the worst case of fraud on Court by a senior court officer and the primary decision-maker in determining the minors' best interest.

802.    Through this Federal Rule 60(d)(3) Motion, N.L has highlighted the gross miscarriage of justice occasioned by the rampant fraud on the Court during the trial that resulted in prejudice on N.L and her children. The actions of the officers of the law, especially the attorneys, have greatly harmed the integrity of the American justice system and related process as it reveals how officers are compromised to act contrary to relevant procedural and statutory laws.

803.    N.L can therefore prove that she has a colorable entitlement to relief as further set forth in detail by the complaints below.

804.    Judgment was entered against N.L on June 23, 2020. The defendant contends that the

1 said judgment was procured through fraud on the Court in that.

2 805. THE COURT HAS THE POWER TO VACATE THE JUDGEMENT THAT WAS
3 ENTERED AGAINST THE DEFENDANT FOR THE FRAUD ON THE COURT. Federal Rule of Civil
Procedures 60 (d) (3) states in patient part that nothing in Rule 60 limits a court's power to set aside a
4 judgment for the fraud on the Court.

5 806. The Applicant contends that adverse parties committed fraud on the Court by following
6 the actions and deliberate omission that armed the integrity of the judicial process.

7 807. **PLAINTIFF SHANEQUA B. AUSTIN**

8 808. Complainant contends that Kimberly Cody, a Caseworker, violated Complainant's Due
process rights, Fraud, and perjury.
9

10 809. Complainant also avers that Dandera Rulhman, a Judge, violated Complainant's Due
Process rights, and intention to cause emotional harm when Complainant's child's life was never in
11 danger. Complainant further contends that Lindsay Crocetti, a Caseworker, committed perjury and fraud.

12 810. Complainant avers that Tessa, a caseworker, committed Fraud, Medical malpractice,
13 and perjury. Around December 6th 2015 I went to Strong hospital to get treatment for depression due to
my baby cousin getting killed Kim Cody came to see me that Friday she informed that I don't deserve to
14 be a mother to my child because I suffer from Depression I told her she can't remove my child based off
15 that I asked her why didn't she respect due process I was told she doesn't have to respect due process
16 because I'm mentally ill and anything she says about will hold immunity in court a couple months after
Kim Cody go.          ... removed from me with no warrant for the removal I never agreed to any
17 contract in the beginning of my case so the removal wasn't just because judge Rulhman never issued a
18 warrant Kim Cody said I Neglected my Son's Health when he never missed a Doctor's appointment.

19 811. Lindsay Crocetti committed perjury and fraud By saying My child has Fetal Alcohol
Syndrome With no medical evidence She took my son for a private Behavior Health evaluation when he
20 was 5 years old Lindsay committed perjury in my family history far as my son biological assessment by
21 saying everybody in my family suffer from Mental illnesses like my sister my mom and my brothers
Lindsay Crocetti has also lied about my Mental Competence by saying I'm incompetent to parent my
22 child because of my Mental health history she has lied on my Babyfather and said he doesn't want to
23 deal with me or want my baby in my care because of my Mental health.

24 812. Judge Rulhman removed my son  . .     ... due to perjury and Fraud No Due
25 Process judge Rulhman placed my child on Mental health drugs without my consent knowing it's against
my Religious beliefs and knowing that it will cause harm to my child Tyshawn Parker tried to kill himself
26

27

28

April 7th 2021 the doctors at Strong hospital discontinued his Ritalin he was on 32mgs every since he was years old he was medicated every court Judge Rulhmann increased my son medication knowing it was causing harm to my child Tessa is a social worker from Strong Memorial Hospital.

813.    May 10th I met Tessa she kept trying to get me to say I had postpartum depression knowing I wasn't depressed after I gave birth to my baby she kept harassing me telling me that I'm not leaving the hospital with my baby because my oldest son is foster care that has nothing to with my baby she told me I do drugs I don't deserve my baby I told her if I really do drugs then why are you guys allowing me to breastfeed my baby I lived in the hospital with my baby for 2 months and CPS said Sadiaus life was in danger Tessa broke HIPPA by sharing my baby information with Lindsay Crocetti to plot and remove my baby from me.

814.    **PLAINTIFF DESIREE PETERSON**

815.    Complainant contends that Rodriguez, Roger, a Social worker, forcefully entered Complainant's house, and forced Complainant to sign documents in violation of Complainant's rights.

816.    Further, Complainant contends that Rodriguez is liable for several liabilities, *inter alia*, negligence, negligent infliction of emotional distress, violation of civil rights, violation of state civil rights, emotional distress, and negligent breach of duty.

817.    **PLAINTIFF STEVEN BRADLEY**

818.    The Complainant filed an affidavit stating that Rhonda L Christopher, an Arizona DCS investigator, showed up at the hospital with two armed police officers and a phony court order and committed armed kidnapping of the newborn baby. She perjured herself on court documents, without any proof of the allegations.

819.    The Complainant contends that Abigail Johnson is part of the fraudulent case against her. Abigail is a co-conspirator in the kidnapping of her newborn under color of law.

820.    The Complainant contends that Marsha Devorah Garrett-Mhuto, a case manager on the case from Arizona DCS, let the Complainant's son be abused in foster home. Besides, Abigail tried to label the Complainant's son autistic. Also, Marsha allowed the Complainant's son to be shot with twelve (12) vaccines against the Complainant's will.

821.    The Complainant further contends that Velora Louise Vincent, a case manager, was in charge of the kidnapping for the first (seven) 7 months. Velora also ignored the abuse and neglect the Complainant son suffered in foster care. Finally, Velora drafted fraudulent documents claiming the Complainant had no parenting skills.

822.     The Complainant contends that Kristin Rene Culbertson, a Judge assigned to her case, ignored actual evidence and rules to take and keep children. She approved the kidnapping after the fact. Further, the Judge ignored every document that Complainant has led on record and ignored proof of the abuse to Complainant's son. Besides, she is tracking children under color of law.

823.     The Complainant contends that Kathleen Erin Martoncik, the Assistant Attorney General, Prosecutor, and lawyer built a fraudulent case against the Complainant to keep and sell the Complainant's newborn.

824.     The Complainant claims that Mathew Laura, Guardian ad litem claiming to speak for Complainant's son, left the Complainant's son speechless, leaving him in foster care and not letting him come home. Besides, the GAL Knows of the abuse and neglect but does nothing to protect the Complainant's son.

825.     The Complainant claims that Analysa Cortez, a parent aide, completely lied on several occasions to help keep Complainant's son detained.

826.     The Complainant contends that Jeremy Welsh, a foster parent, neglected and abused Complainant's baby from the time the baby was taken to foster care and that Jessica Welsh, a foster parent, neglected and abused the Complainant's son while getting paid to keep him safe.

827.     **PLAINTIFF MOHOGONY HUNTER**

828.     Complainant has been victimized by the department of child welfare on multiple occasions and has been the victim of human trafficking as all of her children have been placed in homes of abusers intentionally to cause mother's emotional distress.

829.     The department, juvenile court, and law enforcement conspired and coerced Complainant using threats of force to obtain custody of their children where they were later molested and abused.

830.     State actors continued to harass, trespass, and illegally survey the complainant invading her privacy and quiet enjoyment of her domicile.

831.     **PLAINTIFF RENESHA TOMLIN**

832.     On April 30, 2013, 10:13 am, a CYFD social worker came to my home to do a child welfare check and to advise me that Linda Johnson Hopkins was making outrageous and slanderous allegations against ME such as:

a.     That I was feeding my 2 children at the time dog feces.

b.   That I was on recreational drugs such as meth coke crack cocaine pain pills and heroin

c.   That i also beat my kids and left them alone often

833.   I told her that all allegations were false, but the new social worker proceeded to accuse me herself. It's like they operate with a hivemind. I started crying because the allegations were so horrible, and I would never hurt my children. I was confused on how someone could be so evil; I also was 7 months pregnant at the time. The case worker told me that multiple people would be in contact with me in the near future to do further investigations. CYFD continued to harass me from that moment on.

834.   Cops showed up at my house 3:30 pm checked to see if my children (Jordae, Jamari) had any visible marks on their bodies. The investigation concluded that my children's bodies had no type of injuries. The cop also checked to see if I had food, running water, clean clothes and a clean house. The cop then stated to me that everything was fine on my end and that there would be no more further investigations and my case should be closing soon.

835.   This could not be further from the truth. A CYFD social worker kept popping up at my house causing me stress. She tried to intimidate me by telling me that I had to find a family member to sign my children over to until my investigation was over because Linda J Hopkins kept calling her making false allegations still and she was sick of the phone calls interrupting her LIFE.

836.   Even though there was no evidence of my children being in any danger, or that any abuse was taking place in my home she had me move my kids to my stepdad's house. All the stress put me into premature labor on May 24, 2013.

837.   On    ...ay at 10:00 pm I gave birth to my son ..... with a c section because all the stress CYF caused by me made my body go into shock. I was in labor due to all the harassing the department was doing by continually hurling false allegations against me and continuing to receive false allegations against me.

838.   My son's heart rate dropped and had to be cut out of my stomach. He had to be in the ICU for 3 weeks due to being early. I passed out in surgery. Once I woke the next morning the social worker was there looking at me. She stood over my hospital bed like a stalker and told me that she was going to continue to be in contact with me because I had a newborn while my case was still open. She forced me to do parenting classes and a drug program even though I was no longer on any prescribed or unprescribed medication. As a result of the continued harassment, I began to feel depressed; CYFD did not care or act reasonable during any time. They seemed to take pleasure in causing as much pain as possible.

839. On May 30th, I went and signed up for parenting classes at healthy families and signed up at UNM Hospital for a drug program 'it was hard to get in the program for drugs being that my urine samples i took were negative of any drugs it took me a good 10 hour process to get enrolled at the clinic but i got it done i then called the social worker at CYFD to inform her that i had did as she ask me to do then she advised me that she wanted me to bring the kids          and          i) to the department of CYFD address 300 San Mateo Blvd NE #800 so that the case workers could look at my kids one last time and my case would then be closed.my father and I arrived at CYFD AT approximately at 4:30 pm soon as I took my children up to the second floor the worker had me place my children into a room where she said they were just going to ask my kids questions once I stepped out the room the case worker proceeded to tell me I need to get off of the CYFD property because she was keeping my children.

840. I started trying to get back in the room to get my children, I begged them for answers to why they were doing this to my children, and they just stated that they could because they ran Albuquerque. I refused to leave the office so CYFD social workers called the Albuquerque police department to remove me from the building I could hear my children screaming for me I was screaming for them it was the worst day of my life. After about an hour or so they dragged me out of the office basically and then the social worker called me and said I could not return to the hospital to see my son that I had just had which was still in the hospital unless a social worker was present. I asked her where she was placing my child.

841. She said it would take some time for her to find my children a home she then stated that I needed to work a treatment plan that she would put together for me.it took them weeks to let me see my children again it was so horrible every night I woke up screaming and crying from the separation anxiety I experienced from my children being away from me. I couldn't eat, drink, or do anything. I didn't comb my hair or get dressed or anything. I just layed in my bed. I almost died if it wasn't for my dad getting me up and helping me get dressed and the Lord keeping breath in my body, I would have died from the pain i was feeling. I would call CYFD and they would inform me that I did not have a case worker anymore and they were so busy that they would let me know when I would get one. It took about 3weeks i finally got a call back from CUFD saying I finally had a new caseworker, whose name was Elise.

842. DATE JUNE 15, 2013, I finally got a meeting with my new social worker by the time I got a appointment I had already went to several parenting classes and drug meetings at asap I informed my case worker that and she said that was good, then my case worker informed me that I needed to start taking UA, s Daily

843. I could only see my children including my newborn that was scheduled to be released

105

Mass Tort Claim for RICO-Fraud

from the hospital soon only one hour twice a week. The case worker then stated that i could no longer see my newborn or pump breast milk for him because he needed to get used to his foster parents because he wasn't coming home to me his biological mother.

844.    DATE JULY 5, 2013-MARCH 13, 2013 -THE NEXT 9 MONTHS OF MY LIFE were very stressful, lonely heart breaking and painful for my children and me. I then did UAs for the next 9 months. All of my UAs were always negative, so my PPW Elise recommended that I start having supervised UAs. The stress of a stranger watching you use the restroom every day for no reason sucks makes you feel like a criminal. but that was nothing compared to the torture that my kids suffered. Then for the next 9 months my PPW would meet with me every week twice a week for one hour to let me have visitations with my 3 children for just an HOUR. At the visit my children would ask me what they did wrong and why 'couldn't they come home. My children would be Always hungry and my PPW Elise would have to rip me away from my children because they would be holding on to me begging me to take them home, they even would make my children walk because they didn't want me to see the foster parents that had my children afraid i would hurt them my kids were with strangers it was so scary.

845.    I finally got a lawyer appointed to me named Allison Peroni. I went to see her on about august 23 2013. She went over all my paperwork that I had completed at the time I had done everything that my PPW Elise had asked for as far as having clean UAs everyday completing a parenting class and having psych evaluation and seeing a drug counselor every week. Allison, my lawyer could not understand why they took my children in the first place without any evidence of any abuse. Everywhere I went to get help it was so stressful explaining myself with no proof of child abuse i had to beg everyone I confided in with system and didn't understand why they hadn't been returned to me if i had completed what CYFD had demanded I did in order for my children to be returned home. The next few months I continued to do my UAs which were always clean and to follow my treatment program. we started going to court and each time we went to court I would have to listen to how my 2 older children were suffering such as they were waking up in the middle of the night and screaming, they would urinate and defecate on themselves because my children wanted to come home to their mother and missed me dearly .my lawyer always presented all my documents stating that I had finished all of my treatment plan. The judge still would just ignore everything and let my children stay with strangers. We kept going back and forth to court. I won each time the judge cited me, but my children still couldn't come home.

846.    CYFD would not let me bring my children gifts. They started making me and about 20 more mothers share our visits in one conference room because they had too many children in the system so the ppw's were overwhelmed so we never got any privacy. I would bring toys and snacks for the other children because I would feel bad if they would want the things I bought for my own children. Soon the other ppw's would complain to my ppw and she would inform me that I could no longer bring

anything for any of the children. I was upset but kept it to myself. I just kept telling myself I just have to keep praying and my kids would be home when the Lord saw fit. The ppws would treat you like crap my kids' hand so many foster parents and I had so many ppws it was so frustrating.my children and I would cry ourselves to sleep at night still do till this day 7 years later going on 8years my daughters hair was never combed and I showed them how to comb it her hair ended up falling all out. My kids' clothes would be dirty and have holes in them. My poor babies looked like poor orphans; their spirits were so broken. I finally got a court date for my children to come home sometime in March 2014.

847.     DATE MARCH 1-31 2014 -Before my children were able to come home I had to have my hair cut so CYFD could get another drug sample.my ppw never told me anything about it. I went in for a meeting and then someone informed me that they would be cutting my hair that day. Of course, I didn't mind. I'll do anything for my children if the hair sample comes back negative as well. When we went to our supposed last court date my children's lawyer tried to get my children to stay in foster care because the foster parents wanted to adopt my children.

848.     My children's lawyer and CYFD tried to lie to me some more, but the judge was on my side this time and The Lord. My children were to be returned to me within the next 2 weeks. Well, I was so happy our nightmare was almost over I was thinking to myself yes CYFD can't hurt us anymore boy was I wrong they were just getting started with their sick and twisted ways! My babies came home that same week around March 13, 2014, 2 weeks early because the foster parents' daughter passed away suddenly. I agreed and was happy as soon as my children were returned home CYFD started to harass me all over again when I was waiting for them at organizations to work on our reunification. CYFD had me jumping through hoops for them still.

849.     It caused my anxiety and postpartum to kick in again. I was so overwhelmed I felt like I couldn't be myself anymore. It was so heartbreaking everyday my kids would beg me not to go to school for fear of never seeing me again and they begged never to go back to their foster parents. I was so depressed I didn't realize I was slowly losing myself. The Lord still gave me the strength to keep on going without him. We wouldn't have made it this far and I thank him every day.

850.     I never got around to meeting with any organizations to help my children and I due to the lies and 'bullcrap'. CYFD kept putting me through. about a month later my ppw called me stating come in after I dropped my kids off at school to come and meet so she could give me my paperwork I've been waiting on stating that my children and I were done with CYFD .I got there and I waited for about a hour my ppw finally came out and got me she asked could she hold my 9month old son I agreed soon as she got him in her arms she took of running and locked herself in a room i was in shock once I came to I found myself trying to get in the room she had my baby locked in. About 4 other women were there, two of them were pulling me back, the other two stating for me to go upstairs to talk to who was in charge.

851.    I finally listened because I wanted my baby. I went upstairs and was escorted into a room. My ppw entered the room with a blank stare and tears in her eyes. I start screaming asking her why are you doing this to my baby and what did I do? I'm doing everything you asked. I just want my babies. I asked her where she put my son that she had just taken out of my arms minutes ago. She stated that it wasn't her doing it to me that her boss had made her do it. So i asked to talk to her boss and as soon as I asked that the governor of Albuquerque at the time comes in the room and states to me that she ran Albuquerque New Mexico and she wanted my children and she was taking them. I was so hurt I still was not leaving without my baby .so someone called the cops on me and had me escorted of the premises.

852.    I went to see if I could get my other 2 children from school. By the time I got there they were already kidnapped. I started to realize the reason they never wanted me to move them schools when I got them home was because cyfds plan was never really reunification they had to play like they were giving me my children back because i was the only mother that had beat CYFD SO QUICKLY AND STRONGLY and I believe I was the only African American in Albuquerque New Mexico to do so. I kept calling my ppw to get help and my lawyer I would get no answer from anyone my lawyer stated she could no longer represent me because cyfd said.finally approximately 3weeks later i got a call from my ppw stating that i had a visitation coming up with my kids. I went to the visitation and my kids were in shock and were asking me when could they come home i turned to my ppw who was present at the time and i said can you let my children know why we are back here for no reason?

853.    My ppw then grabbed my baby boy Jareal the 9-month-old from me once more and kicked me out of CYFD once again and stated that my visitations would no longer take place because of my attitude. I was so hurt, stressed and traumatized.

854.    Up on the 5 of July and I was so sick to my stomach I couldn't take it anymore. I wanted to see my babies. I was crying begging to talk to someone, and no one would listen. My ppw would not come down and speak to me. The receptionist called the police on me stating that I was trying to kill myself the police informed me that I needed to leave and i was to never come back or I would be thrown in jail. That left me so broken I explained to the cops my situation and they all worked for the governor so I felt like everyone was against me and it was all about money I slipped into a depression tried to kill myself a few times but the lord intervened and it never worked I was so sick of feeling dead inside .a year passed by so in 2015 i found myself at my lowest in life I started using methamphetamines.

855.    I was no longer myself CYFD had officially broke me down and made me feel like I was at my lowest. This is what they wanted all along. I still went to my drug program and counseling, despite everything I was going through, my counselor decided I should start seeing a psychiatrist -so I did. I started to see DR. Romo at UNM hospital asap. He helped me out a lot got me back on track and sober

again I started taking different medications that helped my mental so i didn't feel like i needed the meth anymore. We used to talk about all the trauma CYFD had caused me and that if my kids were returned or if I knew any information about them i would be much better. I caught my kids lawyer talking to my neighbors a few times I told him that as well I don't think that was appropriate.

856.     DATE SEPTEMBER 26, 2016 - In 2016 Sept 24 I had another baby we were home from the hospital for 2days then CYFD was at my door 501 Dallas street se apt B zip 87108.stating that my 2 day old baby was in danger. CYFD came it was two social workers saying they needed to check on my baby because I had a open case. They came out and everything was fine so they closed my case with just the newborn. Then I got a call finally from a new ppw saying she took over my case and would like to go over a new treatment program to get my kids back. It was all a bunch of lies again, over the next few months I did the same things my last ppw had me do years ago which where DAILY UAs parenting class and counseling. I aced everything once again when we finally went to court almost a year later it was to terminate my parental rights. The day of court CYFD tried to get me to sign my rights over which i wouldn't do so.

857.     CYFD has all my ten ppws get on the stand and fabricate lies about me and my whole case saying I never did anything to get my kids back and that I continually would bash them on Facebook and i tried to blow up cyfds buildings multiple times. I wasn't allowed to present any of my evidence of the progress I had made all those years and the foster parents even lied to me and my children, nor could I have any of my witnesses testify on my behalf. My family couldn't even come to court with me. I was treated like a criminal after each court session. I had to be escorted to my car by police because CYFD workers and the foster parents said they all feared for their lives. It was so embarrassing and heart breaking knowing that these demons had my beautiful angels and there was nothing I could do except wait on the Lord to deliver me and my babies.at the end of trial i lost all rights wrongfully to me nor my children knew nothing about I was railroaded in the end.it has now been 6years since I've seen or talked to my children up until recently my oldest child Jordae has snuck and found me on social media.

858.     We text as much as we can she has been informing me some of the torture that the foster mom has done to them over these years and still daily she puts her hands on my children and much more she has been suicidal since the Age 7 due to her depression of missing her mother. She has ten counselors she has reported the abuse, but nobody is listening to her neither, my daughter and sons state that they want their mother still till this day. My children are all on different medications and have also been placed in mental homes numerous of times because after all these years they still ask to come home.

859.     I've prayed for this day to come when we can all get the justice we deserve for so long I

am so grateful for the angels sent to finally get my story told the trauma has caused me to suppress a lot of the traumatic incidence that CYFD has caused me and my children throughout these years but I today have wrote as much as my mind would let me bring up it will never get easier to be yourself again that person i was before CYFD came into my life is gone forever only thing I can focus on is healing my broken angels and freeing as much children as I can that are in bondage by telling my story and getting it public and making sure CYFD in Albuquerque New Mexico gets exposed so they can never ruin another family.

860. **PLAINTIFFS DIMITRI CASH AND LISA CASH (GRANDMOTHER)**

861. Complainant's constitutional rights were violated by the juvenile court of Monroe County, NY In a juvenile court proceeding, court officers including the judge conspired to deprive the complainant of rights to privacy and to be free from governmental interference in family and private life. Complainant was deprived due process as false allegation with no substantiating evidence was used in a court proceeding and exculpatory evidence was suppressed.

862. Complainant's rights to children were illegally terminated without merit or basis.

863. Complainant has suffered extreme emotional distress as a result of these willful and reckless conduct. The actions by government officials, state actors, and court officials were shocking to the conscience of any reasonable person. The children have been harmed by this separation as well because they enjoyed a close bond and relationship with their parents.

864. Case workers committed perjury and swore false statements in order to kidnap claimant's children under color law. They filed the false paperwork to collect money for the complainant's children as wards of the state.

865. **PLAINTIFF RAYMOND SIPULT**

866. On Sep 14th, 2019, at 12:55 pm Wichita Police Department and D.C.F. took my children w/o a warrant. I HAD called 911 because I was being attacked by their mother. We both went to jail for domestic Violence. For 72 hours. (the charge was later amended to brawling.) My children entered the system at that point in time.

867. I've never given up fighting for my children for 3 years now. (My daughte                . It was adopted around March of 2021 w/o my consent and i was denied an appeal by Judge Gerogery Keith of Sedgwick County )my son                                    was returned to me{Journal entry of administrative review, CINC case on 12/3/21.)  and was reunited to me and his sibling              -··      .   to live with me full time (            and͘            sibling waylon had been living with me the father from sometime around 2020 ) proof that i was the fit and stable parent in the

case and had already had sole legal custody of my oldest son . I'm at a loss of words and plagued with depression and guilt over what I'm unable to explain to my sons who really miss their sibling and have had no contact with her for over a year. I have stayed advocating for their sisters' freedom and the hope that the siblings will be able to reconnect with their sister in order to become involved in her life.

868.    And their biological mother voluntarily relinquished her parental rights and I refused to do so. I love all three Children equally.

869.    I believe that a single man can raise 3 children just as single mothers do and I was denied that opportunity to do so with my daughter and believe it was due to me being a single man. When the Placing agency Saint Francis Ministries offered me a case plan (separate case plans from bio mother) I was under the impression both children Alex and Lizzie would return home. I believe that my children were used as a commodity for the Agencies I'll Gain and disgorgement of profits to take away meaningful time and bonding time in my children's early development years.

870.    My son Alexander was returned to me after about 25 months of court hearings .He was not the same child that went into foster care that i knew before .My child screams in the middle of the night screaming, "Dad! Dad! Dad!", cause he has nightmares as a result of what was done to him when he was forced medications in foster care as such as Clodine Bids and Respodole and Liquid Meltone all against my consent.

871.    As I latter have found out that my son was also subjected to unnecessary medical examinations , and extended time in foster care ,denied sibling placement / kinship placement with siblings and denied proper nourishment my child was drugged, beaten, burned, and starved and forced to go to many medical appointments (I had the painful task as a Father holding on to the bitter end of documenting it with my family and a Private Detective Kelly Patton ) repeatedly on several occasions while in Foster care my Family is now me and my Two sons there is no mom or sister our family experienced two deaths .

872.    I the father of the children had attended many court required - Classes such as Anger Management 3 x's, Parenting Classes, Budgeting classes, Therapy Sessions, Clinical Evaluations, and psychotherapy Evaluations. I had underwent extensive testing that had essential declared that there were no mental health diagnoses that prevented father from any interference with his ability to provide or parent ability, other classes included Nutrition Classes, and approximately 40 hours of Early childhood training services hours with Childstart Inc. in Wichita, Kansas, A one day 8 hour Domestic Violence Educational program was also completed.

873.    I have been subjected to punishment by speaking up about the agency and have even filed a Habeas corpus and it got dismissed by cinc courts. (Examples of Justice Denied).My own public

defender Michell Smith once called me a paranoid schizophrenic and said a politician can do nothing for you .Then a Judge Gregory Keith told me your letters are legal gibberish they mean nothing to me and it's taking up my time you're not co-counsel) these are the things i remember most that haunt me and remind me of the Darkness in my heart and mind I had lost my Happiness by these individuals actions.

874.    I then went To the Kansas Legislature and started talking to the people whom I believe are starting to see the need for change in the Kansas Foster Care system. I believe that i have been able to help parents and others with difficult answers to their own struggles with Foster Care System in Kansas with the support groups that I've offered for free to them Kansas Fact helps parents see the goal Family = Home. Sadly, to this day, time marches on, and I have received no answers on my own Trials and tribulations.

875.    Yet 3 years into this I have no answers to what happened and why it happened. My complaint remains with the Office of The Child Advocate Kerrie Lonard with so much meaningful time gone and No answers at this time as to if my family will get answers that does keep me awake at night and hardens my heart. I continue to look for answers that are never fully answered and help others find answers.

876.     My children deserve and desire to be in each other's lives. Alex, Lizzie, and Waylon need to be able to be in each other's lives in some form or fashion and if possible back in the home with me where they have love and a stable home and two siblings who really want to spend time that was lost. As a single father who cares for them, I completed many classes above and beyond and have submitted proof to the agency and the courts and the results I've experienced are shocking. It doesn't matter what you do the Agency has their own Agenda.

877.    So far I was given 2 Case plan goals of: Reintegration And i completed the permanency plans on those. Then sfm gave me a Permanency plan of adoption. Then I was like no I don't agree with this. It seems they want to take my children cause I'm a good parent. I have went to several attorneys and doctors and mental health professionals who have said that I've had Adjustment Disorder cause the results of cps taking my children and was cleared by a psychotherapist to have no serious mental health issues at all

878.    I have gone through every loop and the documentation of Falsifying reports tends to be a big practice sfm uses and one I never knew how deceitful they were in their lies and reports. They said many things that were not true and I tried to talk with the social workers about how they came to these conclusions.

879.    I simply can say as a man who is a father and Ordained Pagan minister, I was denied a Trial and an Appeal to the Supreme Court. When I was at pre-trial while awaiting Termination while

under Reintegration I was afraid they would take my kids cause the state only has to have clear and convincing evidence. And they set the standard for the parent to meet the burden of proof 27 pages on the states motion to terminate my parental rights

880.    This is madness and even though I worked the program I was eventually taken to unsupervised visits. Visitation Social workers Rehinna Sutherland, Melissa Cooley, Makayla Ray ,Deanna Atkinson, Chovie Adams ,Vickey Malhony all agents of Saint Francis Ministries would bother me by coming to my home residence during visits in an effort to interfere with my meaningful time with my sons  .I don't know what to do it's as if they want me to grovel at their feet i felt as if me and my children were slaves unable to run to freedom I was trapped and made  to feel uncomfortable  in my own thoughts around. I was under the impression that if I was submissive to their Reintegration plans, I would get my kids back. I guessed wrong

881.    I have talked to everyone I can think of and have discovered many things that came to light. This is happening to so many people as there is a pattern and practice of (psychopsema) with the social workers and agencies such as Casa, KFAN, and The courts used to deprive Me and my children of the opportunity to live in our home and me to raise my children full time as a single parent. I did not want Saint Francis Ministries in our life and not in our dreams either. And I never consented to the Adoption of my Daughter and my son's family] .

882.    **PLAINTIFFS RUSS & GLENDA CODY**

883.    I, Glenda Lynn Cody do solemnly swear that the contents  of this document are true and correct, that the individuals acted  unreasonable and unprofessional to be  representing someone at any  time  or  place.  I am the paternal Grandparent of Alexander Blaze Ruark-Sipult born on 08/13/2015 and his siblings Lizzie Poppy-Blaze Ruark-Sipult born 12/01/2018, and Waylon Blaze Sipult born on 08/05/2014.

884.    The individuals I am talking about are Placement Agencies Saint Francis Ministries Social workers who knowingly, intentionally and recklessly conspired to drive a wedge between the family and the siblings and their extended family within kinship placement. The name of the SFM Supervisor Melissa Cooley  also  has  used  other  names  such as   Melissa Milles , Melissa Sheppard, Also  Rehinna  Sutherland the Foster care Caseworker, Chavie Adams The family support worker ,Deanna Atkinson the visitation worker , Mikayla Ray the visitation worker.

885.    Saint Francis Ministries in Wichita Kansas Placement Agency for the Department for children and families of Sedgwick County Kansas is responsible for Several acts that could have been prevented .Instead the Agencies choose to abuse their positions of power to facilitate a hate filled agenda of various acts Harassment, Falsified reports to the courts and acts of (psychopsema) ,

prolonged intentional denial of sibling kinship placement of Alexander and Lizzie with me instead they were separated almost immediately in foster care

886.   I Knew when Melissa Cooley Threatened to remove our Grandson Alexander Blaze Ruark Sipult Multiple times .( whom was already in kinship placement with me ) For no reason just to try and control us with the threat of removing him from us his Grandparents they constantly would threaten to removing and putting him in harms way our Grandsons are Autistic Non- verbal What that means is a person who doesn't speak its known as non-speaking autism.

887.   And knowing this, she used Alexander Blaze Ruark-Sipult as a weapon to keep someone under their control she and Rihanna Sutherland which is also using a different last name now; who works under the directions of Candice Johnson ( no longer @ SFM) and Melissa Cooley. Rihanna Sutherland sent us a notice that they were going to remove Alexander from our home (on 2 occasions) I and my husband Russ Cody contacted our court appointed attorney Whitney Hobson and I stated to her if she would file a petition with the court of ( Judge Gregory Keith ) that indicates that there is an emergency situation we were granted the hearing and Melissa Cooley Attended the hearing along with Mrs. Sutherland and Saint Francis Ministries agency private Attorney My attorney (Whitney Hobson) and my son's (Michelle Smith and Peter Hagan) for Raymond Leroy Sipult Attorney and also Saint Frances Attorney whom even openly admitted that they did not believe Alexander should be removed.

888.   Even though the social workers were colluding to have Alexander removed from Kinship placement. The social workers were essentially practicing the act of psychopema. Then Judge Gregory Keith also agreed that Alexander should not be removed from our care. After that Rihanna Sutherland and Melissa Cooley also conspired to continue with their plan to remove Alexander, How you ask by getting in contact with our Kinship worker Christy Hanna and trying to get her to change her report ( intentionally falsely Official fraudulent record's to the court ) about Alexander remaining in our Home ( example of the behavior would be like asking the kinship worker to change her statements in reports to the courts). I asked Christy Hanna (Saint Francis Ministries Kinship Visitation Placement Worker ) If they were going to put his sister Lizzie in our home with his sibling Alexander as Alex was already in Kinship placement ) Christy stated Candance Johnson and her Team of Rihanna Sutherland and Melissa Cooley and Makayla Ray had stated no way they were going to do that as far as the Team was concerned she would never come back to her family.

889.   She would be placed on a website and stuck back into foster care before your family would ever see custody of her. This did not hold much comfort for me or my family. (Alex Waylon and Lizzie are all blood Siblings) I asked Christy Hanna SFM if she had any concerns for Lizzie being with her brother in the same household and she said absolutely not. These matters were never

considered in the courts though for several court hearing we always had objected to the courts not listening to the children's rights to be heard and be with family than rather with strangers.

890. She had said it was out of her hands and Melissa Cooley and Rehinna Sutherland were running the show and there was nothing else she claimed she could do.

891. **PLAINTIFF KENYA CLOUD**

892. Mrs. Duran informed me that a detective from crimes against children wanted to speak with me regarding my daughter Ahvaeah in the end she told me she never said anything about crimes against children and acted has if she didn't know what i was talking about

893. Dave Peterson conspired with the juvenile court and county welfare department to take my kids prior to requesting a well child check.

894. They gave conflicting stories.

895. Veronica Hernandez, Supervisor perjured herself and stated untrue information in order to be given the removal of my children she named bio father and bio mother as the predators.

896. Amanda Veracka, Social worker, knowingly deceived client with closing the case  also lied causing my kids to enter back in a foster home because she said the bio father was now who molested our daughter she has used the case to gain a higher position and has obstruction charger's and several battery on household member charges and her husband is a police officer who pressed charges on her in 2019.

897. Kari has a vicious raft and allows the unlicensed caseworkers and social workers to cover up their gross negligence and has covered up her wrongs. Lied about everything she told me with the home being safe and continues to inflict mental abuse on my children and refuses to give credit to a completed treatment plan gave me legal custody of my two year but took her and my twins who were never apart of the case she has allowed her worker to place false allegations to take my girls putting another case on me I have

898. Milos Marjanovic Gal failed all my children and has known my children endured some type of abuse from the foster homes they were placed in has knowledge of my five-year-old being molested in a foster home by the adopted child. I have the paper where the caseworker is admitting where and how it took place

899. Maryanne Dearchangles provided Ineffective council and altered a summons the original summons has the deputy stamped and the other is a signed in pen

900. **PLAINTIFF KEONA BRADLEY**

901.     October 5, 2020 I gave temporary custody of my children to my mother Karen Bradley due to my ill health. I was experiencing health complications from recent childbirth.

902.     March 26,2021 7pm children were removed from my mom's house Karen Bradley 1828 E. 22nd Street Wichita KS by Mikayla Russell Saint Francis Ministries with NO PAPERWORK or Warrant on an allegation of physical abuse perpetrated by Karen Bradley (grandmother).

903.     Upon investigation these allegations prove false. I was told by supervisor Monique Lovelady the kids would be returned in 72 hours. As of the date of this document (5/26/21) I have received NO paperwork, no written case plan, and no documentation. I am not certain where my children are even placed.

904.     My daughter Delightis Bradley (2013) reported to me at a visitation at Saint Francis Ministries in the presence of SFM workers, that she was touched in her private area on the date of 3/16/21 at a foster home in Hutchinson Kansas and SFM worker Candace Johnson told me NOT to report this to the police. I made a police report in Wichita K

905.     21C015755 Detective Daniel Ribble 316-660-9457 daniel.ribble@sedgwick.gov and reported to DCF Hutchinson location and assigned to worker Bobby Jermera 620-860- 7336. Upon follow up Bobby Jermera did not follow up on investigation and abruptly quit the agency. The case was passed to Trevor Sandell (james.sandell@ks.gov) and Elisha Guest (elisha.guest@ks.gov). Trevor claimed in an email to Private Detective Kelly Patton that "a forensic interview was done, and she denied any kind of sexual touching denied anything sexual happened. Spoke with siblings that were in their residence they denied anything happened. Interviewed both foster parents that were in the home and they denied anything happened. I spoke with Jammer [sic] and he sent me the law enforcement emails saying that they would investigate it if there was confirmed sexual abuse and there wasn't so complete everything.

906.     Ashton Gillett Wichita DCF worker was assigned to conduct a courtesy interview. She did a forensic interview with Delightis Bradley the little girl and the girl [sic] did not say any [sic] about any sexual acts just that she was afraid of the Dog. There was no discloser of any sexual abuse.

907.     According to St. Francis all the children have been placed in foster homes in Wichita. From speaking with St. Francis they were only there one or two nights then moved to a more permanent placement. I'm currently waiting for her notes and logs. Email by Trevor Sandell 4/1/21 to Detective Sergeant Keaton Berger #413 Reno County Sheriff's office 206 W 1st Hutchinson, KS 67501 620-694- 2735

908.     4/1/21 email from Kelly Roepka DCF (kelly.roepka@ks.gov) responds to Detective

116

Mass Tort Claim for RICO Fraud

1    Berger that no sexual abuse was disclosed.

2    909.    4/1/21 email from Detective Berger "thank you for the information. I will file this case
3    away then."

4    910.    According to my daughter Delightis (victim) and my other daughters Iceland and
     Diamond that witnessed the incident they have NEVER been questioned by any social worker or law
5    enforcement about what happened to Delightis at the foster home in Hutchinson KS on 3/16/21.

6    911.    ***PLAINTIFF KRISTEN CLARK-HASSEL***

7    912.    Hassell, Travis Collusion, 3 years of tax fraud, felony forgery of my signature over
8    $50,000, conspiracy to do theft by taking over 11,400 with Meredith Rowland, slandering, domestic
9    violence, abandonment, falsifying CPS reports, conspiracy, child abuse 7 counts, child neglect 7 counts,
     child abandonment 8 counts, spousal abandonment, falsifying police reports (VA, GA, AR), deformation
10   of character, trying to sell a car illegally to Elissa Patterson, parental alienation, intentional infliction of
11   emotional, mental, and financial stress, fraud, perjury, kidnapping, contempt of court on the $11,400 plus
     child support in October 2018, terroristic threats, harassment, intimidation, bullying, stalking
12

     913.    Rowland, Meredith-Collusion, Conspiracy, conspiracy to commit a felony, conspiracy to
13   falsifying 4 court reports, falsified 4 court reports, perjury, unethical relationship with my ex-husband
14   Travis Hassell but husband at the time, breach of confidentiality, intentional infliction of emotional,
15   mental, and financial stress on myself, Rick Cunningham and all 8 children, threatened my children,
     deformation of character, slandering, intentionally to destroy my character to Judge Green lied about me
16   threatening her life, *ex parte*, perjury, withholding evidence in report that would change outcome of
17   divorce/custody case and DFCS case, intentional parental alienation with Isaac and Elizabeth Hassell,
     endangering my 8 children, financial fraud, food stamp fraud (illegally stopping it), Medicaid fraud
18   (illegally stopping it), identity theft, stalking, harassment on myself, Kaleb, Jeth, Nathan, rick, Kate,
19   Helen, Vicki, Val, Val II, attempted forced entry into home with Jeth and myself, threatened Jeth, Kaleb
20   and Nathan with Juvi, threatened Jeth with jail, threatened me with speaking to the judge if I did not
     cooperate during an active hurricane, intimidation, bullying, stalking, religious discrimination, violation of
21   oath of office

22   914.    Name Last, First Gonzalez-Oganawski,

23   915.    Collusion, perjury, threatened Jeth with jail, Kaleb and Nathan with juvey for obstruction
24   of justice for withholding information they did not have, intimidation, bullying, harassment, stalking,
     attempted forced entry, falsifying court reports multiple , withholding evidence, slandering, deformation of
25   character, fraud, intentional infliction of emotional, mental, and financial abuse/stress, cruelty, religious
26

27

28

discrimination, violation of oath of office

916.   Judge Orville Green, Orville (Brent)

917.   Religious discrimination, withholding evidence(email from Meredith Rowland GAL), allowing ex-parte, allowing me to be revictimized, collusion with DFCS/Jim Chamberlain and all parties involved with the plaintiffs side, violation of the following Amendments of the US Constitution 1st,4th,5th, 6th, 7th, and 14th, (signing off on documents without reviewing appropriately) "biased", not allowing evidence that would change the outcome ,, violating oath of office

918.   Laurie Morton - Collusion, unwarranted entry, intentional infliction of emotional, mental, and financial stress, Social Security fraud, perjury, intentionally withholding my children from being returned to me, intentionally adding to case plans when already completed to withhold children, falsifying multiple court reports, malicious perjury, religious discrimination, slandering, falsifying court reports, fraud, terroristic threats, bullying, harassments, stalking, 9 counts of child endangerment, falsifying drug test, tampering with evidence, withholding evidence, violating oath of office

919.   Jim Chamberlain - Collusion, falsifying court reports, intentionally withholding evidence, ex parte, slandering, defamation of character, intentionally going against DCFS policies and regulations, not abiding by Families First Preservation Act signed into law by President Trump, not sharing witness list to my attorney or discovery info until during active court proceedings, "good olé boy system" with Judge O.B. Green, GAL Michael Perry and GAL Meredith Rowland also Travis Hassell, Claudia Stroud, Laurie Morton, Elissa Gonzalez- Oganawski, Victoria Sevilla, Shay Fullmer, all in collaboration with everyone, violating oath of office.

920.   ***PLAINTIFF ELIZABETH ANDREWS***

921.   In April of 2019 Charles Donald a CPI investigator removed my children from the hospital without a court order or even notifying me there was alleged abuse I found out 3 days after my kids removal the allegations and that my kids were placed in emergency shelter Charles Donald spoke to my kids without me present or without notifying me first I was informed the night before the shelter hearing at approximately 8 p.m. that I needed to be here in Bay County at the courthouse at 7 a.m. for the emergency shelter order which also happened to be the day of Good Friday and all courthouses closed due to national holiday. My case was out of Calhoun County not Bay County. Charles Donald failed to make any and all efforts to prevent removal. He never did a home study nor did he ever meet.

922.   Charles Donald, investigator, violated my 14th and 4th amendment rights among others. He Removed children without a court order or doing a proper investigation, falsified documentation, spoke to my children without my permission or me present and violated confidentiality law

923.    I was wrongfully accused as allegations were proven false through cpt team and still wouldn't let my children come home because of their abuse of power and process, breaking of the social workers code of ethics, sharing Biased opinion and lak of accountability for handling my case unfairly. Tonya Harrison denied my right to due process in her abuse of power and violated my 4 and 14th amendment rights. She Broke the social workers code of ethics when she deliberately falsified documents.

924.    She had biased opinion and intentionally handled my case unfairly. She gave my children's social security cards to foster parents. Did not follow judges orders and alienated me from my kids resulting in emotional pain, suffering, and mental anguish.

925.    **PLAINTIFFS WILLIAM AND EMILY O' DELL**

926.    We are the parents of Gwendolyn, Parker and William (Liam) O'Dell.

927.    This Declaration is being written in support of a motion to return our children to their rightful home – with us their parents. This is in reference to case number: 2019-1827-3

928.    On May 23rd, I took my daughters Gwendolyn and Parker to school for Aloha day. Same as usual without issue. Took my wife Emily to work in Dallas with Liam in the backseat. Liam was so good on that 4-hour trek that I felt it necessary to treat him with Dairy Queen. I left to pick up the girls at 3:20 pm to arrive at the school as it let out at 3:25pm. When I was approached by CPI Erika Jackson. Mrs. Jackson informed me she interviewed my Children but did not state that there were witnesses or that it was recorded.

929.    I was never informed prior to the interview that my children were interviewed, credentials were not properly displayed and no court order was present. My children were detained by CPI Mrs. Jackson after the interview with myself and a phone interview with my wife. In which Erika was very rude and condescending.

930.    I was never informed of the allegations as to why I was being interviewed or why my children were being detained. She only called her supervisor and informed me that it "is a removal." After the interview and during the interview I noticed that there was no recording that was being performed. I noticed this because no recording equipment was present during my interview to even suggest that my children's interview was even recorded.

931.    Law Enforcement was not present until the very end of the process that day. I arrived at the school at 3:25 and left at 5:36pm. Law enforcement was not there until I went to say goodbye to my children to which Gwendolyn made it clear she did not want to go with anyone else. As per TFC 261.105, 261.301(f)-(h) & TFC 261.3011 It is my belief that if she suspected the children were under

physical abuse then law enforcement should have been contacted immediately to perform their own investigation and for them to be there during the children's investigation as part of their investigation of these allegations. This is the first of several failures on Erika Jacksons part. With that said there was no Court order for the removal of my children and I felt strongly armed into giving my children up to the state.

932. Afterwards when she released me and I got to my car, Erika called me back to give me a receipt for the removal in which she needed help to fill out. This was the only time that I saw another CPS official in the office. I felt at this time that Erika was new and should have been shadowed as part of this process to make sure no foul play was committed on her part. Since she was alone, no court order was present, and no recording was performed it left Erika to pretty much make any allegation that she felt necessary to make the situation seem as if Exigent circumstances were present. Which there were none.

933. At the first visitation in Temple, TX Gwendolyn stated to CPS/HST Stephanie (last name unknown) that "Daddy would never hurt us." It was documented but never acknowledged. I had only learned about the allegations upon receiving the first affidavit on June 3rd for the hearing on June 6th, 2019. As Erika Jackson Denied informing me of my allegations twice prior.

934. Also, in the affidavit Mrs. Jackson stated she came to the house then went to the school. She called the state of our house to be "In Chaos." But when called to the stand she stated that she only went to the school. Which leads me to believe that she lied under oath or the court documents.

935. At that hearing there was no evidence produced from CPS other than photos to which articles of discovery were thrown out because CPS and the attorney failed to follow those protocols. We were informed of the family plan over a month after that hearing and started right away once we received it and have been compliant ever since.

936. On November 1st we learned of new Allegations from Mrs. Kimberly Witt our case worker to the effect of Sexual Assault. She did not recommend any actions except the polygraph but claimed it may not be admissible.

937. On November 14th we received the new affidavit for the Nov 19th hearing. In it we found the true context of the

938. October 28th and even though Mrs. Witt visited our house on October 25th, the first and only monthly check-up on us to date, we were never informed until a total of 30 calendar days later. The evidence received in the affidavit suggests that spoliation took place through withholding the evidence of the report from Andrew Thompson with the Brett H. Pritchard Law Firm. Andrew did not receive

1    notification and did not receive the information until he received the affidavit on November 5th.

2    939.    At the November 19th hearing we were blindsided with this once again with which Mr.
3    Price called Emily to the stand and proceeded entrapping my wife to make statements leading against or
     to incriminate me.

4
     940.    When questioned by Mr. Thompson, Mr. Price looked up Rule 504 over spousal
5    privilege and stated that in section 4 in criminal proceedings my wife is subject to cross- examination. He
6    failed to state that in subsection C (i) it states that in civil proceedings that the allegations (if proven) lead
     to a Criminal case the exemption stands and Emily would then be legally subject to cross-examination
7    under that rule, Which leads me to believe that once again a violation occurred.

8
     941.    During the questioning by Mr. Price, Emily exercised her 5th amendment right stating, "I
9    plead the fifth." Judge Mundkowski stated, "It doesn't work like that, you have to answer the question,
10   better yet, I order you to answer the question." This was appalling and damaging to my wife's character
     and emotional stability as it was a blatant attack by the judge to force her to answer a question even
11   after she was told she could invoke the fifth amendment on any question she deemed unfit to answer.

12   942.    CPS has claimed coaching of Gwendolyn and Parker by the Paternal grandparents
13   Mark and Teresa O'Dell. The paternal grandparents had no knowledge of these allegations until Nov 4th
14   and after they reported suspicious activity on the part of Cynthia, Gary and Katherine Snodgrass. After
     Mrs. Witt spoke to Cynthia about the reported concerns, Gary Snodgrass called and informed Mark and
15   Teresa five days later, on Nov. 10th, that they are discontinuing their visitations. To this we believe that if
16   there is no wrongdoing or anything to hide, then this retaliatory action should not have taken place.

17   943.    Mark and Teresa were unaware of the new allegations until Nov 4th and the second
     forensic interview until the new affidavit was received on Nov 14th. At this point in time CPS has
18   claimed, on several occasions, that they have evidence but have not produced tangible evidence to any
19   of the allegations at this time but have been persistent on pursuing corrective actions based on hearsay.

20   944.    Activities have happened in the foster home with "Big" Boys. Included in my video
21   recorded evidence Parker and Gwen have mentioned names of three of those boys. On Tuesday
     January 14th, 2020, it was confirmed that there is no recording of the interview Erika Jackson had with
22   my children. This was the second confirmation and was confirmed by Detective Miller with the Waco
23   Sheriff's Dept. The first confirmation was from Kyle with the DFPS Office of Consumer Relations. Upon
     research this is a clear Violation of Texas State regulations of first TFC 261.311 not informing me that
24   my children were interviewed and TFC's 104.002 & 261.302(e). She failed to record and/or provide
25   reason as to why the interviews were not recorded.

26

27

28

Mass Tort Claim for RICO Fraud

945.　　Throughout this case Mrs. Kimberly Witt has stated that children do not lie. When I placed a complaint based on a recorded statement made from Parker regarding abuse from Gary Snodgrass made with the Nevada CPS office and Las Vegas Metro police Abuse and Neglect unit. I forwarded audio evidence to all parties, including Mrs. Witt. Two days later I was informed by Mrs. Witt that the children said they lied, and that the investigation was being dropped. If children don't lie and that there is tangible evidence, why drop the case? To this it is my firm and sound belief that CPS is choosing what they want to investigate and ignoring pertinent evidence that shows that the children are in possible danger and neglecting their safety as conservators of my children. I feel due to this a motion to dismiss this case is necessary.

946.　　This has made me aware and fearful that my daughter may have been subject to this kind of violence under CPS care to which has prompted me into contesting these and all previous allegations.

947.　　On July 15th 2020, we started our final hearing that was geared and modeled towards Termination of my parental rights. Initially it started out as such with all testimonies defaming my character and the character of my wife. Cynthia Snodgrass testified that Emily O'Dell was unable to determine how to keep the children safe or care for the children properly as she was unable to determine a suitable "Boyfriend" and that I was narcissistic.

948.　　Gary Snodgrass on the other hand testified that the children "Lie all the time" about hitting, kicking, pinching, and biting each other. Once again CPI Erika Jackson perjured herself on the stand when she stated she went to the school, then our home and back to the school. Kimberly Witt testified that there was no evidence of maltreatment of the children and was backed by a forensic interview performed by the Las Vegas Metropolitan Police Dept. She further noted that there were two forensic interviews but when she attempted to get another one performed LVMPD declined and informed her that no prosecution would follow. Suggesting innocence.

949.　　On July 16th, LCSW Hannah Hartman testified that she was not a licensed therapist but in fact an intern. When asked how False memory could occur, she testified and confirmed that it can be caused by repetitive questioning, speech around the victim and gaslighting. During this day of proving no evidence of maltreatment.

950.　　On August 3rd 2020, Final day of the trial I was on the stand to continue my testimony. After several questions and what I would determine hostile prosecution, I testified to the truth even after the prosecution trying to twist the story around. Emily Testified that she in fact did believe the children that they were sexually and physically abuse but only in the foster home and not by myself. During Emily's testimony it was once again brought up about the video regarding Parker who stated the sexual

Mass Tort Claim for RICO Fraud

abuse and who committed it at the foster home in Austin. We played the video as it dictated to the court exactly where, who and what the children were taught. Our witnesses testified to the care and love that Both Emily and I gave to our children and the great care for their safety which was paramount in these witness testimonies. After all testimonies and closing arguments, where our attorneys stated the Department has not met clear and convincing and had a Lack of Evidence to support the allegations against me. Judge Nikki Mundkowsky adjourned the trial stating it would take her a few days to go over the case and report her judgment.

951.    August 4th, 2020, We received the final judgment via email through our attorneys stating our Parental rights were terminated on two basis', one being that we failed to keep the children safe or engaged in unsafe behavior; endangering the children's safety, two being that we did not complete the required safety plan which is a form of servitude or exploitation. This ruling was based clearly on hearsay as will be proven upon submission of the Transcripts from the final hearing and the submission of several other KEY articles of evidence that were submitted for the final hearing.

952.    This ruling based on hearsay is a clear attack on the constitutional rights of our family and a blatant act of treason as we are not the first family this has happened to. To rule on hearsay goes against any and all basis of our Constitution and violates the sanctity of the Nuclear Family structure as granted in our most basic and fundamental of rights.

**953.    PLAINTIFF SALLY BORGHESE (See Attached Exhibit 1)**

**954.    PLAINTIFF JESSICA KIRBY (See Attached Exhibit 2)**

**955.    PLAINTIFF KRISTINA SINGLETON (See Attached Exhibit 3)**

**956.    PLAINTIFF DEANNA ROBINSON (See Attached Exhibit 4)**

**957.    PLAINTIFF KESHIA HOLLIMAN (See Attached Exhibit 5)**

**958.    PLAINTIFF AMANDA HUNT (See Attached Exhibit 6)**

**959.    PLAINTIFF ALAN MEDDOWS (See Attached Exhibit 16)**

**960.    PLAINTIFF LATASHA WOOLRICH (See Attached Exhibit 7)**

**961.    PLAINTIFFS JOY TYLER and ROBERT LISBY JR. (See Attached Exhibit 18)**

**962.    PLAINTIFFS – SEE LIST OF people who want to submit their affidavits later**

**(See Attached Exhibit 8a-e)**

E.    CAUSES OF ACTION

**FIRST CAUSE OF ACTION**

**Violation of Civil Rights Under 42 U.S.C. § 1983**

AGAINST DEFENDANTS et al.

74. Plaintiff re-alleges the Common Allegations of Fact as if fully set forth herein.

75. Plaintiffs indicate in these facts that county agents came to their home without a warrant and entered using coercion and force. This **Intrusion Upon Seclusion** is a violation of the first amendments right to privacy because one has an expectation of privacy and seclusion in one's own home.

76. Defendants prevented Plaintiffs from speaking with their children freely by monitoring their visits and telling parents what to say and not to say. They also took away visits if Plaintiffs expressed too much emotion or talked to their children truthfully about why they could not be together. This is a suppression of the **First Amendment Right to Free Speech**.

77. Defendants prevented children from communicating their true feelings and wishes with the court. On all occasions, children wished for the court to terminate jurisdiction and expressed this by crying and saying they wanted to be returned to their parents; however, the court suppressed this information and the children's right to free speech.

78. Juvenile court judges and social workers conspired to prolong "dependency investigations" as a form of SLAPP or Strategic Lawsuit against Public Participation. Parents were told they could not discuss their case with anyone or criticize the court or agency. Judges issued gag orders while social workers and public defenders threatened parents that if they spoke out about the abuse they were experiencing, they would be sanctioned, thrown in prison, or would no longer get to visit their children.

79. "Violation of **First Amendment** Right to Privacy, Familial Association, Due Process, Free Speech and to be Free of Cruel and Unusual Punishment"

80. Chilling free speech and expression. SLAPP

81. Slander, Libel, False Light, Defamation and Perjury, False Statements

82. Sharing of Private Information by passing around case files.

"Violation of **Fourth Amendment** Right to be Free from Search and Seizure"

83. Children were seized and detained from parents.

"Violation of **Eighth Amendment Right** to be Free from Cruel and Unusual Punishment" by way of False Arrest, False Imprisonment, and Emotionally Torture and Cruelty from being separated.

84. "Violation of **Fourteenth Amendment** Right to Due Process and Familial Association"

85. Plaintiff is informed and believes, and thereon alleges that the right to familial association guaranteed under the Fourteenth Amendment is **"clearly established"** such that a reasonable social worker in defendants' situation would know it is unlawful to remove a child from the care, custody, and control of her parent without good cause. In addition, there is a clearly established due process right not to be subjected to accusations on the basis of false evidence that was deliberately fabricated by the government, such that a reasonable social worker in the situation of the ___SOCIAL WORKER DEFENDANTS and DOES 1 through 50, and ___SOCIAL WORKER DEFENDANTS and DOES 50 through 100 would know it is wrong to lie, fabricate evidence, and suppress **exculpatory evidence**.

86. Plaintiff realleges paragraphs 1-71 and incorporates them herein as though fully set forth.

87. Defendants deliberately failed to provide reasonable efforts to prevent removal of children or place them in the least restrictive setting possible – this is contrary to the best interest of children, harmful to families, and in direct opposition to statutory requirements.

88. Defendants failed to provide reasonable efforts to reunite families because they had conflicting interest and partook in self-dealing by placing children in situations that increased more access to funds.

89. Commencing from approximately [year], and continuing until the present time, Defendants, and each of them, were acting under color of state law when they acted, agreed and/or conspired to unlawfully examine, investigate, threaten, and make false reports resulting in the removal of the minor child from the custody of Plaintiff. Defendants, and each of them, did so without proper justification or authority, and without probable cause. Further, Defendants' actions were taken with deliberate indifference to Plaintiff's rights, and without regard to the truth or falsity of the evidence presented to the court.

90. Defendants, and each of them, maliciously conspired to violate the civil rights of Plaintiff, including violation of Plaintiff's rights found in the _Fourteenth Amendment of the United States Constitution_, by, but not limited to, removing, detaining, and continuing to detain, [minor child] from the care, custody and control of her mother, Plaintiff _, without proper or just cause and/or authority; by the use of coercion and duress to obtain, manufacture, and conceal evidence and testimony; and by maliciously falsifying evidence, and presenting fabricated evidence and perjured testimony to the court, and maliciously refusing to provide **exculpatory evidence** during the pendency of the **dependency** proceedings in violation of _Government Code section 820.21_, and violating the Constitutional rights of Plaintiff.

91. By these actions, Defendants, and each of them, interfered and/or attempted to interfere with Plaintiff's constitutional rights to familial association under the Fourteenth Amendment, as well as those rights under applicable California Law rising to the level of a constitutionally-protected right.

92. As the direct and proximate result of the Defendants' actions, Plaintiffs have suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs and expenses, including those authorized by *42 U.S.C. § 1988*, to an extent and in an amount subject to proof at trial.

93. Defendants Federal Agents and their respective entities, co-conspirators, are vicariously responsible for the conduct of the Federal Agents, State Agents, and Municipal Agent DOES under *Government Code section 815.2* and applicable other statutory and case law.

94. DEFENDENT GOVERNMENT LEADERS inclusive, acted with malice and with the intent to cause injury to Plaintiff, or acted with a willful and conscious disregard to the rights of Plaintiff in a despicable, vile and contemptible manner. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing said Defendants, and to deter them and others in the future.

95. 42 U.S. Code § 1983 provides as follows: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."

96. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); Flagg Bros. v. Brooks, 436 U.S. 149, 155 (1978); Gomez v. Toledo, 446 U.S. 635, 640 (1980).

97. In this lawsuit, Plaintiffs aver that their Fourteenth Amendment rights under the United States Constitution were violated by Defendants. Section 1 of the Fourteenth Amendment provides as follows: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

98. Plaintiffs were deprived of the **_familial right of association_** embodied in the concept of liberty in the Fourteenth Amendment without due process. "Today we hold that the Due Process Clause of the Fourteenth Amendment demands more than this. Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." Santosky v. Kramer, 455 U.S. 745 (1982). For all Plaintiffs in this lawsuit, it was not proven that it was in the best interests of the minor child(ren) to terminate the parental rights of Plaintiffs. In that regard, their child(ren) were unlawfully taken from them without due process.

99. In United States v. Classic, 313 U. S. 299, 326 (1941), the U.S. Supreme Court held that a person acts under color of state law only when exercising power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." The parental rights of Plaintiffs clothed under their Fourteenth Amendment were terminated by state employees acting under the authority of state law.

100. Defendant county agents placed children in the most restrictive environment when the law says they should be in the least restrictive environment

### SECOND CAUSE OF ACTION

Conspiracy Against Rights Under 42 U.S.C § 1985(3)

101. Plaintiffs incorporate by reference Paragraphs (105-350) of this Complaint as if set out in full herein.

102. 42 U.S. Code § 1985(3) states as follows: "*If two or more persons in any State or Territory conspire **or go in disguise on the highway or on the premises of another**, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.*"

103. Plaintiffs aver that there was a conspiracy to deny them equal rights granted to them under the Fourteenth Amendment of the U.S. Constitution. The conspiracy involved using false written statements and affidavits as well as presentation of perjured oral testimonies in court.

104. 18 U.S. Code § 1621 provides that: "Whoever (1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or (2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States." In all instances, all statements were known by the Defendant to be materially false and were made under the color of state law.

105. The plaintiff refers to and incorporates, as though fully set forth herein, Paragraphs 1-26, inclusive of the complaint. The above-listed defendants have a policy, custom and pattern of practice, and act under color of law in their capacities **as employees** for local, county and state public entities, and on a daily basis falsify reports, to engage in acts of abuse of process, to

defraud the general public by **filing false reports** in the juvenile courts for the County to justify excessive expenditures of taxpayers' money and to fail to notify the courts as to the truth of matters which is that, the circumstances that brought the family to the attention of the court has been resolved, vastly improved, completed the reunification plan, or that there was no real detriment to begin with, and that the children are safe to return home.

106. Defendants conspired to deprive plaintiffs of their constitutional right to bring up their children without governmental interference and their right to bring up their child in general. Defendants and each of them, knowingly and willfully conspired, "acted in concert" and agreed among themselves to damage the Plaintiffs by depriving them of the privileges and rights within the Constitution of the United States of America.

107. Defendants also conspired to leave children in abusive situations and covered up real abuse, in order to give rise to situations that would justify the need of an increased budget. These children were used as sacrificial lambs to boost statistics and show, "the dangers of what could happen if children were returned to their birth parents in general." The scheme involved deliberately placing children with abusers and deliberately failing to prosecute the abuser, despite evidence that they were the offending parent. This conspiratorial practice created the perfect storm of situations where the court and agency could continually be involved for longer periods of time. This is state created danger and state created rhetoric. (Exhibit 15)

108. Although, Plaintiffs do not have to allege every aspect of how the conspiracy was carried out, they have alleged with specificity the nature of the conspiracy. Plaintiffs hereby allege that EACH DEFENDANT "CAUSED" and "PARTICIPATED IN" the acts or omissions regarding the facts herein alleged either by "direct conduct, neglect or conspiracy".

109. Plaintiffs re-alleges paragraphs 1-80 and incorporates them herein as though fully set forth. Defendants, and each of them, acting under color of state law, conspired to deprive, and did deprive, Plaintiff of her rights under the laws of the United States.

110. Specifically, Defendants conspired to, and did act, agree and/or conspire to unlawfully examine, investigate, threaten, and make false reports resulting in the removal of the minor child from the custody of Plaintiff. In addition,

111. Defendants, and each of them, conspired to use trickery, duress, fabrication and/or false testimony or evidence, and failed to disclose exculpatory evidence in preparing and presenting reports and court documents to the court. The conduct of Defendants, and each of them, interfered with Plaintiff's rights, including the right to familial association free from government interference as guaranteed by the Fourteenth Amendment of the Constitution of the United States.

112. Defendants, and each of them, engaged in said conspiracies for the purpose of depriving Plaintiffs of equal protection of the laws of the State of California and of the United

States, and depriving them of their rights under the Constitutions of the United States and the State of California.

113. Defendants, and each of them, took several acts in furtherance of the conspiracy, including but not limited to, acting, agreeing and/or conspiring to unlawfully examine, investigate, threaten, and make false reports resulting in the removal of the minor child from the custody of Plaintiff; and by procuring false testimony, fabricating evidence, and failing to disclose exculpatory evidence in preparing and presenting reports and court documents to the court in relation to [minor child's] dependency proceedings.

114. Plaintiff did in fact suffer the deprivation of numerous rights granted to citizens of the United States, including those under the Fourth Amendment that protect against unreasonable seizure, and those under the Due Process Clause of the Fourteenth Amendment, which has been interpreted to protect the fundamental liberty interest of familial relations.

115. As the direct and proximate result of the Defendants' actions, Plaintiff has suffered, and will continue to suffer, physical, mental, and emotional injury, all to an extent and in an amount subject to proof at trial. Plaintiff has also incurred, and will continue to incur, attorneys' fees, costs, and expenses, including those authorized by 42 U.S.C. section 1988, to an extent and in an amount subject to proof at trial.

116. On information and belief, DEFENDANTS BY WAY OF THEIR SUB-CONTRACTORS SOCIAL WORKER DOES, acted with malice and with the intent to cause injury to Plaintiffs, or acted with a willful and conscious disregard to the rights of Plaintiff in a despicable, vile and contemptible manner. Therefore, Plaintiff is entitled to an award of punitive damages for the purpose of punishing DEFENDANTS for their actions as individuals, inclusive, and to deter them and others in the future.

117. Defendants are vicariously responsible for the conduct of other defendants inclusive, under applicable statutory and case law.

## THIRD CAUSE OF ACTION

**Neglect to Prevent under 42 U.S.C. §1986**

**Defendants JOE BIDEN, KAMALA HARRIS XAVIER BECERRA, MERRICK B GARLAND, GOV. GAVIN NEWSOM, FRMR GOV. JERRY BROWN, GOV. GREG ABBOT, GOV. SUSANA MARTINEZ, United States Asst. Secretary for Children and Families, Department of Health and Human Services ET AL.**

118. Referring to the actions in paragraph 121

119. Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or

aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

120. Defendant Assistant Secretary for Children and Family Services continues to give billions of dollars to a system which fails to meet statutory requirements. Instead of not receiving any more Title IV funding, partnering states and communities continually get increased when they fail. Please see management scope in Exhibit 15 which indicates that the budget is currently $53 Billion dollars, yet not on the objectives have been achieved. Why would they ever change is failure is being rewarded?

121. Having stated a claim under the section 1985 above, the Plaintiffs therefore qualifies to state a claim pursuant to section1986. *McCalden v. California Library Association*, 955 F.2d 1214, 1223 (9th Cir. 1990)

122. Section 1986 imposes a good Samaritan duty on the defendants coupled with the strongest affirmative action duty for the enforcement of the 14th amendment rights and requires that the state officials in knowledge of the discriminatory nature of the family court procedures and the Department of Health and Human Services policies that intentionally inflict harm to families, must act to mitigate such harm from continuing.

123. The plaintiffs allege that the defendants had a "meeting of minds" to deprive the plaintiffs of their constitutional rights based on class and racial discriminative motives as the agents, social workers and judicial officials often target the poor, minority, and republic voting families to push forward their agenda of re-education, by defrauding the taxpayers of their dollars by pushing the children from these families through the foster system as alleged in the section 1985 claim above.

124. The Defendant Joe Biden, being the head of the federal government and the Head of State, has stood by idly, despite his advance knowledge that the defendant Xavier Becerra, the USDHHS, Merrick Garland, Gavin Newsom, related state officials and the United States Department of Justice violates the Fourteenth amendment rights of the plaintiff and all the members of the class and the American parents and families at large though their discriminative policies and practices. The President by overseeing the passage and the implementation of

polices that deprive these groups of their rights to equal protection of the laws is liable pursuant to the section 1986.

125. The violations continue to target minorities and social classes throughout the president's term in office. Xavier Baccara and Garland Merrick and the federal institutions they head are unrestrained despite the onslaught of politically motivated removal and termination of parent's rights using threats of imprisonment and assault of parents and wrongful death that emanate from the authorities and personnel under the defendants' authority and control.

126. The defendant Merrick Garland has failed to hold accountable and or, prosecute officer of the court even in cases where it is clear that they conspire against rights of parents by fabricating evidence, making falsified representation to court and Judges when they collude with police officer in order to deny this groups of parents and their children the equal protection of the law.

127. Under this claim the plaintiff must not show that the defendants themselves are not conspirators under 1985. The American civil right laws create liability when the defendant neither personally committed the neglect or engaged in a conspiracy to limit the plaintiff equal protection of law, nor acted with discriminatory intent. A negligent failure to protect by a state actor with the knowledge of section 1985 conspiracy and power to protect its victims is actionable.

128. The defendants and related state agents by reasonable diligence, through their offices and resources funded by the public for such purposes could have prevented the willful persecution of families. But, the defendants neglected and refused to prevent the actions and omissions leading to the physical and emotional injury to the plaintiffs and their children and to damage to their property. The defendants and related agents are therefore liable to the parties injured.

129. DEFENDANT paid their sub-contractors Title IV funding even when they did not comply with statutory requirements – this represents a failure to discipline. This behavior also defeats the purpose of creating the statute because even when it is not followed, there is no consequence (See Exhibits – 10-11-13).

130. Example Auditor's report Exhibit 10 shows that even when more money is given, the systems do not correct the deficiencies.

## FOURTH CAUSE OF ACTION

**Monell Related Claims**

**Defendants – Los Angeles County California, Sebastian County & Scott County Arkansas, Washington County Ohio, Kent County Michigan, Oakland County Michigan, Sedgwick County Kansas, St. Mary's County Maryland, St. Johns County Florida, Bernalillo County Albuquerque New Mexico, McLennan County Texas, Camden and Laurens County Georgia, Bell County Texas, Alleghany County Pennsylvania, et al.**

### Law Enforcement Misconduct, Excessive Force, False Arrest, False Imprisonment, Abuse of Process, Intentional Infliction of Emotional Distress, Sexual Abuse, Wrongful Death, and Malicious Prosecution

#### 131. Law Enforcement Misconduct

132. Plaintiffs allege law enforcement misconduct by the Defendants who are mandated to enforce the laws enacted to protect children, families abuse victims and trafficking victims from abuse. The abusers have used their arbitrary positions to further inflict harm on the victims and to scare them into silence when they want to come out and seek help.

133. The reason for the law enforcement misconduct has been attributed by the Plaintiffs to be negligence from the side of the Defendants who did not practice due diligence when hiring the agencies' personnel. They also did not take time to train these people, nor do they hold them accountable when complaints are brought against them.

134. The Supreme Court held in Monell v Department of Social Services that municipal entities are subject to § 1983 liability, but not on the basis of respondeat superior. This means that the officer in breach of his duties will be liable for his actions solely. The municipal will not be liable for hiring an employee who became a constitutional wrongdoer.

135. However, since the municipality in this case did not perform due diligence to hire competent people for these positions and has not taken seriously complaints made against these officials it will be held liable for harm caused to the victims, children and families.

136. Law enforcement misconduct opens the doorway for the violation of several human rights and freedoms secured under the Fourteenth Amendment Rights.

137. The Plaintiffs have alleged that the officers in the agencies have bullied them into silence when they try to report abuse. These officers have also failed to help victims of abuse to come out of their environment of abuse to safer places.

#### 138. Excessive Force

139. Excessive force is the unreasonable use of force in a particular situation.

140. The Plaintiffs have alleged the use of unreasonable force by the state officials and even the police in handling their cases. The Plaintiffs aver that there are times they have been forced into signing consent forms that determine their parenting plans or reunification plans. The force came in form of threats which left the Plaintiffs with no choice other than to consent. The motive of the State officials was to use the consent forms to fulfil their illegal monetary desires and breach the contract immediately after they receive what they want thus leaving the parents or families without redress.

141. The Plaintiffs also describe scenarios where the state officials and police arrive at their place of residence and forcefully carry away their children. They have also been forced into enduring unfair treatment from these officials for a long time as they have nowhere to report.

142. The force applied has led to serious injuries to the children and their parents which is a violation of their 4th Amendment Rights and 8th Amendment Rights and consequently their 14th Amendment rights. The fourth amendment rights provide that each person is free from unreasonable searches and seizures. The Due Process Clause under the 14th Amendment right protects pretrial detainees from excessive force that amounts to punishment. The Eight amendment rights secures citizens freedom from cruel and unusual punishment.

143. State officials are subject to § 1983 lawsuits when they use unreasonable force to handle people. In determining whether the rights under the Fourth Amendment apply the court will look into the reasonableness of the force applied.

144. Plaintiffs have alleged that the police officers sometimes came armed to collect the children from their homes. There has also been physical force used on parents to make them sign consent documents. Children have also undergone some form of force, for instance, threats, to stop them from reporting abuse. This is an unreasonable force that violated their Fourth Amendment Rights.

145. In Graham v Connor, the Supreme Court looked into the objective reasonableness applied by law enforcement officers. The Supreme Court held that all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach. Therefore, State officials are subject to § 1983 lawsuits and are liable for breach of the Fourth Amendment rights when they use excessive force when enforcing an order or when they want to coerce a person to do something.

### 146. False Imprisonment

147. The Plaintiffs aver that they have been threatened with imprisonment for refusing to hand over their children to strangers. Children have also been placed in the most restrictive environments when taken away from their parents and their homes.

148. False imprisonment is used interchangeably with unlawful imprisonment and happens when a person intentionally restricts the movement of another without legal authority, legal justification or the consent of the person being detained.

149. The Plaintiffs have had endure the harsh treatments and conditions when their children have been detained by the State officials without warrants or court orders. It is not in the best

interest of a child to keep them separate from their parents. It certainly is cruel to take a newborn child from their mother and detain them for prolonged periods of time without justified cause.

150. The Plaintiffs (Parents) have themselves been detained for questioning, to be threatened, for investigation, examining or search without proper warrants or court orders.

151. These amount to a violation of the Eight Amendment Rights which provide the right to be free from cruel and unusual punishment. Falsely imprisoning parents and their children or threatening to do so amounts to cruel and unusual punishment. It is also a violation of their Fourth Amendment Rights which protect them from unlawful and unreasonable search and seizure. As a result, their Fourteenth Amendment Rights have been violated from the detention and continued withholding of the Plaintiff's children without just cause or authority.

**152.** The § 1983 claim on false imprisonment applies where the State officials are acting contrary to the law by forcing the parents to perform a certain act or face imprisonment.

**153. Abuse of Process**

154. Under Section 1983 malicious abuse of process comes about where prosecution is initiated legitimately and is thereafter used for other purposes other than that which was intended by the law. This is where the prosecution law is used to extortionate demand or cause the surrender of a legal right.

155. The Plaintiffs have averred that the Defendants have on several occasions threatened them into consenting different processes which cause them and their children harm. The laws enacted to protect children, families and abuse victims including trafficking victims from harm have been used to inflict harm by the defendants. This is in cases where the Defendants have taken away the Plaintiffs' children without justified cause and detained the children away from their parents. They have also arrested the Plaintiffs and conducted searches on them without warrants or court orders.

156. The Plaintiffs have endured situations where they have been forced into silence when they want to come out to report abuse by the State officials. The laws that were enacted to protect abuse victims and take them out of abusive environments are not implemented in situations where they are required as the Defendants have employed incompetent personnel who are conducting the abuse.

157. These officials are liable under Section 1983 and should be held accountable for their actions. However, the people in charge of hiring them and receiving these complaints do not take on due process to investigate these claims. This is what has led to the bullying of the defendants into silence.

**158. Intentional Infliction of Emotional Distress**

159. Plaintiffs incorporate by reference Paragraphs (-) of this Complaint as if set out in full herein.

160. The Restatement (Second) of Torts § 46 provides that: "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, such bodily harm."

161. Intentional infliction of emotional distress has four elements: outrageous conduct by defendant; the intention of causing, or reckless disregard of the probability of causing, emotional distress; actual suffering of severe or extreme emotional distress; and actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

162. Throughout this Complaint, Plaintiffs have demonstrated the outrageous manner in which their child(ren) were taken away from them without due process or regard for the law. The bond between a parent and a child runs deep through their hearts and minds and should not be broken without any substantial reason. Defendant took away Plaintiffs' child(ren) without regard for the consequences of their actions upon Plaintiffs and their child(ren). Defendant knew what its actions were doing to Plaintiffs and their child(ren) but still continued to deprive Plaintiffs of their parental rights.

163. Defendant's actions have caused untold mental anguish and emotional distress upon Plaintiffs and their child(ren). Plaintiffs have sunk into depression and anxiety due to the uncertainty of what is happening to their child(ren) after they have been taken away from them. Some Plaintiffs have no knowledge of the whereabouts of their children. Plaintiffs have had to seek professional help from therapists to help them deal with the suffering that Defendant has put them through. Since it is impossible to reverse their emotional distress and restore them to the mental state they were in before the actions of Defendant, Plaintiffs seek compensation.

### 164. Sexual Abuse

165. The Plaintiffs have accused foster parents or even people they lived with (for instance a parent's boyfriend) of sexually abusing their children. These children have been abused either once or repeatedly. The violation has been reported to relevant authorities, that is the state officials responsible for ensuring the care and protection of children. Surprisingly, there has been little to no follow-up on these claims.

166. It is these state officials that are placing children with sexual predators and are not responding to reports of sexual abuse to take the children out of these environments.

167. The law of protection of children, families and victims of abuse was formulated to mandate the officials to take victims of abuse out of the abusive environment. These officials are

also mandated under the law to investigate cases of abuse and charge the offenders for their actions.

168. Not investigating the reports and allowing the children to remain in these homes where the sexual abuse continues is a violation of their human rights under the Fourteenth Amendment Rights. This undermines the dignity of the children and their right to protection from cruel and unusual treatment under their Eighth Amendment Rights.

169. Under Section 1983 liability the State officials are liable for placing the children in harmful environments where they are sexually abused and do nothing to protect the children when the matter is reported. The foster parents will also carry liability under this section as they are mandated by the law to protect the children and not inflict harm on them.

**170. Wrongful Death**

171. To hold a State official liable for wrongful death under Section 1983 it should be proved that the Defendant's actions caused the death of the victim.

172. In our case, the Plaintiffs have claimed being pushed into depression which has caused them to consider suicide. This is from both the parents and the children.

173. The Parents may sink into depression when their children are unlawfully taken away from them and they are restricted from seeing them. No Parent would be okay if they cannot be with their children and they are unjustly kept away from them.

174. Children also sink into depression when they are placed in harmful or hostile environments away from the love and care of their parents. They are forced to live in undignified conditions and they consider suicide as a means of stopping the pain.

175. Some of these children may die from being exposed to these harmful and toxic living environments. The injuries inflicted on the Parents when they are being threatened to agree to a particular situation can also be life-threatening and cost them their lives.

176. Death caused by these situations should be blamed on the Defendants who were aware of the suffering but did nothing to mitigate the situation. Laws have been enacted to take victims out of these situations. If the State officials do not apply these laws for the protection of the children, they should be held accountable for any death that occurs.

**177. Malicious Prosecution**

178. In Albright v Oliver it was determined by the court that for a claim of malicious prosecution succeed under Section 1983 it should be proved that there was (a) institution of a criminal prosecution; (b) without cause; (c) with malice; and (d) termination is in favor of the accused.

179. The Plaintiffs have accused the Defendants of arresting and detaining them without warrants or valid court order. This has been done to arbitrarily insert the power of the Defendants into coercing the Plaintiffs to follow their instructions.

180. The Defendants have also falsely accused the Plaintiffs of misconduct which under the law amounts to them being declared unfit to keep their children. They have also threatened the Plaintiffs into agreeing to different situation plans which do not favor the Plaintiffs all for the Defendants' gain. For example, forcing the Plaintiffs to release their children to strangers. This is done to enrich the State officials who will benefit from more children being placed in foster care.

181. The Defendants have gone to extremes of working with court officials to formulate false charges of which the Plaintiffs are charged and the court orders that their children be taken from their homes.

182. There is little to no investigation conducted to ascertain these claims which leaves the Plaintiffs in a prejudiced situation where their innocence is not proved. The Defendants do not obtain warrants or court orders when arresting the Plaintiffs to prosecute them and if they do they acquire them through false pretense or by lying about the conduct of the Plaintiffs.

183. These actions are sufficient to prove that any prosecution that occurs is conducted maliciously to inflict harm on the Plaintiffs.

### FIFTH CAUSE OF ACTION

**Fraud by Intentional Misrepresentation, Fraud Upon the Court, Honest Services Fraud, Mail Fraud, Wire Fraud Resulting in Peonage, Slavery, & Human Trafficking**

### DEFENDANTS – ALL DEFENDANTS

184. All the forgoing allegations are repeated and realleged as though full set forth herein.

185. The United States Court of Appeals for the Sixth Circuit has set forth five elements of fraud upon the court which consist of conduct: "1. On the part of an officer of the court; 2. That is directed to the 'judicial machinery' itself; 3. That is intentionally false, willfully blind to the truth, or is in reckless disregard for the truth; 4. That is a positive averment or is concealment when one is under a duty to disclose; 5. That deceives the court." *Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993).

186. The doctrine of fraud upon the court has been characterized "as a scheme to interfere with the judicial machinery performing the task of impartial adjudication, as by preventing the opposing party from fairly presenting his case or defense." *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d 180, 195(8th Cir. 1976) (citations omitted); *see also Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (holding "only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a

138

party in which an attorney is implicated, will constitute a fraud on the court"). Additionally, fraud upon the court differs from fraud on an adverse party in that it "is limited to fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko*, 860 F.2d 556, 559 (2d Cir. 1998).

187. "One species of fraud upon the court occurs when an 'officer of the court' perpetrates fraud affecting the ability of the court or jury to impartially judge a case." *Pumphrey v. Thompson Tool Co.*, 62 F.3d 1128, 1130 (9th Cir. 1995); *see also Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) (noting that "fraud on the court should embrace only that species of fraud which does or attempts to, subvert the integrity of the court itself, or is a fraud perpetrated by officers of the court" (citation omitted); *Kerwit Med. Prods., Inc. v. N. & H. Instruments, Inc.*, 616 F.2d 833, 837 (11th Cir. 1980) (same).

188. In the cases of all Plaintiffs, officers of the court made statements that were intentionally false in court with the intention of deceiving the courts and making them unable to make impartial decisions in regard to termination of parental rights of Plaintiffs. Court documents were fabricated to purposely mislead the courts to enter declarations and judgments that terminated Plaintiffs' parental rights and took legal custody away from them.

189. The parents and child had a clearly established liberty interest in associating together. This right was violated where the defendants allegedly had no indication of any physical neglect of the child ,no indication of any immediate threat to his welfare ,and no indication of any criminal activity by his mother ,where they only had third-hand hearsay....where defendants refused to return the child, had not investigated to determine whether it was necessary to remove the child in the first place ,and had not investigated the possibility of returning the child to his mother, grandmother, or anyone designated by the mother .Whisman V. Rinehart ( 8th Cir. 1997)

190. Child protection workers are subject to the 4th and 14th Amendment in the context of an investigation of alleged abuse or neglect are all government officials .The court ruled despite the defendants (Child protection Worker) exaggerated view of their powers ,the fourth Amendment applies to them, as it does to all other officers and agents of the state whose request to enter ,however begin or well-intentioned, are met by a closed door.

191. The fourth Amendment's prohibition on unreasonable searches and seizures applies whenever an investigator, be it a police officer a DCFS employee, or any other agent of the state, responds to an alleged instance of child abuse, neglect, or dependancy.3:01-cv-7588 Walsh V. Erie county Department of Job and family Services.

192. A due process violation occurs when a state -required breakup of a natural Family is founded solely on a best interest analysis that is not supported by the requisite proof of parental unfitness. Quilloin V. walcott (1978) 434 U.S. 246,25541.

193. Plaintiff in Brokaw,305 F.3d 660 (&th Cir.2002),brought suit against defendants in the child neglect office based on a conspiracy to take away her children. The seventh circuit held that Rooker-Feldman did not bar her claims significantly, and similarly to the case at bar, Brokaw alleged that "The defendants conspired -prior to any judicial involvement -to cause false child neglect proceedings to be filed ." Id. at 665.

194. The seventh Circuit specifically held that the plaintiff' is not merely claiming that the decision of the state court was incorrect or that the decision violated her constitutional right; rather, she is alleging that the people involved in the decision to forcefully remove her from her home and her parents and subject her to the custody of {child Services) violated her constitutional rights, independently of the state court decision.

195. Up to 83% of all investigations are ultimately concluded to have involved no abuse or neglect. ONLY INNOCENT FAMILIES! We believe that parents have the fundamental right to the care, custody and control of their children so long as the child is not harmed.

196. **Fraud Upon the Court**

197. One of the most frequent ways DEFENDANTS obtain adverse judgements against parents is by committing fraud upon the court and intentionally offering **"(a) misrepresentations (false representation, concealment, or nondisclosure);** in their statements to the court.

198. Social workers are quasi court officials. Prosecutors, judges, children's attorney and parents attorneys are all officers of the court. In Bulloch v. United States, 763 F.2d 1115, 1121 (10th Cir. 1985), the court stated "Fraud upon the court is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. ... It is where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function --- thus where the impartial functions of the court have been directly corrupted."

199. Appeals court have previously recognized a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free from judicial deception and fabrication of evidence in the context of civil child custody cases. *See Costanich v. Dep't of Soc. and Health Servs.*, 627 F.3d 1101,1108 (9th Cir. 2010) ("[D]eliberately fabricating evidence in civil child abuse proceedings violates the Due Process clause of the Fourteenth Amendment when a liberty or property interest is at stake  "); *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9thCir. 2000) (stating "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention" and "children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures").

200. "To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding " *KRL v. Moore*, 384 F.3d 1105, 1117 (9th Cir. 2004).

201. A plaintiff who provides direct evidence of false statements can allege deliberate fabrication of evidence in violation of constitutional due process guarantees. *See Costanich*, 627 F.3d at 1108. "Reporting that a witness said something he or she did not cannot reasonably be characterized as a recording error or a misstatement," but is instead fabricated evidence. *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034, 1055 (S.D. Cal. 2016) *rev'd in part on other grounds sub nom. Reynolds v. Bryson*, 716 F. App'x 668 (9th Cir. 2018) (citation omitted).

202. Furthermore, in the search warrant context, we have previously held that an omission of a fact necessary to establish probable cause presented a triable issue of material facts about whether that omission "amounted to at least reckless disregard for the truth." *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1088 (9th Cir. 2011). Examples of judicial deception in child protective custody cases are illuminating. In *Reynolds*, a district court held that omission of two words from medical notes was "[a]t worst . . . a reporting error or misstatement" and not sufficient evidence of deliberately or recklessly false statements or material. 224 F. Supp. 3d at 1056 (citation omitted). By contrast, in *Costanich*, we held that allegations that a social worker falsely claimed to have interviewed several witnesses in connection with a child protective custody case presented a triable issue of material fact that there was deliberate fabrication of evidence. 627 F.3d at 1112–14. In *Greene v. Camreta*, 588 F.3d 1011 (9th Cir. 2009), *vacated in part*, 563 U.S. 692 (2011), 661 F.3d 1201 (9th Cir. 2011), we held that "proof, in the form of [an] affidavit and deposition testimony, that [defendant] included false statements in his affidavit requesting a protective custody order," *id.* at 1035, was sufficient to present a genuine issue of material fact of judicial deception to which qualified immunity did not apply and summary judgment was inappropriate, *see id.* at 1035–36.

203. The Plaintiffs have alleged judicial deception sufficient to meet the constitutional standard, if not the heightened pleading standard of Rule 9(b), to overcome the County's motion to dismiss under Rule 12(b)(6). Finally, the alleged misrepresentation was material to granting of the juvenile court's Orders.

**204. Honest Services Fraud**

**205.** Plaintiffs incorporate by reference Paragraphs (25-41) of this Complaint as if set out in full herein.

206. Never do attorneys appointed by dependency courts reveal they speak to opposing counsel without informing client/plaintiffs; receive documents served on the parent's behalf. Court officials have a practice of holding secretive hearings without knowledge of parents and having ex-parte hearings where they make arguments when the parents are not there to defend themselves.

207. In every case before your Honorable, these court appointed attorneys do not say objections as asked to do so. They defraud parents and children by pretending to be their advocate while working against them as much as possible.

208. Court appointed attorneys do not submit evidence on the plaintiff's behalf when asked to do so to help defraud the court and the client.

209. They regular ignore constitutional liberties to the extent of stating through their action and inaction that, "the constitution does not apply here" and "there is no time to argue the constitution".

210. The written, stated, sworn, and understood definition of "representation" is nothing of this sort and is stated in the DOG BOOK Dependency handbook for attorneys, stating their role is to "make the process smoother" for opposing party; attorneys are not there to "represent" the parents but mitigate resistance. A fact which is never disclosed to distraught parents.

211. Court appointed attorneys do not contact or communicate with parents until 10 minutes before the 1st hearing. This violates the service of paperwork rules of court.

212. Similarly prosecutors are not working in the interest of justice but in the interest of the department and securing more wins and funds for the county agency they work for.

213. These attorneys are forced to follow department lead, which is unstated and unwritten, again at the department's will, and have court watchers to make sure of this as training states from the Capacity Building in DC. In other words, if an attorney attempts to properly represent, the department can and will remove them.

214. Reunification services are provided to give kickbacks to preferred providers who go along with the department agenda. They are not provided in good faith as a protective measure to ensure safe homes.

**215. Human Trafficking**

216. Parents are indentured servants and are subject to peonage and involuntary servitude as they are human chattel forced to attend endless services that only benefit the provider's bottom line.

217. Lives are disrupted and jobs are lost as Plaintiffs cannot hold regular jobs because they must contract with service providers of the departments choice that are inconvenient locations, do not offer the services parent needs, or have working hours that conflict with the work schedule of the Plaintiffs.

218. If Plaintiffs do not go to these services, they are threatened that their children will never come home. No consideration is made for parents who have made changes on their own without services.

219. Children are seized without warrants and return of them becomes the discretion of a social worker and not the imposed service completion.

220. Servitude is required for release of children. Social services forces housing and drug services for parents never convicted of drug offenses. The time and duration of services is capricious and ambiguous.

221. **Knowledge of falsity**

222. Even when parents complete the programs the DEFENDANTS will not provide the record to the court or claim the program was not effective as a way of intentionally misleading the court.

223. Courts tell the parents the wrong time to come to court. The deliberately tell them that their time is early in the morning but they do not call the parents' court case until last as a way to lie to the parent.

224. **Intent to defraud, i.e., to induce reliance;**

225. Parent Plaintiffs are told by officers of the court that Juvenile Dependency is quasi-criminal or even civil in nature. Neither is fact, Juvenile dependency falls under administrative law, which is regulated by the APA and case law such as "Chevron", which explains the deference given to agencies. A parent, when pro se or for mere understanding purposes cannot make sense of what is happening to them in court because the laws they seek for reference that has been spoken as superseding the venue is Civil or Quasi-criminal. Attorneys and the Courts do not disclose this as fact, tend to "pick and pull" statutes as they chose to benefit the agency, and ignore the law of the land we as Americans know, defend and have sacrificed all to retain.

226. Parents believe, and rightfully so, they will never see thier children again if they do not comply with agency demands despite and in spite of innocence.

227. A court appointed attorney in dependency hearings tried to induce parents to rely on their sham services instead of going with the gut instinct and acting in their best interest.

228. These attorneys have a conflict of interest because they are paid by the county and do not benefit if the client wins or if trial/interactions are of short duration.

229. Keeping the peace with their peers in the Juvenile Court room rather than representing and presenting parents are of the most importance to them. This is made clear when all entities within the venue enjoy holiday parties and exchange gifts and even enjoy lunch breaks together. The "appearance" of impropriety exists, the fraud of the action commences soon after.

230. The fact is that all proceedings in juvenile dependency have pre-printed and pre-durational time frames. This in itself shows a factory-like process not an individualized service for families as clearly stated in the Family First Act and all legislative intent acts established by congress.

231. Children are seized without exigency in nearly every case before Your Honorable, and finding of unfitness in court has not been established prior to removal as Judicial Findings have established time again.

232. After which the return of children becomes contingent upon a service that is only rendered if admission of guilt is made. This is the parallel definition of extortion, to release bondage of kidnapping, child being held until services rendered by parent. Yet even at the end of a completion to demanded services, for the child to return, the agency retains discretion to actually return child to parent. The calculation to determine this then becomes the time already stolen and "best interest" with interest in monetary accumulation county prospectively can claim from child needs if kept in system.

233. **(d) Justifiable reliance**

234. Child Welfare, once contacted by them, causes a do or die situation for families. Plaintiff Parents who are told to do services or "reunification" which do not eventually reunite parents with their children as followed. Instead they are forced into an open ended contract made under duress which the social worker can use to manipulate the parent who initially believes they are operating in good faith.

## SIXTH CAUSE OF ACTION

**Breach of Fiduciary by way of Legal Malpractice, Medical Malpractice**

**235. Gratuitous Services**

236. Parent attorneys conspiring with the other defendants to not present an adequate defense for the parents. They threaten parents into taking plea deals by telling them they will never see their children against.

**237. Special Relationship**

**238.** Defendant Government Agents owe a duty of care to their citizens. They must care because they took an oath to uphold the constitution and protect the citizens. They owe Plaintiffs a duty of loyalty and to diligently try to solve the problem within their powers and abilities. They have a lot of power and resources to address the issue and prevent it from happening.

239. Social workers also have a special relationship with Plaintiffs and are supposed to act in a way as to not harm the parents or act as enemy number one. They have a plethora of resources at their disposal to help families that they underutilize.

240. Truly helpful resources are sidelines while the most harmful and restrictive treatments they can think of are utilized.

241. They do not listen to clients or attempt to gather relevant facts as required by their job description (Exhibit Social Worker Job Ad). They do not understand cultural differences or help

144

families. They create their own narrative that usually casts parents and children in their worst possible light and continue to deliberately antagonize them even as they can see they are experiencing emotional turmoil.

**242. Duty of Care -** It is well-establish public policy that, social workers have an affirmative duty to work for the client's best interest and welfare as consented to by the client.

243. Failure to Train – Agents are often not trained on legal aspects of the job and don't acquire adequate and appropriate trainings and discussions on how to protect the rights of clients.

244. Failure to Supervise (Exhibit – Sample State Job Description)

245. Supervisors in higher positions like the DEFENDANTS are supposed to know the law and convey this knowledge to their subordinates. DEFENDANTS have recklessly disregarded having these training with agencies that they fund. When the agencies harm people with their conduct it is the fault and cause of the failure of the DEFENDANTS to train.

246. As in the police brutality cases, you must train officers on the consequences and ramifications of deadly force. They should know when it is necessary and when it is legal. Giving police a dangerous weapon and not telling them this disclosure is a failure to train which puts the public in danger.

247. In the same way, giving money and power to agencies to remove children from home and subject children and adults to endless rounds of therapy; but not training them on Constitutional rights, Federal Law, and State Law is like giving a loaded gun to these agencies to shoot and kill their citizens legally.

248. Failure to Discipline (Exhibit 11 – Auditors Report)

249. Social workers request excessive continuances that they not are against the law and harm children emotionally, but they show no sympathy.

250. Parents attorneys do not speak up against excessive continuances when the children should no longer be detained, and judges grant the orders. Yes, these is no disciplinary action taken if they do these things. Various boards and agencies pass the buck and assume no responsibility for ensuring due process of law. (Exhibits Letter to Greg Abbot, Letter to Consumer Affairs)

251. These individuals who hold positions of public trust attempt to separate children and families for as long as possible and then say that they children have a bond with the new caregivers. Again, they caused the situation and were deliberately trying to sever the familial bond which is a breach of fiduciary and social worker malfeasance.

252. Agencies do not reprimand social workers when they authorize medical treatments on children without the consent or notice of parents. Social workers have in these cases described

145

practiced medicine and attempted diagnose parents with mental disorders and suggest they should be taking prescribed medication, even when medical professionals have said the contrary.

### 253. Duties of Court Appointed Attorneys for Parents

254. Even if providing services free of charge to parents, attorneys are still being compensated by the state. The law states that even when services are free agents must still behave with diligence, loyalty, and in the overall interest of the client.

255. Attorneys here give wrong and bad advice to parents like telling them to wait until the end to present evidence or appeal. Many times, parents lose appeals opportunities because of the wrong advice given by their attorney who is self-dealing and getting kickbacks from letting the case mature.

256. When Counties do not provide adequate notice to Plaintiffs about the nature of the hearings so Plaintiffs could be prepared for the hearing, and it be a meaningful hearing, attorneys encourage clients to disregard the prejudice and just let it happen.

257. Domestic violence victims have nowhere to turn because the social worker, police, attorneys, and judges are all corrupt.

### SEVENTH CAUSE OF ACTION

### Breach of Express and Implied Warranties, Unconscionable Contracts

### DEFENDANTS St. Francis Ministries, Municipalities et al. GOVERNMENT AGENTS

258. Defendants breach their affirmative Duty to Protect when they cause harm to clients and show a deliberate disregard for their safety, consent, or wishes. Social workers who do the right thing are often quit, while the black hearted workers get promotions (See Exhibit 13)

### 259. REUNIFICATION PLANS

260. Reunifications plans, also called service plans, are supposed to benefit the recipient but the only people who benefit are the providers. They make money from constantly referring the parent or child to another agency, who also makes money.

### 261. Unconscionable

262. The contracts are unconscionable because parents cannot decline to participate and find their own provider or solve the problem themselves. They are force to contract with theses 'ministries' or 'agencies' because if they do not cooperate, they will never see their children again. As described in the affidavits, parents and children are made to repeatedly receive services regardless of necessity or effectiveness, at the whim and arbitrariness of a social worker who has all the bargaining power. The government has delegated them this authority.

### 263. Bargaining Power

264. The agencies and service providers have more bargaining power and thus the contracts are void because they amount to involuntary servitude and a constitutional violation of all men and women being created equal and being able to make decisions for themselves.

265. Contract of Adhesion – the terms of the contract cannot be bargained for and one must accept all the terms and conditions.

266. Anticipatory Repudiation – even after completing the terms of the plan, social workers can change the plan at will, add new terms, or find another reason to completely derail the plan after Significant Performance by the parent or child.

267. Express Warranties – service providers have no incentive for their program to be effective because the less effective the program is, the longer the parent has to stay and the more clients they have. Even after attending these so-called therapies, social workers determine the therapy didn't work and blame the client that they did not work instead of acknowledging, their therapy did not work is nothing more than quackery.

268. Implied Warranties – in all contracts there is an implied warranty of good faith and fair dealing under the common law; however, these contractors traffic human beings and destroy families with their services that do more harm than good. They know their services are harmful and use them any way which is bad faith and unfair dealing.

### EIGHTH CAUSE OF ACTION

**Bivens Claims**

**Defendants – JOE BIDEN, KAMALA HARRIS, XAVIER BECERRA, MERRICK B. GARLAND, JERRY MILNER, DOES ASSISTANT SECRETARY OF HHS**

269. Plaintiffs incorporate by reference Paragraphs (-) of this Complaint as if set out in full herein.

270. Congress has not enacted a counterpart to § 1983 authorizing a claim for relief based on constitutional violations by federal officials. To fill this remedial gap, the Supreme Court, in the 1971 landmark decision, Bivens v. Six Unknown Named Agents,40 recognized an implied claim for damages for Fourth Amendment violations by federal law enforcement officers. The Bivens claim is a personal-capacity claim against the officer(s) responsible for the constitutional violation. 41 Relying on Bivens, the Court held, in Davis v. Passman,42 that a claim for damages could be asserted against a federal official based upon an alleged violation of the equal protection principles of the Fifth Amendment.

271. The Court stressed, in Bivens and Davis, that the federal judiciary has the primary responsibility for enforcing federal constitutional rights, and that historically damages have been considered the "ordinary remedy for an invasion of personal interests in liberty."44 It expressed

concern that failure to recognize the Bivens damages remedy against a federal official would leave the plaintiff without a remedy, because constitutional claimants like Webster Bivens and Shirley Davis did not have claims for prospective relief, and could not seek damages against the United States or a federal governmental agency because of sovereign immunity.45 The Court acknowledged, however, that the Bivens remedy might be denied either when Congress created an "equally effective" alternative remedy, or when "special factors counsel[ ] hesitation in the absence of affirmative action by Congress."

272. In 1980, in Carlson v. Green,47 the Supreme Court recognized **a damages remedy under** the Bivens doctrine in a suit by the administratrix of the estate of a deceased federal prisoner. The complaint alleged that the failure of federal prison officials to provide the prisoner adequate medical care violated the Eighth Amendment's prohibition against cruel and unusual punishment. The Court recognized the Bivens claim even though the prisoner had an alternative remedy under the Federal Tort Claims Act. The Court in Carlson found that (1) Congress did not intend for the FTCA to be the exclusive.

273. When a federal court plaintiff is entitled to assert a Bivens claim for money damages for an alleged constitutional violation by a federal official, normally the same procedures and legal principles applied in § 1983 actions will also apply in the Bivens suit. In Ashcroft v. Iqbal, the Supreme Court stated that "[i]n the limited settings where Bivens does apply, the implied cause of action is the 'federal analog to suits brought against state officials under . . . 42 U.S.C. § 1983.'"

## NINTH CAUSE OF ACTION

### 28 U.S.C. 1361 Action to Compel and Office of the United States to Perform his Duty Enforcement of Acts

274. Violation of all Congressional Acts listed below create human trafficking and cause child abuse. Plaintiffs want to enforce these acts and for the Defendant Federal Agents to do their job and stop doing the complete opposite.

275. Plaintiffs incorporate by reference Paragraphs (303-313) of this Complaint as if set out in full herein. Plaintiffs wish to for DEFENDANT MERRICK B GARLAND to do his job and stop the rampant fraud and deprivation of rights that is existing in the juvenile courts and welfare agencies. Plaintiffs seek to compel all GOVERNMENT ACTORS DOES to do their job and help families and stop harming them by operating under the following acts:

276. ANTI-KICKBACK ACTS, 41 U.S.C. § 51 (Date Signed into law by President Ronald Regan on November 7th, 1986)

277. ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. §§ 551–559 June 11th 1946.

278. The CHILD ABUSE PREVENTION AND TREATMENT ACT - U.S.C. § (2018)

279. The CIVIL RIGHTS ACT OF U.S.C. § (1871)

280. The ETHICS IN GOVERNMENT ACT, 12 U.S.C. § (1978).

281. The FAMILY FIRST PREVENTION SERVICES ACT, U.S.C. § (2018) which was signed into law on February 9th 2018 to provide funds to keep families together.

282. Plaintiffs have analyzed the Federal Tort Claims Act that ensures that plaintiffs can sue the federal government and its employees or agents for their tortious activities and omissions like the emotional distress.

283. The U.S.C.§ FREEDOM OF ACCESS TO CLINIC ENTRANCES ACT (1994), signed into law by President Bill Clinton on May 26, 1994. Women giving birth are terrorized by social workers who threaten to punish them for giving birth by taking their child when he or she is born. They cannot receive adequate medical care because of this fear.

284. The HUMAN TRAFFICKING PREVENTION, INTERVENTION, & RECOVERY ACT. H.R. 350 - 2015 114TH CONGRESS (2015-2016). Children are removed from home by conspiring social workers and medical 'professionals' who determine children are unsafe by arbitrary and capricious standards without due process. The children are then trafficked through courts and subcontractors for therapy. All caregivers are paid for with Title IV funding.

285. The JUDICIARY ACT OF MARCH 3, 1875. Plaintiffs exercise their right bestowed upon them by Congress to present their claims to a federal tribunal. Courts were given authority to operate and create lower courts which they are responsible for monitoring.

286. The JUSTICE FOR VICTIMS OF TRAFFICKING ACT PREVENTING SEX TRAFFICKING AND STRENGTHENING FAMILIES ACT OF 2014, which was signed into law on Sep 29th, 2014, by President Obama.

287. The PREVENTING SEX TRAFFICKING AND STRENGTHENING FAMILIES ACT 42 USC 1305 which was signed into law Sept 29th, 2014.

288. The PROGRAM FRAUD CIVIL REMEDIES ACT (PFCRA )31 U.S.C. 3801-3812 enacted by congress in October of 1986.

289. The ORGANIZED CRIME CONTROL ACT- RICO. 9-110.000

290. The QUI TAM FALSE CLAIMS ACT

291. The SOCIAL SECURITY ACT 42 USC 301- 1305 Suppl.4,1934.

292. The STOP ADVERTISING VICTIMS OF EXPLOITATION ACT (SAVE ACT of 2014)

293. The STRENGTHENING CHILD WELFARE RESPONSE TO TRAFFICKING ACT H.R. 469-114TH CONGRESS (2015-2016)

294. The TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT H.R. 898 - 113th Congress (2013- 2014)

295. The VICTIMS OF CHILD ABUSE ACT TITLE II OF 1990.

**TENTH CAUSE OF ACTION**

**Defendants – UNITED STATES, COUNTY AGENCIES, COMMUNITY AGENCIES et al.**

**Declaratory & Injunctive Relief**

296. Plaintiffs incorporate by reference Paragraphs (102-350) of this Complaint as if set out in full herein.

297. There now exists, between the parties hereto, a dispute and controversy to which the Plaintiff and the Defendants are entitled to have a declaration of their rights and further relief relating to the facts and circumstances as set forth in this action.

298. Plaintiffs respectfully request this Honorable Court issue a declaratory judgment declaring that the actions and/or inactions of the Defendants violate the rights of Plaintiffs.

Defendants and the State Employees are not Protected by Qualified Immunity

299. Officials are sheltered from suit, under a doctrine known as qualified immunity when their conduct "does not violate clearly established constitutional rights as a reasonable official, similarly situated, would have comprehended." *Harlow v. Fitzgerald*, 457 US 800 (1982). The state employees' actions of unlawfully taking away Plaintiffs' children without following due process that involved proving by clear and convincing evidence that it was in the best interests of Plaintiffs' children to terminate Plaintiffs' parental rights violated a clearly established constitutional right, the Fourteenth Amendment. The familial right of association is embodied in the concept of liberty in the Fourteenth Amendment.

300. Qualified immunity protects an executive official who violated the plaintiffs federally protected right so long as the official did not violate clearly established federal law. In *Saucier v. Katz*, 533 US 194 (2001), the Supreme Court held that when qualified immunity is asserted as a defense, the court must first determine if the complaint states a violation of a federally protected right, and only if it does, then proceed to determine whether that right was clearly established.

301. Plaintiffs have stated violation of their Fourteenth Amendment rights by employees of various states acting under the color of law. The Fourteenth Amendment is a clearly established right which gives a fair and clear warning as follows: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

302. "The doctrine of qualified immunity protects government officials from liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, (2) that the right was clearly established at the time of the alleged conduct." *Ashcroft v. al-Kidd*, 563 US 731 (2011).

303. From Paragraphs (50-100) of this Complaint, Plaintiffs have stated facts showing that state employees across various states in the United States deprived Plaintiffs of their Fourteenth Amendment right by denying them the familial right of association embodied in the concept of liberty. The state employees unlawfully took away Plaintiffs' children without proving that it was in the best interests of the children to terminate Plaintiffs' parental rights by clear and convincing evidence. The Fourteenth Amendment was ratified in 1868. Therefore, it was established at the time the state employees deprived Plaintiffs of their Fourteenth Amendment right.

304. In *Causey v. City of Bay City*, 353 F. Supp. 2d 864 (2005), it was held as follows: "The Sixth Circuit has expanded that inquiry into a three-step sequential analysis when the qualified immunity defense is raised in a summary judgment motion brought after some discovery has been conducted, as here. "The first inquiry is whether the plaintiff has shown a violation of a constitutionally protected right; the second inquiry is whether that right was clearly established at the time such that a reasonable official would have understood that his behavior violated that right; and the third inquiry is `whether the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established rights.'" *Tucker v. City of Richmond,* 388 F.3d 216, 220 (6th Cir.2004) (quoting *Higgason v. Stephens,* 288 F.3d 868, 876 (6th Cir.2002); *Champion,* 380 F.3d at 901) (citing *Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003))." "In the civil sphere, we have explained that qualified immunity seeks to ensure that defendants "reasonably can anticipate when their conduct may give rise to liability," *id.,* at 195, by attaching liability only if "[t]he contours of the right [violated are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *United States v. Lanier*, 520 U.S. 259 (1997).

305. Throughout this Complaint, Plaintiffs have demonstrated how state employees of various states across the United States have deprived them of their Fourteenth Amendment rights. The state employees understood that their actions violated Plaintiffs' Fourteenth Amendment rights but that did not stop them from executing their unlawful schemes of terminating Plaintiffs' parental rights without proving that it was in the best interests of their children to do so by clear and convincing evidence. Plaintiffs have attached volumes of exhibits to prove the actions of state employees across various states alleged in this Complaint.

306. Under qualified immunity, "officials are not liable for bad guesses in gray areas, they are liable for transgressing bright lines." *Maciarello v. Sumner*, 973 F.2d 295 (1992). The actions of state employees across various states where the causes of action in this Complaint took place

151

were deliberate, intentional and outrageous. The employees could not prove by clear and convincing evidence that it was in the best interests of Plaintiffs' children to terminate Plaintiffs' parental rights. The state employees resorted to intentionally making false statements in court to deceive the courts, thereby making the courts unable to make impartial decisions that were fair. The employees also forged documents to lead the court to make orders, declarations, and judgments that terminated Plaintiffs' parental rights.

F.   PRELIMINARY INJUNCTION

307. Families need a nationwide temporary injunction on child removals to protect families from irreparable harms. Children need to be returned to biological families immediately while the details of the case are being debated as they have already suffered and been harmed for prolonged separation without due process.

308. Please restrain the Department of Health and Human Services and All State Courts from removing any more children from homes and holding the children of the people on this list.

309. [1] Even though jurisdictional finding may be based on substantial evidence, dispositional findings have a different focus and heightened burden of proof – clear and convincing evidence (§ 361, subd. (c)(1); *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996, 1011.) This heightened standard is premised on the notion that even after parents have been found to have abused or neglected their children "keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interest. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1066-1067.)

310. [2] Even though children may be dependents of the juvenile court, they shall not be removed from their parents unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being and there are no "reasonable means" by which the child can be protected without removal. (§ 361, subd. (c)(1).) When considering if the child will be in substantial danger if permitted to remain in the parent's custody, the court must consider not only the parent's past conduct, but also current circumstances and the parent's response to the conditions that gave rise to juvenile court intervention. (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 451-452.)

311. Plaintiffs' Motion for Preliminary Injunction

312. **Preliminary Injunctive Relief is Necessary to Protect Against Irreparable Harm**

313. The requested preliminary injunction is necessary to prevent irreparable harm during the pendency of the litigation. Without this relief, the court will be unable to render a meaningful judgment on the merits. If a preliminary injunction is not specifically requested in the complaint, the preliminary injunction must be related to the relief sought in the complaint. A district court lacks authority to grant a preliminary injunction that is not of the same character as the final relief sought

in the underlying complaint. *Omega World Travel v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997).

### 314. **The Court Has the Discretion to Grant Preliminary Injunctive Relief**

315. Plaintiffs' motion for a preliminary injunction is properly within the Court's discretion

316. The preliminary relief requested is of the same character as the final relief sought in the complaint.

### 317. **A Mandatory Injunction Is Necessary to Prevent Irreparable Harm**

318. Defendants' refusal to take action will result in irreparable harm to Plaintiffs. A mandatory preliminary injunction is the only way to protect Plaintiffs from this harm and preserve the court's ability to render a meaningful final judgment on the merits.

### 319. **The Evidentiary Record Establishes the Need for Preliminary Injunctive Relief**

320. Plaintiffs' request for preliminary injunctive relief is amply supported by the factual record. The affidavits and other evidence submitted by Plaintiffs demonstrate that Plaintiffs would suffer irreparable harm in the absence of injunctive relief

### 321. **Plaintiffs' Affidavits Are Properly Considered on a Motion for a Preliminary Injunction**

322. Plaintiffs' affidavits, which describe in detail why Plaintiffs would suffer irreparable harm in the absence of the requested injunctive relief, constitute proper evidence on a motion for a preliminary injunction. Formal evidentiary requirements do not apply to affidavits in support of a preliminary injunction, which may be based on hearsay or belief. Affidavits may be submitted in support of or in opposition to a motion for a preliminary injunction. *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (finding that a preliminary injunction may be granted on affidavits, even if the affidavits contain hearsay); *Federal Sav. Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987) (finding that court's reliance on affidavits in resolving motion for a preliminary injunction was not erroneous, even though the affidavits contained hearsay, as it is common for district courts to consider affidavits on a preliminary injunction and such relief may be granted based on evidence that would not be admissible at trial).

### 323. **Because Plaintiffs Has Satisfied the Statutory Conditions, the Preliminary Injunction Should Be Granted**

324. Because the requested preliminary injunction is expressly authorized by statute and the statutory conditions are satisfied, the injunction may be granted without a showing of irreparable injury. A preliminary injunction may be granted without a showing of irreparable injury if the injunction is authorized by a statute. *Securities & Exchange Commission v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975) (holding that SEC was not required to

153

demonstrate irreparable injury to obtain an injunction authorized by statute); *Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019).

325. **The Preliminary Injunction Is Necessary to Protect Civil Rights**

326. Because Defendants's proposed actions will violate constitutionally-protected rights, Plaintiffs is likely to succeed on the merits of its claims. These violations of fundamental rights cannot be adequately compensated by money damages, and in fact, are presumed to cause irreparable injury. The preliminary injunction should therefore be granted. A court will grant a preliminary injunction when necessary to protect civil rights. *Clemons v. Board of Education of Hillsboro*, 228 F.2d 853, 857 (6th Cir. 1956) (injunction will issue to protect and preserve basic civil rights); *Cent. Presbyterian Ch. v. Black Liberation Front*, 303 F. Supp. 894, 901 (E.D. Mo. 1969) (preliminary injunction granted to enjoin violation of civil rights laws guaranteeing plaintiffs' right to use their property for religious services). Irreparable injury may be presumed in cases involving certain deprivations of civil rights, including deprivation of First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

327. A court will find that the civil rights plaintiff has established a likelihood of success on the merits when the defendant's proposed actions will clearly violate constitutionally protected rights. *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (preliminary injunction was granted when plaintiffs established First Amendment violations); *American Federation of Government Employees, Afl-Cio, Council 33 v. Meese*, 688 F. Supp. 547, 548 (N.D. Cal. 1988) (compulsory drug testing enjoined as violation of Fourth Amendment "unless and until" plaintiff can show that such testing supersedes constitutional rights of employees).

### G. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs are entitled to damages from the Defendants, and they hereby pray that judgment be entered in their favor and against the Defendants and the following relief be issued:

i. Declaratory Relief: Termination of Final Juvenile Court Judgement Based on **Federal Rule 60D**

ii. An injunction against the Defendants ordering the Defendants to restore and enforce Plaintiffs' rights to have custody of their children and to stop oppressing families and detaining their children under the guise of child welfare.

iii. An award for actual damages exceeding $1,000,000,000 (1 billion dollars) for violation of Plaintiffs' rights as alleged herein;

iv. Punitive Damages

v. Compensatory Damages

vi.     Treble Damages for Fraud

vii.    Pre-Judgement Interest as provided by law.

viii.   Such other relief as the Court deems just and proper.


Respectfully submitted:

Dated:  October 10, 2022


(See attached Signature LIST)


_____

Pro Se Plaintiffs

### SIGNATURE OF PRO SE CLASS – MASS TORT PLAINTIFFS

1. MELODY RODGERS

2. MALACHI CHAPMAN

3. LAURIE REYNOLDS

4. TIJANA VIDANOVIC

5. TERESA GOIN

6. GERRI HOOD

7. RENESHA TOMLIN

8. RAYMOND SIPULT

9. GLENDA CODY

10. RUSS CODY

11. CHRISTINA ANDERSON

12. KRISTINA SINGELTON.

13. SALLY BORGHESE

14. DEANNA ROBINSON

15. NATASHA LOACH

16. JESSICA KIRBY

17. WILLIAM O'DELL.

18. EMILY O'DELL.

19. HEIDI DAVIS

20. APRIL FOX

21. KESHIA HORTON AKA KESHIA HOLLIMAN

22. STEVEN B. MOOSE

23. STEPHANI HUMPHRIES

24. TINA BRANDON

25. CAROLYN MCGHEE

26. SHANEQUA AUSTIN

27. REBECCA BOGARD.

28.. ALAN MEDDOWS

29. QUEENA HACKNEY

30. CONNIE JOHNSON

31. KRISTEN CLARK-HASSELL

32. RONISHA PETERS

33. KATHERINE THOMAS

34. MOHOGANY HUNTER

35. JOY TLYER

36. ROBERT LISBY JR.