**PLAINTIFF'S EXHIBIT**
tabbies
11



# *Los Angeles County Department of Children and Family Services*

It Has Not Adequately Ensured the Health and Safety of All Children in Its Care

*May 2019*

← Duty of Care
← Breach of Implied Warranty
← Neglect to Prevent
← Deprivation of Rights

**REPORT 2018-126**





**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814



**916.445.0255** | TTY **916.445.0033**



For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact* Margarita Fernández, Chief of Public Affairs, *at* 916.445.0255



Elaine M. Howle *State Auditor*

May 21, 2019
*2018-126*

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As directed by the Joint Legislative Audit Committee, the California State Auditor conducted an audit of the health and safety of children in the care of the Los Angeles County Department of Children and Family Services (department). Our assessment concludes that the department unnecessarily risks the health and safety of the children in its care because it does not consistently complete child abuse and neglect investigations, and related safety and risk assessments, on time or accurately. As a result, the department leaves some children in unsafe and abusive situations for months.

*(See Exhibit*

Safety and risk assessments are critical tools used to assess a child's immediate safety and the likelihood that the department will receive future allegations of child abuse or neglect for a family. The department completed only 72 percent of its safety assessments and 76 percent of risk assessments on time during fiscal year 2017–18, and it failed to complete 10 percent of safety assessments and 8 percent of risk assessments. We also found numerous instances in which these assessments were not accurate, including several safety assessments that social workers prepared and submitted without actually visiting the child's home. Even if supervisors had identified and corrected many of these issues upon review, we found that they often completed such reviews long after social workers had made decisions regarding children's safety.

*Job Duties*
*o determine*
*nthpulness and*
*omplete*
*nvestigations)*

*Fraud*

Further, despite budget increases that allowed the department to hire more social workers and reduce caseloads, it did not comply with several other state-required child welfare practices. The department did not consistently perform required home inspections and criminal background checks before placing children with relatives of their families. In fact, of the 22 relative placements we reviewed, the department conducted only 16 of the required in-home inspections prior to placement, and it documented the completion of mandatory pre-placement criminal background checks for only five of these placements.

*More Money*
*not Solution*

We identified several underlying causes for the department's deficiencies. In particular, the department does not have specific time frames for when supervisors must complete reviews of safety and risk assessments. It also currently performs quality assurance reviews on only a limited number of social workers' cases, and these reviews do not include an analysis of the quality of supervisors' reviews. Finally, although it reviews the circumstances surrounding child deaths, the department does not have a process for ensuring that it implements the recommendations resulting from such reviews.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
California State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| CWS | Child Welfare Services |
| LGBTQ | Lesbian, gay, bisexual, transgender, and questioning |
| SDM | Structured Decision Making |

# Contents

Summary 1

Introduction 7

**Audit Results**
The Department's Failure to Meet Investigation Timelines Has
Placed Children's Safety at Risk 15

The Department's Safety and Risk Assessments Have Often
Been Late and Inaccurate 17

The Department Has Not Consistently Conducted Required
Assessments When Placing Children With Relatives 21

The Department Has Not Always Met State Requirements for
Conducting Monthly Case Visits 23

The Department Has Not Always Conducted Reunification
Assessments on Time 25

The Department Has Missed Opportunities to Improve the
Quality of Its Case Reviews 26

Although the Department Has Generally Met Its Targeted Caseloads
for Social Workers, Its Supervisors Have Often Overseen
More Social Workers Than Its Established Threshold 30

The Department Is Implementing a Process to Protect the
Health and Safety of Youth Who Identify as LGBTQ 32

Recommendations 32

**Appendix**
Scope and Methodology 35

**Response to the Audit**
Los Angeles County Department of Children and Family Services 37

California State Auditor's Comment on the Response From the
Los Angeles County Department of Children and Family Services 43

*(handwritten note in left margin:)* Failure to Supervise

Blank page inserted for reproduction purposes only.

# Summary

## Results in Brief

The Los Angeles County Department of Children and Family Services (department) is tasked with responding to child abuse and neglect in Los Angeles County. When the department receives an allegation of child abuse or neglect (referral), it routes it to one of its 19 regional offices for in-person investigation and case management, if warranted. However, the department has unnecessarily risked the health and safety of children in its care because it has not consistently completed investigations and required safety and risk assessments on time or accurately. As a result, the department has left children in unsafe and abusive situations for months longer than necessary. Further, despite budget increases that allowed it to hire more social workers and reduce caseloads, it has not improved its compliance with several state-required child welfare practices.

After the department receives an allegation of abuse or neglect and decides to pursue an in-person response, state law requires that it begin the investigation within 24 hours or 10 days, depending on the severity or circumstances of the referral. However, the department complied with the applicable requirement for only 19 of the 30 investigations we reviewed. For one referral, the social worker made one unsuccessful attempt to contact the family within 24 hours but did not make subsequent attempts. Once the department sought and found the family—151 days after the referral—it removed the children from an unsafe home situation.

The department also struggled to complete investigations within the allotted time frames. Although state law allows up to 30 days from the initial in-person response to complete an investigation of child abuse or neglect in most situations, the department adhered to these required time frames for only nine of the 30 referrals we reviewed. In fact, six of these investigations lasted more than 90 days, and one exceeded 400 days.

The department's social workers were also often late in completing safety and risk assessments, which are standardized tools the department uses to document critical decisions regarding children's safety. Social workers must complete safety assessments and enter them into a database within 48 hours of meeting children in person for the first time, and they must complete risk assessments within 30 days of starting investigations that analyze the likelihood that families will have subsequent referrals. However, departmentwide data show that social workers completed only 72 percent of safety assessments and 76 percent of risk assessments on time during fiscal year 2017–18. In that same year, the department failed to

**Audit Highlights...**

*Our review of the health and safety of children in the care of the department revealed the following:*

» *The department has risked the health and safety of children in its care because it has not consistently completed child abuse and neglect investigations, and related safety and risk assessments, on time or accurately.*

- *Social workers completed only 72 percent of safety assessments and 76 percent of risk assessments on time during fiscal year 2017–18.*

- *Social workers did not always accurately identify safety threats present in children's homes and several assessments were prepared without actually visiting the child's home.*

» *The department does not have specific time frames for when supervisors must complete reviews of safety and risk assessments.*

- *Supervisors could have corrected many risk and safety issues, but often completed their reviews long after the social worker made decisions affecting children.*

» *The department did not consistently perform required home inspections and criminal background checks before it placed children with relatives.*

» *Once children were in its care, the department did not always meet requirements for evaluating the well-being of those children.*

» *Although the department reviews the circumstances surrounding child deaths, it has not ensured that it consistently implements recommendations resulting from these reviews.*

complete 10 percent of safety assessments and 8 percent of risk assessments. The department agreed that these late and incomplete assessments are inappropriate and told us that it is developing new policies and processes that it believes will help address this issue.

We also determined that the department's safety and risk assessments were frequently inaccurate. For five of the 30 safety assessments we reviewed, social workers did not accurately identify or attempt to address safety threats present in the homes. In two instances, the social workers erroneously performed the safety assessments for homes and caregivers who were not the subjects of the referrals. In three other instances, social workers filled out safety assessments without actually visiting the children's homes; nonetheless, they asserted that the homes were safe and without hazards. Similarly, of the 30 risk assessments we reviewed, 12 were inaccurate, largely because social workers failed to consider important risk factors, such as past domestic violence in the homes or results of previous department investigations. The social workers had this information available to them when performing the assessments but did not include it.

Although supervisors could have identified and corrected many of these issues upon review of the assessments, they did not do so. Further, the supervisors often completed their reviews long after the social workers had made decisions regarding the children's safety. In fact, the department does not have policies requiring supervisors to approve assessments within specified time periods; rather, the department's policy is that supervisors review and approve safety and risk assessments before the department closes referral investigations. Although we do not agree that this policy is sufficient, we examined whether department supervisors had complied it and found that they had not. Of the 30 safety and 30 risk assessments we reviewed, supervisors approved 12 risk assessments and five safety assessments after closing investigations. They never approved two of the assessments.

The department also did not consistently perform required home inspections and criminal background checks before it placed children with relatives. The department conducted initial in-home inspections before placement for only 16 of the 22 relative placements we reviewed, and in one case, a social worker did not visit the home until nearly a month after the placement occurred. The department documented required background checks of such relatives for only five of the 22 placements we reviewed. In fact, the department did not complete the required background check for the relatives of one child until we raised the issue in December 2018—nearly 800 days after the placement. Although the

department ultimately confirmed that the adults living in the home passed the background check, it unnecessarily risked this child's safety by not conducting a proper review before placement.

The department also failed to consistently perform other critical steps required for relative placements. In addition to the initial in-home assessment and criminal background check, state law requires the department to conduct a more thorough home environment assessment within five business days of a relative placement. However, the department did not conduct home environment assessments within this time frame for 16 of the 22 relative placements we reviewed, and in four of those cases, it did not complete the assessments until more than a month after it placed the children with the relatives. The law in effect during most of our audit period required the department to complete a fingerprint criminal clearance (live scan) for all adults living in the home within 10 days of the initial background check.[1] Nonetheless, the department did not complete the live scans within 10 days for all adults living in the homes for 10 of the 22 relative placements we reviewed.

Moreover, once children were in its care, the department did not consistently meet requirements for evaluating the well-being of those children. State law requires the department to conduct monthly in-home visits of children in its care. Social workers use those visits to verify children's locations, monitor their safety, and assess the effectiveness of the services provided. Before 2015 the law required the department to complete at least 90 percent of these monthly visits; since 2015 the required amount of visits has increased to 95 percent. The law also requires that the majority of each child's visits occur in that child's home. The department complied with the previous 90 percent threshold and the requirement that the majority of the visits take place in children's homes, but it did not meet the 95 percent requirement in fiscal year 2017–18. In fact, although the social workers' caseloads decreased, the department's percentage of completed monthly visits declined from 95 percent in fiscal year 2016–17 to 93 percent in fiscal year 2017–18. Further, when we reviewed 30 cases, we found that two social workers repeatedly used nearly identical narratives to document ongoing visits for multiple months, casting doubt on whether the visits actually occurred. The department confirmed that it will take appropriate action for any falsification of contact documentation.

---

[1] Beginning January 1, 2018, the Legislature amended state law to require the department to conduct the live scan within five business days of the relative placement or 10 days of the initial background check, whichever comes first. This change impacted only two of the 22 relative placements we reviewed.

We identified several underlying causes for the deficiencies we describe above. As we state earlier, the department has not developed time frames for the completion of most supervisory reviews. As a result, the department may not discover for many months—if at all—errors in judgment by social workers that affect the safety of children. In addition, although the department provides new social workers with training on the use of assessments, it does not provide any other regular training on this subject. The department also performs reviews of a limited number of cases, but these reviews do not include an analysis of the quality of supervisors' reviews. Further, only one type of review looks at the accuracy of assessments.

The department has not ensured that its reviews of the deaths of children in the county improve the services it provides. Although the department conducts robust reviews of the circumstances surrounding the deaths of children, it does not have a mechanism to ensure that it consistently implements recommendations resulting from these reviews. Further, the documentation related to children's deaths rarely focuses on the performance of the supervisors involved. Half of the 10 cases we reviewed did not have findings of fault or recommendations for supervisors' improvement, even though the related documentation identified numerous errors that social workers—whose work the supervisors should have reviewed—had made.

Finally, although the department has generally decreased its social workers' caseloads, its ratio of social workers to supervisors increased from 5.5 in August 2017 to 6.3 in October 2018. If any of its supervisors oversee more than six social workers, a provision in the supervisor's union contract limits the department's ability to discipline them for poor performance. The department confirmed that a smaller ratio of supervisors to staff would improve the quality of the supervisors' review of cases. To address these concerns, we offer the recommendations below.

### Selected Recommendations

To ensure that it protects children by completing investigations, assessments, home inspections, and background checks in a timely manner, the department should do the following by November 2019:

- Require staff and supervisors to use tracking reports that identify investigations and assessments that are not completed on time.

- Establish thresholds for the number of outstanding days that will trigger follow up from the department's various levels of management.

- Implement a tracking mechanism to monitor and follow up on uncompleted or undocumented initial home inspections and background checks.

- Implement a tracking mechanism to monitor live scan criminal record checks and home environment assessments to ensure that these assessments are completed on time.

To ensure that its staff appropriately use assessments to identify safety threats and risks, the department should revise its policies and procedures by July 2019 and provide mandatory annual training for applicable staff, supervisors, and other members of management by May 2020.

To ensure that supervisors review investigations, assessments, and other documentation on time, the department should, by November 2019, specify time frames by which each type of document should be reviewed.

To improve the accuracy of its assessments, the department should require its supervisors to regularly review and evaluate assessments against available evidence and observations. It should implement this process by July 2019.

To improve the quality of supervisors' reviews and to allow it to hold supervisors accountable, the department should, by May 2020, reduce the number of social workers assigned to each supervisor to at least the ratio specified in its union contract.

To strengthen and improve its quality control processes, the department should do the following by November 2019:

- Enhance the focus of its case reviews to not only include a review of particular case outcomes, but to also determine whether critical assessments are accurate and thorough.

- Broaden its case reviews to include an evaluation of the quality of supervisor reviews.

- Implement a tracking system to monitor the implementation and results of recommendations resulting from child-death reviews.

**Agency Comment**

The department agreed with the findings and recommendations in our report and indicated that it is initiating corrective actions to address our concerns.

Blank page inserted for reproduction purposes only.

# Introduction

## Background

About 2.2 million children—25 percent of all children in California—live in Los Angeles County. Under the purview of the Los Angeles County Board of Supervisors (board of supervisors) and the California Department of Social Services (Social Services), the Los Angeles County Department of Children and Family Services (department) is responsible for protecting these children by responding to child abuse and neglect. The department receives allegations of child abuse or neglect through its centralized hotline, opens referrals for allegations of abuse and neglect, and routes them to one of its 19 regional offices for in-person investigation and case management, if applicable.

The department's budget increased by 22 percent from $1.8 billion in fiscal year 2013–14 to $2.3 billion in 2017–18. This included funding for department staff who provide services for children, increasing the number of positions from 3,500 in fiscal year 2013–14 to 5,000 in fiscal year 2017–18. As its budget and staff have grown in recent years, the department's overall caseload has decreased. According to department data, the number of allegations of abuse or neglect, in-person responses to these allegations, and children receiving services from the department generally declined each year from fiscal years 2013–14 through 2017–18, as Table 1 shows.

**Table 1**
**The Number of Children Receiving Child Welfare Services in Los Angeles County Has Generally Declined in Recent Years**

| FISCAL YEAR | ALLEGATIONS OF ABUSE OR NEGLECT | IN-PERSON RESPONSES | CHILDREN RECEIVING SERVICES* |
|---|---|---|---|
| 2013–14 | 177,509 | 149,533 | 36,542 |
| 2014–15 | 176,682 | 148,319 | 35,441 |
| 2015–16 | 169,637 | 140,310 | 34,634 |
| 2016–17 | 167,500 | 136,243 | 34,052 |
| 2017–18 | 167,294 | 134,482 | 34,248 |

Source: The department's child welfare services data from fiscal years 2013–14 through 2017–18.

\* Number of children receiving child protective services, including emergency response, family maintenance, family reunification, permanent placement, and supportive transition.

## Protecting the Well-Being of California's Children

The system of laws and agencies California uses to prevent and respond to child abuse and neglect—often referred to as child protective services—is part of a larger set of programs known as child welfare services (CWS). This system seeks to balance the right and responsibility parents have to raise their children with the State's responsibility to protect children and promote their health and well-being. Courts have ruled that the right of parents to the custody and care of their children is an important interest that warrants deference and protection and that this right should be disturbed only when parents act in a manner incompatible with parenthood. Courts have also declared that children are vested with rights of their own: they are entitled to protection, and parental rights must yield to the right of the State when children's welfare requires it.

In addition to balancing the rights of parents and children, the department and CWS agencies throughout California must weigh the trauma children may endure by continuing to reside in homes in which they are being mistreated and the trauma children may suffer by being separated from their homes and parents. Research has shown that the consequences of child maltreatment can be profound and may endure long after the abuse or neglect occurs. These effects range in consequence from minor physical injuries, low self-esteem, and attention disorders to violent behavior, severe brain damage, and death. However, research has also shown that removing children from their homes and primary caregivers, to whom they have some of their strongest emotional attachments, may also have profound effects, even if the removal is only for a short time. In particular, researchers have found that a high number of different caregivers can negatively affect a child's social and emotional functioning, adaptive coping, self-regulation, and ability to maintain healthy relationships.

## The CWS Process

The decisions that social workers and others involved in the CWS system have to regularly make are profoundly difficult. As a result, California state law and other guidance from Social Services provide a rigorous framework that county CWS agencies must use to reach these decisions. Although juvenile dependency courts make final determinations on the custody of children, the department and other CWS agencies use various risk-based assessments to determine what actions to take—including whether to remove children from homes—and to develop and maintain case plans that are responsive to children's current and future needs.

*Referrals and Investigations*

State law requires the department and other CWS agencies to operate a 24-hour emergency hotline to receive and respond to allegations of child abuse or neglect (referrals). The department must conduct immediate in-person responses in all situations in which referrals indicate children are in imminent danger of physical pain, injury, disability, severe emotional harm, or death. In addition, the department must conduct immediate in-person responses when law enforcement makes referrals that children are at immediate risk of abuse, neglect, or exploitation. When an allegation could constitute abuse or neglect but the child is not at imminent risk, state law requires an in-person response within 10 days. Department policy, however, specifies that this action must take place within five business days. The text box identifies the possible outcomes of a referral to the department.

**Outcomes of Referrals
of Child Abuse and Neglect**

- **Evaluated out:** These referrals are not investigated because they do not meet the definition of child abuse or neglect, lack critical details (such as the whereabouts of the child), or relate to open or previously unsubstantiated cases. These referrals may be referred to other community agencies.

- **Unfounded investigation:** The department's investigation determines that the alleged abuse or neglect was false, was inherently improbable, involved an accidental injury, or did not constitute child abuse or neglect.

- **Inconclusive or unsubstantiated investigation:** Because of a lack of sufficient evidence, the department could not determine whether or not the allegations of abuse or neglect occurred.

- **Substantiated investigation:** The department's investigation determines that the alleged abuse or neglect more likely than not occurred.

Source: California Penal Code and state regulations.

As Figure 1 demonstrates, once the department substantiates referrals, children may either remain in their homes or be removed by social workers or law enforcement officers and placed in safe environments. In most instances, state law requires the department to determine whether they should open cases and provide family services within 30 days of their initial in-person responses with the families. However, within those 30 days—and before the department decides whether to open a case—social workers must determine whether or not to leave children in the custody of their parents or guardians. Thus, during initial in-person responses, social workers must conduct safety assessments related to this determination. Because even substantiated allegations of abuse or neglect do not necessarily mean that it is in the best interest of children to be removed from the custody of their parents, social workers conduct separate risk assessments that examine the likelihood of future referrals of abuse and neglect. These assessments, which are described in more detail below, help social workers determine whether the department should open cases and provide various family services.

**Figure 1**
State Law and Department Policy Establish a Clear Process for Responding to Allegations of Child Abuse or Neglect



Source: State law, Social Services *Structured Decision Making Manual*, and department policies.

### Safety and Risk Assessments

To assess a child's immediate safety, the risk of future referral, the family's and child's needs, and more, the National Council on Crime & Delinquency developed the Structured Decision Making (SDM) tools, which all California counties use. During the first in-person response with a child for whom the department has received a referral, a social worker uses the SDM safety assessment to determine whether the child can remain safely in the home or whether the department should remove the child to a safer environment. This assessment examines the vulnerability of the child, the presence of different safety threats, and whether these threats can be adequately mitigated by protective actions or particular household strengths. Protective actions can include steps the social worker or family takes to reduce potential threats, such as identifying a stable support network that is willing to protect the child. Household strengths include the presence of at least one nonoffending caregiver who acknowledges the safety threats and demonstrates a willingness to protect the child from these threats.

The social worker must submit the completed safety assessment for supervisory review within two days of the initial in-person response. If a social worker determines that a child can remain in a home where the social worker has identified one or more safety threats, the social worker must document all protective actions in a safety plan that the individuals involved—including the social worker and caregiver—sign and that the social worker's supervisor approves.

While the safety assessment focuses on the immediate decision of whether to leave a child in the home, a risk assessment focuses on the longer-term decision of whether the department should open a case and begin providing services to the child and the child's family. These services can range from placing the child in a safe environment with regular visits from a social worker to leaving the child in the home and providing family maintenance services, such as professional counseling. During the risk assessment, a social worker considers a variety of factors that include the results of prior referrals and investigations, incidents of domestic violence, and the caregivers' mental health, histories of drug abuse, and criminal arrest records.

### Placement Decisions and Juvenile Courts

In the short term, the department has the responsibility to make decisions regarding the type and duration of services it provides to a specific child or family. A juvenile dependency court, however, ultimately makes decisions regarding the long-term needs of

each dependent child in the CWS system. State law requires the department to consider whether a child may remain safely in a home before removing that child. If the department believes that taking the child into its custody is necessary for the child's protection, the department may petition a juvenile court to declare the child a dependent of the court. If the court orders a child to be removed from the custody of the offending parent or guardian, the court may decide to place the child under the care of the nonoffending parent or in out-of-home care.

State law and department policy establish a preference first for out-of-home care with a child's relatives and then with nonrelative extended family members, including teachers, neighbors, and family friends. When the department is unable to place a child with a relative or nonrelative extended family member, it generally places the child with a resource family, which is a preapproved foster family. When it has exhausted all other options, the department may place a child in licensed congregate care.

Before placing a child with a relative or nonrelative extended family member, the department must conduct an initial in-home inspection and a background check on all adults living in the home. The department may streamline these two steps in emergency situations. The department must then conduct a home environment assessment within five business days and generally perform a fingerprint-based criminal background check (often referred to as *live scan*) within 10 days of the initial background check.[2] Before an individual or family can become an approved resource family, the department must conduct a comprehensive in-home assessment, and a live scan check of all adults living in the home.

### Case Management and Reunification Assessments

Until the department closes a child's case, it continues to provide case management and other services. For example, the department generally must perform visits at least once each month for each child with an open case to check on that child's well-being. It must conduct the majority of these visits at the child's home rather than at other locations, such as at school. To assess if a child in an out-of-home placement should eventually be reunified with a parent, the department must also regularly review whether that parent is following a case plan that outlines the steps the parent must take to reunify with the child. To assess the risks of reunifying

---

[2] Beginning January 1, 2018, the Legislature amended state law to require the department to conduct the live scan within five business days of the relative placement or 10 days of the initial background check, whichever comes first.

a child with a parent, the department must perform reunification assessments every six months. It must also complete a reunification assessment before any permanent placement decision—such as reunifying a child with one or both parents or placing the child in another home.

### *Supervisory Review and Other Quality Control Processes*

Recognizing that social workers complete critical and complex tasks, state requirements and department policies include quality control processes aimed at ensuring that social workers are protecting at-risk children. Specifically, the department charges its supervisors with upholding professional social work standards for their units. According to department policy, it expects supervisors to meet individually with each social worker in their units at least monthly and to approve safety assessments, risk assessments, investigative conclusions, and safety plans, among other documents. To ensure that supervisors have time to provide this oversight, the department—through its contract with the supervisors' union—generally limits the number of social workers each supervisor may oversee to six. If a supervisor must oversee more than six social workers for more than 30 consecutive days, the union contract does not allow the department to discipline the supervisor for poor performance. In addition to supervisory review, state law and a court order require the department to conduct regular countywide evaluations of different performance outcomes, such as the recurrence of abuse or neglect in the county and the stability of the department's placements.

State law permits, but does not require, the department to conduct reviews of the circumstances of any children who die within the county. When a child dies in Los Angeles County, mandated reporters, such as law enforcement, report the death to the department, which has a designated division—directed by the county counsel and board of supervisors—charged with reviewing child deaths. Specifically, for each child's death, the department makes an initial determination of whether suspected or confirmed abuse or neglect may have led to the death. The department then identifies whether the child had interactions with the department, such as a prior referral or an ongoing case. If those interactions occurred and if the child died of suspected or confirmed abuse or neglect, the department reviews interactions between the child, the child's guardians, and department staff. The department then completes a report that the county counsel and board of supervisors review. These reports may include findings that a social worker or supervisor did not comply with department policy and recommendations for how the department could improve its procedures and processes.

Blank page inserted for reproduction purposes only.

May 2019

# Audit Results

## The Department's Failure to Meet Investigation Timelines Has Placed Children's Safety at Risk

The department did not consistently start or complete its investigations of child abuse or neglect within required time frames during fiscal years 2013–14 through 2017–18. When the department receives an allegation of child abuse or neglect (referral) and determines that an in-person response is necessary, state law requires it to conduct this response immediately or within 10 days, depending on the severity or circumstances of the alleged abuse or neglect.[3] The department's policy is even stricter, requiring that social workers begin these investigations within five business days. However, the department adhered to its required time frames in only 19 of the 30 referrals we reviewed.

*The department adhered to its required time frames in only 19 of the 30 referrals we reviewed.*

Of the nine immediate-response referrals that we reviewed, the department began six investigations within 24 hours. In the three investigations that it failed to begin within the required time frame, the department did attempt to make in-person contact within the first 24 hours, but the social workers did not conduct continued follow-up attempts, as department policy requires, after the initial contacts were unsuccessful. In fact, in one instance, the department made one contact attempt within 24 hours but then failed to make any further attempts for 151 days. Once the department made renewed attempts, it removed multiple children from their mother's care after discovering she had been abusing illegal drugs. Throughout those five months, the department risked the health and safety of the children by leaving them in an unsafe situation. The department confirmed that the file does not indicate why the delay occurred, and the social worker responsible for the referral no longer works for the department.

Of the 21 referrals we reviewed that legally required a 10-day response time, the department began 13 investigations within the department's policy of five business days. Of the remaining eight referrals, the department complied with state requirements— making the in-person contact within 10 days—in four instances. For three of the remaining four referrals, the social workers attempted contact before the initial in-person meetings. In one instance, the social worker attempted four contacts in 19 days before succeeding, and in another instance, the social worker made six attempts in 28 days before successfully arranging an in-person meeting. For the last referral, the social worker did not make a second attempt for

---

[3]  Because Social Services uses 24 hours as its measure for immediate responses, we did the same in evaluating whether the department met the department's immediate response referrals.

Case 7:22-cv-00178-FL   Document 1-11   Filed 10/11/22   Page 21 of 49

12 days; while this second attempt was successful, the time frame did not comply with the department's policy to make additional attempts at least once each week until making contact or exhausting all possible resources.

When we reviewed departmentwide referral data, we found that the department's response time for immediate investigations improved from 85 percent of investigations beginning on time in fiscal year 2013–14 to 88 percent in fiscal year 2017–18. However, its 10-day response investigations lagged behind, decreasing from 76 percent to 73 percent during the same time period, as Table 2 indicates.

**Table 2**
**The Department Has Not Consistently Opened Investigations Within Required Time Frames**

| FISCAL YEAR | IMMEDIATE RESPONSE | 10-DAY RESPONSE |
|---|---|---|
| 2013–14 | 85% | 76% |
| 2014–15 | 84 | 73 |
| 2015–16 | 86 | 75 |
| 2016–17 | 87 | 74 |
| 2017–18 | 88 | 73 |

Source: Analysis of case and referral data.

We also found that the department did not consistently complete its investigations into child abuse or neglect within required time frames. State law generally requires counties to close an investigation of allegations within 30 days of the date that the social worker has an in-person response with the child. Additionally, in 2017 Social Services clarified that if a social worker is not able to initiate an investigation within the first 10 days of a referral, the social worker must close the investigations within 40 days from the referral date. However, of the 30 investigations we reviewed, the department completed just nine investigations within the required time frames. In fact, we found six investigations that exceeded 90 days. One investigation lasted over 400 days, and throughout that period, the social worker visited the children only three times. In another instance, the department had only one visit with the family, and the social worker did not attempt subsequent in-person visits, leaving the children in an unsafe situation. In fact, while that investigation was still open, law enforcement notified the department it had removed the children as a result of another allegation.

Completing investigations within the prescribed time safeguards the welfare of vulnerable children. We shared our findings with the department's director (director), who indicated that some referrals are more complex—including sexual abuse and exploitation—and that 30 days is not always sufficient time to conduct a thorough investigation. He explained that he is planning to work with Social Services to extend the investigation completion time frame to ensure that social workers have sufficient time to conduct thorough investigations. The director also stated that the department is planning to incorporate how well social workers meet timelines into their performance appraisals. Further, the department implemented protocols in March 2019 to ensure that social workers close referrals on time, including providing a greater level of oversight when investigations exceed 30 days and establishing the expectation that regional offices will develop and monitor work plans to close referrals.

### The Department's Safety and Risk Assessments Have Often Been Late and Inaccurate

Late and inaccurate safety and risk assessments, along with the lack of an adequate mechanism to catch errors in a timely manner, weaken the department's ability to mitigate risks to children's safety. As we discuss in the Introduction, the department uses SDM tools to assess a child's immediate safety and the need for services, such as placement in a safe location. According to Social Services, the accurate and timely use of the assessment tools is critical to the department's ability to effectively monitor each child's safety and well-being. Social Services' SDM policy manual requires the department to complete safety assessments and enter them in a database within 48 hours of meeting children in person for the first time.[1]

However, when we reviewed 30 safety assessments, we found that the department did not complete 25 within the required 48 hours. In one instance, the department took 112 days to complete the assessment because the assigned social worker was not able to meet the required time frames and the department had to reassign the case. In another instance, the social worker completed the safety assessment 50 days after the initial visit. The department confirmed that this delay was inappropriate but explained that some of the children living in the home were not available for the initial

*We reviewed 30 safety assessments and found that the department did not complete 25 within the required 48 hours.*

---

[4]   The department's policy differs from the SDM manual in that it requires social workers to complete safety assessments within two business days. We evaluated the department's compliance with the SDM policy manual requirement of 48 hours.

assessment. Nevertheless, the social worker could have performed an initial safety assessment and completed a follow-up assessment if necessary.

Department policy requires social workers to complete a risk assessment within 30 days of starting an investigation, but the department did not do so for two of the 30 investigations we reviewed. In one instance, the social worker did not perform the risk assessment until 42 days after the referral—at which point the social worker determined that the child should be removed from the home. Completing the risk assessments on time is necessary to ensure that the department mitigates circumstances that may endanger children's health and safety.

After we identified these issues with the cases we reviewed, we examined departmentwide data and found that although the department has made improvements in recent years, it has not consistently completed safety and risk assessments within required time frames. In fiscal year 2017–18, the department completed 18 percent of its safety assessments late and never finished 10 percent. In that same year, the department completed only 76 percent of its risk assessments on time, while it failed to complete 8 percent, as Table 3 shows. The director acknowledged these deficiencies, as well as the accuracy problems we describe below, and he indicated that a review the department commissioned found that some of the department's social workers were not relying on the assessments as decision-making tools but instead viewed them as an additional bureaucratic step. He noted that the department is addressing this issue by developing new training that he plans to roll out by July 2020.

*[handwritten note: How were they making risk assessments? Personal judgeme…]*

**Table 3**
**The Department Has Not Completed Safety and Risk Assessments Within Required Time Frames**

| FISCAL YEAR | SAFETY ASSESSMENTS* | | | RISK ASSESSMENTS† | | |
|---|---|---|---|---|---|---|
| | ON TIME | LATE | NOT COMPLETED | ON TIME | LATE | NOT COMPLETED |
| 2013–14 | 69% | 20% | 11% | 65% | 28% | 7% |
| 2014–15 | 66 | 23 | 11 | 65 | 28 | 7 |
| 2015–16 | 66 | 24 | 10 | 67 | 24 | 9 |
| 2016–17 | 68 | 22 | 10 | 72 | 20 | 8 |
| 2017–18 | 72 | 18 | 10 | 76 | 16 | 8 |

Source: Analysis of case, referral, and assessment data.

* Safety assessments assist the social worker in determining whether a child is likely to be in immediate danger of serious harm.

† Risk assessments assist the social worker in identifying the likelihood that a family will have a subsequent referral of abuse or neglect.

We also determined that some of the department's safety and risk assessments were inaccurate. In five of the 30 safety assessments we reviewed, social workers did not accurately identify safety threats. For example, children can have caregivers who do not live in the same household and to ensure social workers identify safety issues appropriately, they need to evaluate the household in which the allegations occurred. However, in two instances in our review, the social workers erroneously performed safety assessments on homes and caregivers who were not the subjects of allegations. In the other three instances, social workers filled out safety assessments without actually visiting the children's homes, yet they inaccurately asserted that the homes were safe and without hazards.

Similarly, 12 of the 30 risk assessments we reviewed were not accurate. In these instances, social workers failed to consider important risk factors such as the age of a very young child or the results of previous department investigations. The social workers omitted this information from assessments even though the information was available to them in the case files. In one instance, the social worker failed to include the caregiver's mental health history. Although the social worker did open a case, failing to include all necessary information weakens the usefulness of the risk assessment.

Supervisors could have identified and corrected many of these issues upon review of the assessments, but they did not. Even if they had, the supervisors' reviews often happen long after the department has made decisions affecting children. The department does not have policies that require supervisors to approve assessments within specified time periods after social workers submit them; rather, the department's policy is that supervisors review and approve safety and risk assessments before the department closes a referral investigation. Although we do not agree that this policy is sufficient, we reviewed 30 safety and 30 risk assessments for compliance with it. Of the 60 assessments we reviewed, supervisors approved 17 after the investigations were closed and never approved two others. In one instance, the supervisor took 125 days to review and approve the initial safety assessment.

*The department does not have policies that require supervisors to approve assessments within specified time periods after social workers submit them.*

We analyzed the department's data to determine the number of days between when social workers submitted their safety and risk assessments and when supervisors reviewed and approved them. As Table 4 shows, supervisors did not approve 11 percent of safety assessments and 27 percent of risk assessments until after the referrals were closed. Further, supervisors never approved 4 percent of safety assessments and 6 percent of risk assessments.

**Table 4**

**Supervisors Did Not Approve All Safety and Risk Assessments Before the Closure of Referrals**

**Fiscal Years 2013–14 Through 2017–18**

| | SAFETY ASSESSMENTS | RISK ASSESSMENTS |
|---|---|---|
| Approved while the referral was open | 85% | 67% |
| Approved after the referral closed | 11 | 27 |
| Never approved | 4 | 6 |

Source: Analysis of case, referral, and assessment data.

We asked the regional offices whether they had guidelines or expectations beyond department policies for supervisors' approving assessments. The Santa Fe Springs and Van Nuys regional offices explained that supervisors should approve assessments within 48 hours of submission, while the Compton regional office indicated that it expects supervisors to complete their assessment reviews within five days of submission. However, these are not documented policies. The department acknowledged that it currently does not have departmentwide time frames for supervisor reviews but stated that it plans to include timelines in an upcoming policy revision. The department has several tools supervisors can use to track the timeliness of assessments, including SDM tracking reports and SDM email alerts that flag supervisors when assessments are completed. However, the director indicated that supervisors' use of these tools has been optional. He stated that he plans to require that supervisors use them in the future.

Additional training could better prepare social workers to use SDM assessments appropriately. Social Services requires new social workers to receive SDM assessment training that includes an overview of the procedures for completing the assessments. However, the department confirmed that it does not require ongoing training and that in order to ensure that social workers properly use the assessment tools, it needs to provide additional training. The department plans to develop robust training for social workers, supervisors, and managers related to new SDM policies by July 2020. By providing annual training specific to SDM assessments, the department can better ensure that its social workers and supervisors respond to allegations and conduct assessments thoroughly and in a timely manner.

Finally, the department inappropriately excluded some risk assessments when deciding whether to open cases and provide the children and families involved with services. Risk assessments evaluate a family's likelihood of being referred to the department

Case 7:22-cv-00178-FL   Document 1-11   Filed 10/11/22   Page 26 of 49

again, using a rating scale of very high, high, moderate, or low. Department policy requires that social workers open cases only for investigations that have substantiated allegations—regardless of the level of risk. However, SDM guidelines note that the department should open a case for referrals with high or very-high risk assessments, even if the investigation of the allegation is inconclusive. We identified three instances that had inconclusive allegations but high or very-high risk assessments. Social workers did not open cases for these children. However, the department later received new allegations related to two of these closed investigations. Social Services has highlighted the importance of following all components of SDM guidelines, and the department confirmed that it is currently revising its policy manual to better conform to the SDM guidelines.

### The Department Has Not Consistently Conducted Required Assessments When Placing Children With Relatives

*also a constitutional violation*

Although state law requires the department to conduct certain assessments before placing children with relatives, the department did not consistently meet these requirements. As we discuss in the Introduction, state law and department policy establish a preference for out-of-home care with children's relatives or nonrelative extended family members (relative placement). In situations requiring an immediate placement of a child, state law requires the department to conduct an abbreviated in-home inspection and background checks of the relatives willing to care for the child and of any other adults living in the home. State law also specifies that the department must complete these tasks before placing the child. However, the department may expose children to risk because it does not consistently meet this requirement and does not hold its supervisors accountable for thorough review of relative placements.

Because cases may involve multiple placements for a child, the 30 cases we reviewed involved 65 placements. Of those 65 total placements, 22 involved the department placing children with relatives. The department did not conduct initial home inspections before completing six of these 22 relative placements. In one placement, the social worker did not conduct an in-home inspection until nearly a month after placing the child. The department did not provide specifics about the in-home inspection for this case, but it agreed that in-home inspections generally should occur before placing a child with relatives. Further, in two of these six relative placements, the social workers did not note whether they inspected the homes during their in-person visits. Although the department's expectation is for social workers to document that they inspected each home, it was unable to determine why these two social workers failed to do so.

*In one placement, the social worker did not conduct an in-home inspection until nearly a month after placing the child.*

*The department did not document whether it completed all required initial background checks before 17 of the 22 relative placements we reviewed.*

The department also did not document whether it completed all required initial background checks before 17 of the 22 relative placements. The department did not document one required check until we questioned it on the matter in December 2018—nearly 800 days after the child had been placed. Although the department confirmed that the adults living in the home later passed the background check, it was unable to determine why it had not been documented on time.

In addition to the abbreviated home inspection and background check, state law requires the department to conduct a full home environment assessment within five business days of each relative placement. The department's Resource Family Approval Unit (approval unit) contracts with community-based organizations to conduct these home environment assessments. However, in 16 of the 22 relative placements we reviewed, the department did not meet the five business day requirement. In fact, the department did not complete four of these home environment assessments until more than a month after the children had been placed with relatives.

The director stated that communication gaps between social workers and the community-based organizations make it difficult to complete the home environment assessments within the five business day period. The department's standard contract language with the community-based organizations states that the department will conduct annual reviews of the organization's performance, including its on-time completion of home environment assessments. However, the department has not performed these reviews. Had the department done so, the community-based organizations might have completed more home environment assessments on time.

To ensure the accuracy of the initial background check, state law also generally required the department—for most of the years we reviewed—to secure a fingerprint clearance check (live scan) for all adults in the home within 10 days of the initial background check.[5] To comply with this requirement, the department has live scan technicians. However, the department did not conduct live scans within the required time frame for 10 of the 22 relative placements we reviewed. The approval unit's division chief explained that the database that contains live scan requests and results is not connected to the database containing

---

[5] Beginning January 1, 2018, the Legislature amended state law to require the department to conduct a live scan within five business days of a relative placement or 10 days of a initial background check, whichever comes first. This change impacted two of the 22 relative placements we reviewed.

information about the department's relative placements. As a result, the department has limited ability to determine whether it is performing live scans within the required timelines.

### The Department Has Not Always Met State Requirements for Conducting Monthly Case Visits

The department did not consistently meet requirements for evaluating the well-being of children in its care. As the Introduction explains, the law generally requires the department to perform ongoing case visits at least once a month for all children with active cases, and the majority of the ongoing visits must take place in the children's homes. Social workers use these visits to verify the location of the children, monitor their safety, and gather information to assess the effectiveness of services provided. Before 2015 the law required that the department complete at least 90 percent of these monthly visits; it now requires that the department complete 95 percent of these visits and that the majority of visits occur in the home.

As Table 5 shows, the department complied with the previous 90 percent threshold and the requirement that the majority of visits take place in the child's home. However, it did not meet the 95 percent requirement in the most recent year we reviewed. In fact, although social workers' caseloads decreased, the department's percentage of completed monthly visits also declined. We would have expected the percentage of monthly visits to increase with the reduction of social workers' caseloads, but the director said that the decrease was likely due to an increase in the number of inexperienced staff who are less likely to meet time frames for ongoing case visits.

**Table 5**

**The Department Generally Met Requirements for Monthly In-Person and In-Home Visits**

| FISCAL YEAR | IN-PERSON MONTHLY VISITS | IN-PERSON AND IN-HOME MONTHLY VISITS |
|---|---|---|
| 2013–14 | 95% | 80% |
| 2014–15 | 94 | 81 |
| 2015–16 | 95 | 81 |
| 2016–17 | 95 | 81 |
| 2017–18 | 93 | 79 |

Source: Analysis of case and referral data.

Although the department conducted approximately 80 percent of the required monthly visits in the children's homes, our review of 30 cases found compliance issues in some cases. For example, for two of the 30 children, it conducted the majority of ongoing monthly visits in other locations. The department agreed that the majority of the ongoing monthly visits should take place in children's homes, and it was not able to provide an explanation for why this did not occur for these two children.

We also noted that for eight of the 30 children whose cases we reviewed, the department did not comply with the requirement that it conduct no more than two consecutive visits outside of the home. These eight children had more than two consecutive visits at locations other than their homes. In fact, in one case the social worker did not visit the child at home for eight months. Although social workers regularly saw this child in their offices during these eight months, they could not evaluate the safety of the child's placement during this time because they did not visit the child in his home. To ensure that its social workers comply with this requirement, the department indicated that it will have supervisors review the locations of ongoing case visits to ensure that it conducts no more than two consecutive visits outside of the home.

In our review of 30 cases, we also noted two different cases in which the social workers repeatedly used nearly identical narratives for multiple months to document ongoing visits. When we discussed these cases with the department, it agreed that the social workers' entries for these ongoing visits were questionable. Because the department does not require documented supervisor review for these visits, it is unable to determine whether the social workers actually performed them. The department confirmed that it will conduct a review of these two social workers and take appropriate action for any falsification of contact documentation.

*The department does not have a system in place to hold supervisors accountable for conducting thorough reviews of ongoing case visits.*

The department does not have a system in place to hold supervisors accountable for conducting thorough reviews of ongoing case visits. Although the department asserted that it expects supervisors to conduct monthly reviews of three to five cases from the social workers they supervise to ensure that those social workers are making monthly well-being visits, the department does not have a policy requiring documentation of these reviews. Thus, it cannot ensure that supervisors conducted these reviews or hold them accountable if they do not meet its expectations. The department agreed that it would benefit from creating a policy that requires supervisors to not only review a sample of social workers' ongoing monthly visits, but to also document the outcome of those reviews. It has recently created a form for supervisors to document these reviews.

**The Department Has Not Always Conducted Reunification Assessments on Time**

The department did not consistently conduct reunification assessments in a timely manner. Reunification assessments document caretakers' behavioral progress and evaluate the risk associated with returning children to their homes. State law generally requires the department to review the status of every child who is in an out-of-home, nonpermanent placement every six months. Social Services also requires county CWS agencies to conduct reunification assessments every six months in alignment with the SDM policy manual. However, the department has not conducted reunification assessments within this time frame, and it confirmed that it does not have a policy reflecting these requirements. Rather, pursuant to department practice, its social workers generally conduct reunification assessments before semiannual court hearings, which may not occur every six months.

Of the 30 cases we reviewed, 27 required reunification assessments, yet the department completed an assessment for only one of these cases within the six-month time frame. In addition, supervisors took more than a month to approve 14 reunification assessments and did not approve one at all. The department's data for fiscal years 2013–14 through 2017–18 show that it failed to ensure that it performed reunification assessments within the six-month time frame for 73 percent of its cases. Further, supervisors took more than 30 days to approve 13 percent of reunification assessments and never approved 8 percent. The department does not believe it must conduct reunification assessments every six months because court hearings—during which a court determines whether a child returns home or is permanently removed from parental custody—do not always occur every six months. The director stated that the department will attempt to work with Social Services and the SDM provider to update the SDM policy manual to allow the department to conduct reunification assessments before court hearings rather than every six months. Nevertheless, until this change in policy occurs, the department must comply with current requirements.

*For fiscal years 2013–14 through 2017–18, the department failed to perform reunification assessments within the required six-month time frame for 73 percent of its cases.*

Although the SDM policy manual also states that a reunification assessment must occur no more than 65 days before a change in a child's permanent living situation, the department did not consistently meet this requirement either. Of the 30 cases we reviewed, 20 resulted in changes to the children's permanent living situations—including reunification with a parent or permanent placement with a relative or others. In 11 of these 20 cases, the department did not conduct reunification assessments within the 65-day required time frame. In fact, in three of the cases, the last reunification assessments occurred more than a year before the changes in the children's permanent living situations

From fiscal years 2013–14 to 2017–18, the department conducted reunification assessments within the 65-day requirement in only 34 percent of cases that ended in reunification with parents or guardians. Not completing these assessments promptly could lead the department to inappropriately return a child to a parent or guardian.

### The Department Has Missed Opportunities to Improve the Quality of Its Case Reviews

Although the department has processes to review the quality of its casework, it needs to enhance these reviews to ensure that it identifies problems with individual cases and that it uses the results of the reviews to improve its departmentwide practices and procedures. The department has established reviews to evaluate its casework and key outcomes, but as we note earlier, it has not improved its performance in many important areas. The department could improve the quality assurance processes it employs by increasing the number of individual cases it reviews and by widening the scope of these reviews to address the accuracy and timeliness of assessments, as well as the quality of supervisors' reviews.

*The department could improve the quality assurance processes it employs by increasing the number of individual cases it reviews and by widening the scope of these reviews.*

#### The Department Should Enhance Its Monitoring of Cases

The department's efforts to improve the quality of its casework have not been sufficient. In our March 2012 audit titled *Los Angeles County Department of Children and Family Services: Management Instability Hampered Efforts to Better Protect Children*, Report 2011-101.2, we noted that the department struggled to complete investigations of child abuse and neglect within required time frames and failed to perform all required assessments of homes and caregivers before placing children with relatives. Our current audit found that the department still needs to improve in these areas. Further, as we note earlier, we found numerous instances in which social workers performed inaccurate or incomplete assessments and supervisors failed to perform adequate reviews of those assessments. These findings indicate that the mechanisms the department uses to monitor and improve the quality of its casework need improvement.

The department uses two key performance evaluations to conduct systemwide reviews of its policies and procedures. The two evaluations are the Quality Service Review—which it must perform as the result of a 2011 court order—and the Child and Family Services Review, which state law requires. These reviews include analyses of outcomes related to children's overall well-being, including safety and stability in living arrangements.

However, neither the Quality Service Review nor the Child and Family Service Review includes an analysis of the quality of supervisorial reviews. Only the Child and Family Service Review evaluates if social workers have accurately assessed all risk and safety concerns, and—as we discuss below—the number of cases involved in this review limits the department's ability to identify trends in noncompliance with assessment policies at the regional, supervisor, and social worker level.

Although these evaluations allow the department to identify some trends and spot certain problems, they include a review of only a relatively small number of cases. Specifically, as part of the Quality Service Review, the department reviews 216 cases at least every 18 months, and in its Child and Family Service Review, it analyzes 25 cases every quarter. Reviewing a larger number of cases would allow the department to identify issues that are specific to individual regional offices or even specific supervisors, therefore allowing it to take action on both countywide and individual levels. In early 2019, the department completed a review of 1,000 cases and referrals, and it anticipates using the results to identify a need for broader reviews, policy or practice changes, and resource allocations.

*Reviewing a larger number of cases would allow the department to identify issues that are specific to individual regional offices or even specific supervisors.*

The department stated that it plans to expand its existing quality improvement section, which would allow it to gain a comprehensive understanding of processes and to enhance its internal and external operations. According to the department, the expanded quality improvement section would conduct reviews of a greater number of cases, of the quality of assessments, and of supervisorial reviews. However, the department does not yet have a time frame for implementing this expansion.

### The Department Has Not Ensured That Its Reviews of Child Deaths Have Resulted in Meaningful, Systemwide Improvements

Although the department conducts robust reviews of circumstances that result in the death of any child in the county—particularly if it had responsibility for the child at some point in time—it does not have a mechanism to ensure that it consistently implements recommendations resulting from these reviews, nor does it always place sufficient scrutiny on supervisors' work. As Table 6 shows, more than 250 children died as a result of abuse or neglect in Los Angeles County from fiscal years 2013–14 through 2017–18, including 69 children who had prior contact with the department. Although not all of these children were receiving services from the department at the time of their deaths, the department conducts reviews of all the referrals, cases, and interventions it performed related to children who died from suspected or confirmed abuse or neglect.

**Table 6**

**In Los Angeles County, More Than 250 Children Died From Abuse or Neglect**

| | FISCAL YEAR | | | | | |
|---|---|---|---|---|---|---|
| | 2013–14 | 2014–15 | 2015–16 | 2016–17 | 2017–18 | TOTALS |
| Children with prior CWS case history | 13 | 18 | 18 | 11 | 9 | 69 |
| Children without prior CWS case history | 43 | 41 | 44 | 42 | 18 | 188 |
| Totals | 56 | 59 | 62 | 53 | 27 | 257 |

Source: Department report.

State law permits, but does not require, the department to conduct reviews of child deaths. To review child deaths in Los Angeles County, the department has a designated division, which the county counsel and board of supervisors direct. This division identifies when the social workers or supervisors have not complied with statutory requirements or department policy. Further, the division recommends, when appropriate, how the department may improve its procedures. As part of our review, we selected 10 child-death review cases in which the children had previously been the subjects of departmental referrals or cases. The documentation we reviewed identified numerous errors of varying levels of severity in the department's management of the cases, including insufficient documentation of interviews and background checks. Other documentation related to the deaths of children in Los Angeles County noted that social workers neglected to interview children apart from their parents, improperly completed safety or risk assessments, or failed to verify where the children's parents were living.

Many of these reviews resulted in recommendations to improve the quality of the department's casework. However, the department confirmed that it currently does not have a process to track the implementation or outcomes of these recommendations. The department stated that although it informs regional offices of findings and recommendations on a case-by-case basis, it does not have a method to track these concerns on either systematic or specific levels. For example, the department does not have a process to identify the most frequently occurring or persistent case-management problems. The department informed us that it will implement a web-based tracking system by September 2019 to assist it in identifying, monitoring, and ensuring implementation of the recommendations resulting from the child-death reviews.

In addition, while child-death reviews generally focus on social workers' actions, they generally do not scrutinize supervisors' decisions. Supervisorial review of referrals and cases is critical in ensuring that social workers' investigations, assessments, and

Case 7:22-cv-00178-FL Document 1-11 Filed 10/11/22 Page 34 of 49

case management are on time, accurate, and professional. Because supervisors are responsible for the quality control of the referrals and cases their social workers oversee, the department should also closely examine the supervisors' work. We reviewed documentation related to the deaths of 10 children in Los Angeles County and in five of these cases the documentation did not include any findings related to supervisors—even though the documentation highlighted errors or omissions that the supervisors should have identified as part of their reviews. Table 7 identifies the findings of these five child-death reviews and the actions the department took to address the issues.

**Table 7**

**The Department Has Not Consistently Scrutinized Supervisors or Taken Action to Correct Problems**
**Fiscal Years 2013–14 Through 2017–18**

→ Failure to Supervise

| KEY FINDINGS FOR SOCIAL WORKERS | FINDINGS FOR SUPERVISORS | CORRECTIVE ACTIONS TAKEN BY THE DEPARTMENT |
|---|---|---|
| Poor investigation technique and documentation | None | None documented |
| Improper conclusions in assessments | | |
| Focus on compliance rather than mitigating safety factors | | |
| Improper documentation of in-person contacts | None | None documented |
| Inadequate safety plan | None | Findings shared with social worker and supervisor |
| Lack of consultation with supervisor regarding family's noncompliance with safety plan | | |
| Lack of focus on underlying issues | None | None documented |
| Failure to communicate safety concerns with caretaker | | |
| Assessments not completed | None | Results provided to regional office |
| Insufficient documentation of home and in-person visits | | |
| Failure to fully investigate allegations | | |

Source: Analysis of department documentation.

As the table shows, the documentation for three of these five cases also did not describe any actions the department took to mitigate the errors it identified. The department indicated that over the past year and a half, it has begun working more closely with regional offices to apprise them of child-death report findings and recommendations. Nevertheless, we would have expected the department to consistently document such interactions and reviews of the supervisors' work. This further illustrates the need for the department to create and implement a robust tracking system for findings and recommendations.

## Although the Department Has Generally Met Its Targeted Caseloads for Social Workers, Its Supervisors Have Often Overseen More Social Workers Than Its Established Threshold

*The department acknowledges that high caseloads lead to poor outcomes, and it is working to improve its staffing levels to reduce caseloads for social workers and supervisors.*

The department has generally met target caseloads for social workers, but it has failed to meet the threshold of supervisors overseeing no more than six social workers. The department acknowledges that high caseloads lead to poor outcomes, and as a result, it is working to improve its staffing levels to reduce caseloads for social workers and supervisors. The agreement between the department and the social worker union limits the caseloads to 35 cases a month for social workers and to 27 referrals a month for emergency response social workers. If the department exceeds those limits, the agreement limits it from suspending or discharging social workers who are performing poorly. Further, it cannot even prepare written warnings or reprimands on performance evaluations. To ensure that it does not exceed those limits and to allow social workers to dedicate themselves to their duties, the department has set target caseloads for social workers that are below the agreement's levels. In 2018 the target caseloads were 19 cases a month for social workers and 16 referrals a month for emergency response social workers.

According to department staffing data, nearly 60 percent of regional offices met their lower target caseload goals in June 2018, and none exceeded the limits established in the union agreement. Nevertheless, some regional offices have a persistent need to add social workers to meet the department's target caseloads. For example, throughout 2018, the Palmdale regional office needed a 1 percent to 16 percent increase in social worker staffing to attain its caseload goal. When it does not ensure that regional offices meet these caseload targets, the department risks delaying its response to allegations of child abuse and neglect, which could result in some children staying in abusive homes for longer periods. The department confirmed that at some regional offices, such as Palmdale, hiring and retaining social workers is more difficult, and it is proposing offering financial incentives for working at those locations.

Moreover, the department has not consistently met its required ratio of social workers to supervisors. According to its union agreement, supervisors may supervise up to six social workers. If the supervisor oversees more than six social workers for 30 consecutive days, the union contract limits the discipline that the department may impose on supervisors for poor performance. However, department data indicate that its supervisors are chronically exceeding that threshold. In fact, from May 2017 through October 2018, the average ratio of social workers to supervisors increased from 6.5 to 6.3. Some regional offices

had even greater caseloads for supervisors. For example, from
May 2017 through October 2018, the ratio of social workers to
supervisors rose from 6.2 to 7.3 at the Palmdale regional office
and from 6.1 to 6.6 at the Pomona office. During the month
of October 2018, the average caseload for supervisors at 13 of
the 19 regional offices exceeded the supervisor staffing limits,
as Table 8 shows.

As we previously discuss, supervisors as a whole struggle to approve
investigations and assessments accurately or in a timely manner.
The department agrees that a smaller ratio of supervisors to staff
would improve the quality of supervisors' reviews of cases, and in
August 2018, the department met with the board of supervisors and
indicated that it would like to reduce the ratio of staff to supervisor
to five-to-one. However, the department does not currently have a
time frame for when this reduction would happen.

**Table 8**
**The Department Has Not Consistently Met Its Required Ratio of
Six Social Workers Per Supervisor**
**October 2018**

| REGIONAL OFFICE | AVERAGE NUMBER OF STAFF |
|---|---|
| Palmdale | 7.3 |
| Metro North | 6.7 |
| South County | 6.6 |
| Pomona | 6.6 |
| West San Fernando Valley | 6.6 |
| Wateridge North | 6.5 |
| Santa Clarita | 6.5 |
| Santa Fe Springs | 6.4 |
| Lancaster | 6.3 |
| Glendora | 6.3 |
| Vermont | 6.2 |
| Pasadena | 6.1 |
| West Los Angeles | 6.1 |
| Torrance | 6.0 |
| El Monte | 6.0 |
| Wateridge South | 5.9 |
| Van Nuys | 5.8 |
| Compton | 5.8 |
| Belvedere | 5.6 |
| **Total** | **6.3** |

Source: Department report.

**The Department Is Implementing a Process to Protect the Health and Safety of Youth Who Identify as LGBTQ**

The department is taking steps to improve the conditions of youth in its care who identify as lesbian, gay, bisexual, transgender, and questioning (LGBTQ). A 2014 Los Angeles County study of youth over age 12 in foster care found that about 19 percent—1,400 out of 7,400—identified as LGBTQ. Moreover, the study found that 13 percent of youth who identify as LGBTQ reported poor treatment by the foster care system, compared to 6 percent of youth who do not identify as LGBTQ. A recent state law required Social Services to begin collecting voluntary information regarding the sexual orientation and gender identity of youth within its care no later than July 1, 2018, to guide policy decisions for improving its services to this group. Accordingly, Social Services updated its database to include LGBTQ fields and began requiring county agencies to collect this information.

A board of supervisors' motion in January 2018 requested that the department evaluate and make recommendations for improving its support of youth who identify as LGBTQ. In response, the department developed a work plan to identify and improve the conditions of youth who identify as LGBTQ by increasing the data gathering it requires, training its workforce, and improving its communication about LGBTQ issues with other county agencies. The department expects to fully implement this plan—which includes various milestones—by December 2021. In April 2018, the department began to include LGBTQ-related fields in its database. The department also indicated that it would develop a process to track whether a guardian has a negative perception of a child's perceived LGBTQ status, regardless of whether the child identifies as such. Although the department is only beginning the process of improving the conditions of youth who identify as LGBTQ in its care, it appears to be taking reasonable steps to address the board of supervisors' motion requesting it to better support these individuals.

**Recommendations**

To ensure that it protects children by completing investigations, assessments, home inspections, and background checks in a timely manner, the department should do the following by November 2019:

- Require staff and supervisors to utilize tracking reports and email alerts to identify investigations and SDM assessments not completed on time.

- Establish thresholds for the number of days that will trigger follow-up from the department's various levels of management.

- Implement a tracking mechanism to monitor and follow up on uncompleted or undocumented initial home inspections and background checks.

- Implement a tracking mechanism to monitor live scan criminal record checks.

- Conduct annual reviews of community organizations that perform home environment assessments to ensure that they complete these assessments on schedule.

To ensure that its staff appropriately use SDM assessments to identify safety threats and risks, the department should incorporate SDM instructions into its policies and procedures by July 2019 and provide mandatory annual SDM training for applicable staff, supervisors, and other members of management by May 2020.

To ensure that supervisors review investigations, assessments, and other documentation on time, the department should, by November 2019, specify time frames by which each type of document should be reviewed. In doing so, the department should acknowledge the particular urgency of reviewing safety assessments and related safety plans, which are key to determining whether to leave a child in a home.

To improve the accuracy of its assessments, the department should require its supervisors to regularly review and evaluate assessments against available evidence and observations. It should implement this process by July 2019.

To improve the quality of supervisors' reviews and to allow it to hold supervisors accountable, the department should, by May 2020, reduce the number of social workers assigned to each supervisor to at least the ratio specified in its union contract.

To strengthen and improve its quality control processes, the department should do the following by November 2019:

- Follow through on its plan to create a quality improvement division and increase the number of cases it regularly reviews.

- Enhance the focus of its case reviews to not only include a review of particular case outcomes, but to also determine whether critical assessments are accurate and thorough.

- Broaden its case reviews to include an evaluation of the quality of supervisor reviews.

- Establish a mechanism to identify and address case management problems that are prevalent and persistent among social workers, supervisors and regional offices.

- Implement a tracking system to monitor the implementation and results of recommendations resulting from child-death reviews.

We conducted this audit under the authority vested in the California State Auditor by Government Code 8543 et seq. and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives specified in the Scope and Methodology section of the report. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
California State Auditor

Date:    May 21, 2019

# Appendix

## SCOPE AND METHODOLOGY

The Joint Legislative Audit Committee directed the California State Auditor to evaluate the department's procedures and practices for responding to allegations of child abuse or neglect. The audit scope includes eight audit objectives. The table below lists the audit objectives and the methods we used to address them.

**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | We reviewed relevant federal and state laws, regulations, and other background materials applicable to the department's processes for responding to child abuse or neglect in Los Angeles County. |
| 2 | Evaluate the department's responses to child abuse and neglect allegations to ensure it performs the following: | To address this objective, we judgmentally selected 30 risk assessments, 30 safety assessments, and 30 reunification assessments from fiscal years 2013–14 through 2017–18 and performed the tasks described below: |
| | a. Provision of timely and accurate safety, risk and reunification assessments that appropriately determined the severity of risk to the child. | • To determine if the safety, risk, and reunification assessments were conducted on time, we calculated the days for the completion of these assessments and compared them to required time frames. |
| | b. Provision of statutorily required background checks and history checks of all individuals who have access to the child. | • We reviewed the departmentwide data to identify the percentage of assessments completed on time. |
| | c. Assessments that include a thorough review of previous allegations of abuse and neglect. | • To determine the accuracy of safety, risk, and reunification assessments, we reviewed these assessments against department policies and case materials, including social worker case notes, meeting summaries, and, when applicable, court reports. |
| | | • We reviewed case files to determine if social workers conducted required background and history checks for all adults with access to children. |
| | | • We reviewed the accuracy of the assessments to ensure social workers included previous allegations of child abuse or neglect. |
| 3 | Determine the adequacy of the department's investigations, based on factors such as timeliness, adherence to policies, thoroughness, and appropriate assessments leading to effective actions taken to ensure child safety. | We used the referrals and supporting documentation we obtained for Objective 2 to meet this objective. |
| 4 | Determine whether the department is performing required wellness checks on children for whom it is responsible. | • We used the referrals and supporting documentation we obtained for Objective 2 to determine if social workers complied with applicable requirements. |
| | | • We reviewed departmentwide data to determine the department's overall compliance with ongoing monthly wellness visit requirements. |
| 5 | To the extent the department is not performing assessments, investigations, or wellness checks appropriately, identify the root cause of these deficiencies and propose solutions to address these causes. | We analyzed management processes for ensuring social workers and supervisors complied with state laws and departmental policies in our review of case files for Objectives 2, 3, and 4. |

*continued on next page…*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 6   Assess the adequacy of the department's efforts to examine and transform its practices in response to the deaths of children for whom it had responsibility or at least some level of previous contact. | • We reviewed department policies and interviewed staff to identify its processes for performing child-death reviews.<br><br>• We judgmentally selected and analyzed documentation related to 10 department child-death reviews from fiscal years 2013–14 through 2017–18 where the children had previously been the subjects of departmental referrals or cases.<br><br>• We reviewed the department's processes for sharing its child-death review findings and recommendations with social workers and supervisors and its processes for incorporating these recommendations into its policies and procedures. |
| 7   Evaluate whether the department has adequate processes to identify and protect LGBTQ youth. | • We reviewed a board of supervisors' motion that the department evaluate—and make recommendations for improving—its support of LGBTQ youth.<br><br>• We reviewed department plans and interviewed staff to evaluate how it identifies and protects youth who identify as LGBTQ and are in its system. |
| 8   Review and assess any other issues that are significant to the audit. | • To determine whether the department is meeting caseload limits, we reviewed the department's staffing levels and caseloads for each of its 19 regional offices.<br><br>• We interviewed staff and reviewed the department's quality assurance process to assess its process for identifying concerns and making systematic improvements. |

Source: Analysis of Joint Legislative Audit Committee audit request number 2018-126 and information and documentation identified in the table column titled Method.

### Assessment of Data Reliability

In performing this audit, we relied on the department's case, referral, and assessment data. The Government Accountability Office, whose standards we are statutorily required to follow, requires us to assess the sufficiency and appropriateness of the computer-processed information that we use to support our findings, conclusions, or recommendations. To evaluate these data, we performed electronic testing of the data, reviewed existing information about the data, and interviewed agency officials knowledgeable about the data. However, we did not perform accuracy and completeness testing of these data because they are from partially paperless systems and hard-copy documentation was not always available for review. Further, any available source documents for open child welfare services cases are maintained by social workers at different locations, making testing cost-prohibitive. Consequently, we found the data to be of undetermined reliability for the purposes of our audit. Although this determination may affect the precision of the numbers we present, there is sufficient evidence in total to support our findings, conclusions, and recommendations.



**County of Los Angeles**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**

425 Shatto Place, Los Angeles, California 90020
(213) 351-5602



BOBBY D. CAGLE
Director

BRANDON T. NICHOLS
Chief Deputy Director

Board of Supervisors
**HILDA L. SOLIS**
First District
**MARK RIDLEY-THOMAS**
Second District
**SHEILA KUEHL**
Third District
**JANICE HAHN**
Fourth District
**KATHRYN BARGER**
Fifth District

May 1, 2019

To:        Elaine M. Howell, CPA*
           California State Auditor

From:      Bobby D. Cagle
           Director

## RESPONSE TO THE CALIFORNIA STATE AUDITOR'S LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES AUDIT

Thank you for the opportunity to review the draft of the California State Auditor's audit of the Los Angeles County Department of Children and Family Services (DCFS).

We agree with the recommendations contained in the current report, and have already initiated corrective actions on the issues that were brought to our attention during the review process. My Department is committed to improving internal practices to ensure the health and safety of the children of Los Angeles County. We thank your staff for their professionalism and time in performing this review to help strengthen our operations.

If you have any questions or require additional information, please have your staff contact Onnie Williams III, Administrative Services Manager III, at (323) 881-1348.

BDC:BTN:DI:ow

Attachment

*"To Enrich Lives Through Effective and Caring Service"*

*   California State Auditor's comment appears on page 43.



**County of Los Angeles**
**DEPARTMENT OF CHILDREN AND FAMILY SERVICES**

425 Shatto Place, Los Angeles, California 90020
(213) 351-5602



BOBBY D. CAGLE
Director

BRANDON T. NICHOLS
Chief Deputy Director

Board of Supervisors
**HILDA L. SOLIS**
First District
**MARK RIDLEY-THOMAS**
Second District
**SHEILA KUEHL**
Third District
**JANICE HAHN**
Fourth District
**KATHRYN BARGER**
Fifth District

### Recommendations

① **To ensure that it protects children by completing investigations, assessments, home inspections, and background checks in a timely manner, the Department should do the following by November 2019:**

- **Require staff and supervisors to utilize tracking reports and email alerts to identify investigations and Structured Decision Making (SDM) assessments not completed on time after these activities should have been completed. Establish thresholds for the number of days that will trigger follow-up from the department's various levels of management.**

  The Department will work with its Business Information Systems (BIS) division to enhance existing management tracking reports that identify when investigations should be completed. An alert system will be developed to inform Children's Social Workers (CSWs), Supervising Children's Social Workers (SCSWs), and/or Assistant Regional Administrators (ARAs) of due dates when a referral has been open for 20 days. An alert system with notification triggers for outstanding SDM Safety and Risk Assessments will be developed for CSWs and SCSWs for further follow-up by regional administration teams. Staff and Supervisors will be trained to effectively utilize the enhanced tracking reports and alert system.

- **Implement a tracking mechanism to monitor and follow-up on uncompleted or undocumented initial home inspections and background checks.**

  To strengthen monitoring and follow-up practices on uncompleted or undocumented home inspections and background checks, the Department will issue a For Your Information (FYI) bulletin and enhance its policy so it includes a matrix of approval levels, to remind staff that background clearances and physical home inspections are to be completed, documented in CWS/CMS, and filed in hardcopy case files before being approved.

- **Implement a tracking mechanism to monitor Live Scan criminal record checks.**

Elaine M. Howle, CPA
May 1, 2019
Page 2

> To monitor timely Live Scan and criminal record checks, the Department will work with BIS to modify the Criminal Clearance Tracking System (CCTS) application to provide alerts to CSWs and SCSWs to allow for tracking and follow-up with caretakers and other adults who have not appeared for fingerprinting.

- **Conduct annual reviews of community organizations that perform home environment assessments to ensure that they complete these assessments on schedule.**

> On April 5, 2019, DCFS began on-site Technical Reviews with all Relative Home Assessment Services (RHAS) Community-Based Organizations (CBOs) for families served in 2017 and 2018. The reviews will be completed by May 31, 2019 and notifications of findings will be provided to the CBOs by June 30, 2019. The CBOs will be required to submit corrective action plans within 30 days for any findings of non-compliance. Follow-up reviews to ensure implementation of corrective action plans will occur on a selective basis through the end of 2019. In 2020 and annually thereafter, Technical Reviews will be completed for all RHAS CBOs.

> In addition to completing annual Technical Reviews, DCFS will work with its vendor to develop additional measures on its Resource Family Approval Tracking System (BINTI) to help verify and track the timeliness of RHAS CBO preliminary home environment assessments.

**To ensure that its staff appropriately use SDM assessments to identify safety threats and risks, the Department should by July 2019 incorporate SDM instructions into its policies and procedures and provide mandatory annual SDM training for applicable staff, supervisors, and other members of management by May 2020.**

The Department has been engaged in an SDM fidelity review with National Council on Crime & Delinquency (NCCD)/Children's Research Center (CRC). A policy is in the process of being developed on the use of the SDM assessments, and will coincide with the case-consultation coaching that ARAs will receive beginning May 2019; this will be completed by August 2019. Training for Trainers for SCSWs by CRC and South Academy will begin in November 2019 and be completed in January 2020. CSW training will be held in the Emergency Response Academy and will be accomplished by the fall.

**To ensure that supervisors review investigations, assessments, and other documentation on time, by November 2019, the Department should specify**

Elaine M. Howle, CPA
May 1, 2019
Page 3

**timeframes by which each type of document should be reviewed. In doing so, the Department should acknowledge the particular urgency of reviewing safety assessments and related safety plans, which are key to determining whether or not to leave a child in a home.**

In conjunction with the SDM Fidelity Review and the update of the Disposition of the Allegations policy, DCFS will develop a matrix outlining timeframes for supervisor and manager review of SDM Safety and Risk Assessments, home inspections, criminal clearances, and background checks.

**To improve the accuracy of its assessments, the Department should require its supervisors to regularly review and evaluate assessments against available evidence and observations, and implement this process by July 2019.**

The Department developed tools, and implemented a process in which each Assistant Regional Administrator is required to review and evaluate a sample of their supervisor's work product to ensure accuracy of the assessment against available evidence and observations. Additionally, each office will use the Summary of Findings as coaching opportunities and reinforce expectations to improve staff performance.

**To improve the quality of supervisors' reviews and to allow it to hold supervisors accountable, the Department should, by May 2020, reduce the number of social workers assigned to each supervisor to at least the ratio specified in its union contract.**

The Department will develop and implement a staffing plan to reduce the number of CSWs assigned to each SCSW to effectively align with the Span of Control as identified in the 2018 Memorandum of Understanding, Bargaining Unit 777 - Supervising Children's Social Worker, Article 44 – Caseloads, Section 1.

**To strengthen and improve its quality control processes, the Department should do the following by November 2019:**

- **Follow through on its plan to create a quality improvement division and increase the number of cases it regularly reviews.**

  The Department is in the process of designing a Quality Improvement (QI) division. The centralized division will have QI teams conducting ongoing, uniform comprehensive assessments of referrals and cases from all its regional offices and special programs to address CSW assessments and practice skills. The reviews will also evaluate the roles of supervisors and managers.

Elaine M. Howle, CPA
May 1, 2019
Page 4

- **Establish a mechanism to identify and address case management problems that are prevalent and persistent among social workers, supervisors, and regional offices.**

  To better understand the internal and systemic constructs affecting service delivery and practices, the QI teams will evaluate practices and identify enhancements and/or necessary system changes that address operational issues to improve present case practices. Together with its QI partners (Risk Management Division, Quality Service Review, Core Practice Model, and Training), the teams will provide feedback regarding practice strengths/gaps and system barriers and support skill development of workers and supervisors.

- **Implement a tracking system to monitor the implementation and results of recommendations resulting from child death reviews.**

  The Department will enhance its Child Fatality/Near Fatality (CF/NF) system so it better delineates action items and creates feedback loops with regional offices addressing issues noted on Summary of Findings reports. The system will include action items and note progress made towards addressing systemic issues identified in both case reviews and Administrative Review Round Tables.

  Additionally, enhancements have been made in the past year to the Department's review process to assist the regional offices with implementation of recommendations made as a result of child death reviews. A comprehensive Summary of Findings is sent at the end of each review to regional office administrations to be shared with SCSWs and CSWs detailing the strengths of the practices and how case practices can be further strengthened. Coaching guides, skill building tips, as well as suggested questions to be asked by CSWs when conducting investigations are provided to increase capacity. These tools enable workers to elicit better responses from families and build rapport to identify abuse and neglect, and determine what actions needs to be taken to ensure child safety.

  Finally, supervisory issues identified will be specifically outlined in reports. Our primary objective is skill-building and increasing capacity with regional management and SCSWS. The goal is to provide tools to better assist CSWS with training, investigations, more comprehensive assessments, and identifying child safety, as well as how to assess for parents' protective factors.

Blank page inserted for reproduction purposes only.

# Comment

## CALIFORNIA STATE AUDITOR'S COMMENT ON THE RESPONSE FROM THE LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES

To provide clarity and perspective, we are commenting on the department's response to our audit. The number below corresponds with the number we have placed in the margin of the department's response.

Although the department agreed with our findings and recommendations, some of the descriptions of its intended actions do not clearly outline how and when it will fully implement our recommendations. We look forward to receiving its 60-day response to this report identifying its progress and plans for implementing our recommendations.

①